**REPL**                                                    E-filed on:  August 28, 2013
HOWARD C. KIM, ESQ.
Nevada Bar No. 10386
E-mail: howard@hkimlaw.com
JACQUELINE A. GILBERT, ESQ.
Nevada Bar No. 10593
E-mail: jackie@hkimlaw.com
KATHERINE C.S. CARSTENSEN, ESQ.
Nevada Bar No. 10656
E-mail: katherine@hkimlaw.com
HOWARD KIM & ASSOCIATES
400 N. Stephanie St, Suite 160
Henderson, Nevada 89014
Telephone: (702) 485-3300
Facsimile: (702) 485-3301
*Attorneys for David A. Rosenberg, Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>WILLIAM A. GAYLER<br><br>         Debtor. | Case No.: BK-S-09-31603-MKN<br>Chapter 7<br><br>Hearing Date:  September 4, 2013<br>Hearing Time:  3:00 p.m.<br>Place:   Foley Federal Bldg.<br>        300 Las Vegas Blvd. S.<br>        Las Vegas, NV 89101<br><br>Hon. Mike K. Nakagawa |

**REPLY IN SUPPORT OF TRUSTEE'S MOTION TO DISQUALIFY COUNSEL FOR JOHN D. O'BRIEN PROFIT SHARING PLAN AND COUNSEL FOR BARRY R. MOORE AND JANIE MOORE AS CO-TRUSTEES OF THE BAMM LIVING TRUST DATED JULY 16, 2003, GROTH, LLC, CH PICHON, LLC, AND HARLAN LLC THROUGH THEIR MANAGING MEMBER JOHN O'BRIEN**

David A. Rosenberg, Chapter 7 Trustee ("Trustee") for the bankruptcy estate of William A. Gayler ("Gayler") and CH Angelus II, LLC, Case No. 12-22209-MKN ("Angelus II"), by and through his counsel of record, Howard Kim & Associates, respectfully submits this Omnibus Reply ("Reply") to Marquis Aurbach Coffing ("MAC") and Zachariah Larson's ("Larson") Oppositions to Trustee's Motion to Disqualify Counsel for John D. O'Brien Profit Sharing Plan ("O'Brien") and Counsel for Barry R. Moore and Janie Moore as Co-Trustees of the BAMM Living Trust Dated July 16, 2003 ("BAMM"), Groth, LLC ("Groth"), CH Pichon, LLC ("Pichon"), and Harlan LLC Through Their Managing Member John O'Brien ("Harlan")(collectively the "MAC Creditors").

HOWARD KIM & ASSOCIATES<br>400 N. STEPHANIE ST, SUITE 160<br>HENDERSON, NEVADA 89014<br>(702) 485-3300 FAX (702) 485-3301

- 1 -

This Reply is made and based upon the pleadings and papers on file herein, the attached

Memorandum of Points and Authorities, and any oral argument permitted at the hearing.

DATED this 28th day of August, 2013.

**HOWARD KIM & ASSOCIATES**

*/s/Howard C. Kim*
_____
Howard C. Kim, Esq.
Nevada Bar No. 10386
Jacqueline A. Gilbert, Esq.
Nevada Bar No. 10593
Katherine C.S. Carstensen, Esq.
Nevada Bar No. 10656
400 N. Stephanie St. Suite 160
Henderson, Nevada 89014
*Attorneys for David A. Rosenberg, Chapter 7 Trustee*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  LEGAL ARGUMENT**

**A.  This Motion to Disqualify Was Not Brought for an Improper Purpose**

MAC and Larson contend that the Trustee only brought this Motion to Disqualify to gain

a tactical advantage by silencing any voices that may object to the pending Motion to Approve

Settlement Agreement in the Gayler bankruptcy proceeding.[1]  This accusation is patently untrue.

Trustee brings this Motion to Disqualify not to silence any voices (the MAC Creditors will still

be free to make any objections they see fit after this disqualification[2]), but rather, to prevent

MAC and Larson from using confidential information obtained as counsel to James F. Lisowski,

Sr. ("Former Trustee") and the Trustee to the detriment of the Trustee and his efforts to bring

assets into the estate.  Preventing confidential information from being used against a former

client is a completely valid reason for bringing this disqualification motion.  *See Yellow Cab*

*Corp. v. Dist. Ct.*, 123 Nev. 44, 53, 152 P.3d 737, 743 (2007) (stating "One purpose of

disqualification is to prevent disclosure of confidential information that could be used to a former

---

[1] *See MAC Opp* [Dkt. No. 543] at pg. 3 ¶ 3-4, pg. 29 ¶ 8-10, and pg. 39 ¶ 22-23; *also Larson Opp* [Dkt. No. 547] at pg. 2 ¶ 11-12.

[2] In fact, pursuant to the Stipulation and Order filed on July 23, 2013 [Dkt. No. 529], if this Court grants Trustee's Motion to Disqualify, the Trustee has agreed to continue the hearing on Trustee's Motion to Approve Settlement Agreement to a later date to provide the MAC Creditors ample time to obtain new counsel and make any objections they see fit.

**HOWARD KIM & ASSOCIATES**
400 N. STEPHANIE ST. SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

client's disadvantage."). The reason the Trustee brings this Motion to Disqualify now is that this is the first time the conflict, which has always existed, has been so blatantly and belligerently adverse.

As the Trustee will show, MAC, as counsel for the MAC Creditors, was conflicted out of representing the Trustee from the beginning. Despite this, MAC purposefully downplayed the conflict on its employment application, seeking out this representation as a means to obtain information to further the MAC Creditors' interests in the state court litigation and control the direction of Gayler's bankruptcy. After the Trustee was appointed and understood the complexities involved in the case, the severity of the conflict in MAC's dual representation of the MAC Creditors and the Trustee became undeniable. *See Rosenberg Declaration*. The Trustee gave MAC the option to voluntary withdrawal as counsel for the Trustee and waive all fees (which totaled over 1 million dollars). At that time, the Trustee also demanded that MAC withdraw as counsel for the MAC Creditors. On April 11, 2013, MAC withdrew as counsel for the Trustee and agreed not to file an application for compensation. On or around July 10, 2013, the Trustee discovered that not only was MAC no longer going to voluntarily withdraw as counsel, but, on the contrary, MAC now intended to proceed as counsel for the MAC Creditors in the state court action that sought to disgorge Gayler of his interests in CH Angelus, LLC ("Angelus I") and CH Angelus II, LLC ("Angelus II"). Additionally, MAC intended to participate in Gayler's bankruptcy and oppose the Trustee's currently pending Motion to Approve Settlement Agreement (the same settlement agreement that MAC drafted and negotiated). This was the last straw; it brought the conflict inherent in MAC's dual representation to a head. As such, on July 17, 2013, the Trustee defended the estate by filing this instant Motion to Disqualify [Dkt. No. 524].

**B. MAC Does Not Dispute the First Two Elements of Disqualification**

In *Yellow Cab Corp. v. Dist. Ct.*, the Nevada Supreme Court held that the elements for disqualification of an attorney who has a conflict with a former client are: (1) that an attorney-client relationship existed; (2) that the former matter and the current matter are substantially related, and (3) that the current representation is adverse to the party seeking disqualification.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

*See* Yellow Cab Corp. v. Dist. Ct., 123 Nev. 44, 50, 152 P.3d 737, 747 (2007). All doubts are resolved in favor of disqualification. *Yellow Cab Corp.*, 123 Nev. at 53, 152 P.3d at 743.

Here, MAC concedes that it had an attorney-client relationship with the Former Trustee and the Trustee. As to the second factor, MAC does not deny that its representation of the Former Trustee and the Trustee is substantially related to its representation of the MAC Creditors. Finally, as shown more fully below, a conflict of interest has materialized that is so adverse to the Trustee's interests that MAC's continued representation of the MAC Creditors would be unconscionable. The Trustee has more then met its burden under Rule 1.9 of the Nevada Rules of Professional Conduct ("NRPC") for disqualification.

## C. MAC Should Have Never Represented the Trustee in the First Place

Pursuant to Rule 1.7 of the Nevada Rules of Professional Conduct, a lawyer cannot represent concurrent clients if the representation of one client will be directly adverse to another client or if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client. *See* N.R.P.C. Rule 1.7.

Moreover, 11 U.S.C. § 327(a) prohibits the employment of professional persons that hold or represent an interest adverse to the estate and 11 U.S.C. § 327(c) prohibits employment if there is an actual conflict of interest. *See* 11 U.S.C. § 327(a) and (c).

At the time the application for employment was filed, MAC was prosecuting five different lawsuits on behalf of the MAC Creditors in the Eighth Judicial District Court and Gayler's bankruptcy proceeding.[3] All five of these lawsuits named Gayler as a defendant.[4] Moreover, two of MAC's partners/attorneys, Dale Hayes and Phillip Aurbach, personally held membership interests in several of the Gayler Entities while working on these matters for the estate. *See Summary*, attached hereto as **Exhibit "1"**, at pg. 1.

Despite MAC's claims to the contrary, the interests of the estate and the MAC Creditors were always actual and adverse. As a fiduciary for the estate, the Trustee is charged with bringing assets into the bankruptcy estate for the benefit of ALL of the creditors. This includes

---

[3] *See Hayes Decl* [Dkt. No. 544] at pg. 2 ¶ 7-18.
[4] *See Id.*

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST. SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

the MAC Creditors, Dale Hayes, and Phillip Aurbach.  If money came into the estate, all creditors were entitled to a pro-rata share.  Of course, priority creditors would get paid first, and, in this case, the IRS has filed a proof of claim for $1,891,092.85, all of which is a priority claim. *See Claims Registry*, Claim 2-1.  Thus, if all of Gayler's assets were administered and liquidated in the bankruptcy estate, the majority of monies coming into the estate would be for the benefit of the IRS; the MAC Creditors and individuals like Phillip Aurbach and Dale Hayes would get little if anything.  Faced with this unfavorable result, MAC's primary interest, as counsel for the MAC Creditors, became to prevent this orderly administration of the estate and obtain as much money as possible for the MAC Creditors.  On a personal level, MAC wanted to punish Gayler for his misconduct and make sure that Gayler did not receive a discharge in the case.

MAC accomplished these goals by soliciting the Former Trustee and offering to work for the estate on contingency, including advancing all fees and costs.  Unaware of MAC's ulterior motives and the significant conflicts, the Former Trustee agreed to let MAC assist his efforts. On April 14, 2011, MAC on behalf of the Former Trustee, drafted an employment application and moved the Court to employ MAC as special counsel.  In the employment application, supported by the Declaration of Phillip S. Aurbach, MAC states:

> "Marquis Aurbach Coffing **has represented** the following individuals and entities which are **possibly related** to this bankruptcy case:  Barry R. Moore, Janie Moore, Eroom Holdings, LP and Barry R. Moore and Janie Moore, Co-Trustees of the BAMM Living Trust dated July 16, 2003, John D. O'Brien, as the Trustee of the John D. O'Brien Profit Sharing Plan, Donald Campbell, Colby Williams, Mario P. Borini, Individually and as Chairman of the Board of Trustees of The Alexander Dawson Foundation, John and Lorraine Esposito, CH Angelus, LLC, CH Angelus II, LLC, ICON Real Estate Services, of which William Gayler was the President, in a real estate transaction."

*See Application for Employment* [Dkt. No. 192] at pg. 2 ¶ 15-22 (emphasis added).

As this Court can see, MAC made a cursory disclosure and significantly downplayed the conflicts involved in their dual representation of the MAC Creditors and the Former Trustee in this case.[5]  Moreover, MAC did not disclose the fact that two of its attorneys, Dale Hayes and Phillip Aurbach, held membership interests in several of the Gayler Entities and thus were not

---

[5] In the application for employment, MAC stated that they represented individuals possibly related to Gayler's bankruptcy case.  In fact, MAC was actively representing the John D. O'Brien Profit Sharing Plan in a state court action, who was not only a creditor in Gayler's bankruptcy case, but was one of the three petitioning creditors that forced Gayler into bankruptcy in the first place.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

HOWARD KIM & ASSOCIATES

400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

1    eligible to be employed under § 327.[6]  Furthermore, in its opposition, MAC states that it

2    represents a number of creditors in the bankruptcy proceeding, including but not limited to,

3    William Godfrey, Bianca Borini and Joseph Borini.[7]  These three creditors were not disclosed in

4    MAC's application for employment.

5            Nevertheless, in his opposition, Larson attempts to rewrite history and insists that MAC's

6    employment application is credible and provided the Former Trustee full disclosure of the

7    conflict involved in this case.[8]  Larson then goes on to state that the Court should treat this

8    signed Application to Employ as satisfactory and take judicial notice of this document to find

9    that the Former Trustee had knowledge of—and gave informed consent to—MAC's dual

10   representation in this case.[9]  Trustee disagrees with this self-serving request and sees no reason

11   why he should be bound by the wildly misleading and factually incorrect statements contained in

12   MAC's employment application.

13           That said, even if the Court could uncover some subtle veracity in MAC's application,

14   given the conflicts involved, MAC should never have asked to represent the Former Trustee in

15   this matter, as it could not zealously advocate for both the MAC Creditors and the bankruptcy

16   estate.

17       **D.  MAC Obtained Confidential Information During Its Representation**

18           MAC and Larson adamantly maintain that the Former Trustee and the Trustee did not

19   provide them with any confidential information.[10]  As mentioned previously, MAC was

20   employed as Special Counsel to the Former Trustee on or around May 23, 2011 and voluntarily

21   withdrew as Trustee's counsel on or around April 11, 2013.  Thus, MAC represented the Former

22   Trustee and the Trustee for almost **two years**.  During those two years, MAC, as counsel for the

23   Former Trustee and the Trustee, conducted over 29 examinations under Rule 2004 and reviewed

24   over 45,000 documents consisting of bank records, tax returns and transfer documents.[11]  MAC

25

26   [6] *See Summary*, Exhibit 1, at pg. 1.
     [7] *See MAC Opp* [Dkt. No. 543] at pg. 1, ft. 1.
27   [8] *See Larson Opp* [Dkt. No. 547] at pg. 16 ¶ 19-25.
     [9] *See Id.*
28   [10] *See MAC Opp* [Dkt. No. 543] at pg. 18 ¶ 12-14; *see also Larson Opposition* [Dkt. No. 547] at pg. 7 ¶ 7-11.
     [11] *See MAC Opp* [Dkt. No. 543] at pg. 18 ¶ 7-10.

admits this in their opposition but asks the Court to not make the reasonable inference that MAC must have been privy to privileged information and confidential case strategy developed by the Former Trustee and the Trustee.  MAC would have the Court discount its admission, in an e-mail dated April 17, 2013, attached hereto as **Exhibit "2"**, that it has "institutional knowledge" of the case.  Likewise, MAC makes no mention to the Court of the e-mail, dated February 4, 2012, attached hereto as **Exhibit "3",** where MAC admits it shared discovery information gathered by counsel for the MAC Creditors and counsel for the Former Trustee and the Trustee.  Instead, MAC asks the Court to assume that, in spending over 1 million dollars in fees and costs to develop this institutional knowledge, no confidential information was ever disclosed to MAC.

Finally, MAC even has the audacity to claim that any information it gathered for the estate concerning the Angelus investments and Diamante Rose was obtained by MAC through its representation of the MAC Creditors, not working as counsel to the Former Trustee.[12]  Given the substantial relatedness of Gayler's bankruptcy and the state court actions, it is hard to believe that there was no overlap in the accumulation of information used in prosecuting these cases, especially when the 2004 examination of Gayler, attached hereto as **Exhibit "4",** shows that MAC used its position as Trustee's counsel to further discovery efforts in the MAC Creditors' state court litigation.

Mr. Aurbach:  The first thing I want to talk to you about is Gloria's computer.  Do you remember on August 15th there was a hearing where your attorneys went.  You didn't go.  It was actually Rob Edelman that went.  And the judge ordered to allow a copy of Gloria's computer?

Mr. Kneeland:  Objection.  Is this about the bankruptcy proceeding or the state court proceeding?

Mr. Aurbach:  The bankruptcy proceeding.  The judge ordered to allow a copy of Gloria's computer.  Were you aware of that?

Mr. Gayler:  I guess to answer that, I believe that's part of the state court action.  I don't think that has anything to do with the bankruptcy.

Mr. Aurbach:  So you're not going to answer that question?

Mr. Gayler:  I'll answer it.  I just want to let you know that was part of the state action, not the bankruptcy.

Mr. Aurbach:  You were aware that order was entered?

Mr. Gayler:  I was aware there had been a motion and a decision by the judge, but I had not seen any kind of court order.

Mr. Aurbach:  You hadn't seen it, but you had heard that there was an order by the judge?

Mr. Gayler:  Verbal orders I don't believe are relevant.

Mr. Aurbach:  Right.  But I was just saying that you knew of the court order on Monday, August 15th?

Mr. Gayler:  My attorneys kept me informed of what happened in the hearing.

---

[12] *See MAC Opp* [Dkt. No. 543] at pg. 18 ¶ 10-13.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

Mr. Aurbach:  The computer that was at issue was Gloria's computer.  Does she have more than one computer?

Mr. Gayler:  Again, I don't know what that has to do with my 2004 Examination.

*See 2004 Examination*, Exhibit 4 at pg. 6 ¶ 6-25 and pg. 7 ¶ 1-14.

Mr. Aurbach:  Has Diamante Rose ever been in bankruptcy?

Mr. Gayler:  You're asking questions about an adverse legal complaint.  I don't know I have any answers.

Mr. Aurbach:  I don't know what you're talking about.

Mr. Gayler:  Diamante Rose is part of a bankruptcy litigation.

Mr. Aurbach:  I don't understand.  I don't know that.  Tell me what's happening.

Mr. Gayler:  Ask your client, John O'Brien.

Mr. Aurbach:  He's not my client.  My client is the trustee.

Mr. Gayler:  He is your client within this law firm, is he not?

Mr. Aurbach:  He's not my client.

Mr. Gayler:  Is he the law firm's client?

Mr. Aurbach:  I want to know what Diamante Rose is doing.  What are you talking about?  You don't know?

Mr. Gayler:  Phil, all I can tell you is there's a lawsuit against me in the bankruptcy court with Diamante Rose's name on it.  And I don't think I have to talk to you about that because that would be trying to get your discovery process started.  All I can tell you is to the best of my knowledge, I have 11.25 percent invested in TGF Holding LP.

*See 2004 Examination*, Exhibit 4 at pg. 43 ¶ 4-25 and pg. 44 ¶ 1-3.

Thus, despite MAC's repeated contentions to the contrary, MAC clearly obtained information related to Diamante Rose by and through its representation of the Trustee and not the MAC Creditors.

At this point, it is simply impossible to separate facts and information MAC and Larson gathered as counsel for the MAC Creditors from those gathered as counsel to the Former Trustee and Trustee, particularly as the state court litigation is so substantially related to Gayler's bankruptcy.  Given the vast amount of "institutional knowledge" at stake, the Trustee believes that disqualification is the only means available to prevent purposeful or inadvertent disclosure of confidential information gathered as Trustee's counsel.

### E.  MAC Spearheaded the Adversary Action to Recover Gayler's Interests in Various Entities, Including CH Angelus, LLC and CH Angelus II, LLC

MAC was employed as special counsel to assist the Former Trustee in recovering assets of the estate by and through fraudulent conveyance and/or preference actions.[13]  To that end, on

---

[13] *See Application for Employment* [Dkt. No. 192] at pg. 3 ¶ 6-17.

HOWARD KIM & ASSOCIATES

400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014

(702) 485-3300 FAX (702) 485-3301

December 23, 2011, MAC initiated Adversary Case No. BK-S-11-01410-mkn to, among other things, bring Gayler's interests in Angelus I and Angelus II into the bankruptcy estate.[14]

The Trustee believes, and has always believed, that Gayler's interests in Angelus I and Angelus II belong to the bankruptcy estate. Moreover, the Trustee, in keeping with the Former Trustee's position on the matter, has vehemently refused to allow Gayler's interests to be disgorged to the CH Angelus members.

In its opposition, MAC claims that the MAC Creditors share the Trustee's position regarding Gayler's interests in Angelus I and Angelus II.[15] However, in the e-mail from Phillip Aurbach to the creditors on September 24, 2012, attached hereto as **Exhibit "5"**, Aurbach states:

> "The Trustee's position is that the Estate will abide by the arbitrator's decision. The Trustee did **not** and does **not** agree to allow disgorgement to CH Angeles members as speculated to in our conference call."

*See E-mail*, Exhibit 5 at pg. 2.

Clearly, at that time, back in September of 2012, MAC was aware of a conflict with the MAC Creditors and should have foreseen that it would one day lead to a motion to disqualify MAC.

Now, with Gayler's interests in Angelus I and Angelus II are up for arbitration, MAC, as counsel for the MAC Creditors, wants a free pass to help disgorge Gayler of any and all membership interests in Angelus I and Angelus II. This position is directly adverse to the estate and contrary to the adversary action filed by the Trustee, with MAC's assistance; that adversary still seeks to bring those interests into the estate. Somewhat shockingly, MAC refuses to acknowledge or accept that an intractable conflict exists in this case.[16]

## F. MAC Submitted the Prior Settlement Agreement to the MAC Creditors and They Rejected It

In its opposition, MAC recounts that the Former Trustee considered settling with Gayler back in 2012, but that the proposed settlement was rejected by the MAC Creditors.[17] In rejecting

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

---

[14] *See Amended Complaint* [Adv. Dkt. No. 80] at pg. 74 ¶ 3-15.
[15] *See MAC Opp* [Dkt. No. 543] at pg. 33 ¶ 17-21.
[16] *See MAC Opp* [Dkt. No. 543] at pg. 3 ¶ 2.
[17] *See MAC Opp* [Dkt. No. 543] at pg. 19 ¶ 11-19 and pg. 20 ¶ 1-6.

the settlement agreement, the MAC Creditors made it abundantly clear to the Former Trustee that they would not approve any settlement where Gayler would receive any money.[18]

Without question, MAC never should have advised the Former Trustee to submit this potential settlement agreement to the MAC Creditors for approval in the first place.  MAC and Larson seem to confuse the fact that the Trustee's duties are to benefit ALL of the creditors of the estate, not just the MAC Creditors; this same duty is owed by MAC as Trustee's special counsel.  Here, the MAC Creditors represent less than a quarter of the creditors listed in the Claims Registry[19] and the total sum of their proofs of claim[20] is less than 8% of the total amount claimed by the all of the creditors in the Gayler estate.  Even so, somehow MAC provided this minority with special veto rights.  As special counsel, MAC should have ignored the MAC Creditors' wishes and, if the settlement was in the best interests of the estate, should have submitted it to the Court for approval, just as the Trustee is doing now.[21]  Had MAC lived up to its duty, the MAC Creditors would still have had an opportunity to oppose the settlement and the Court, after taking all opinions under advisement, would have been the final arbiter of what was in the best interests of the estate.  The fact that the settlement was not pursued simply because the MAC Creditors had special access and their opinions were given disproportional weight highlights the inherent conflict that has always been present in MAC's dual representation of the MAC Creditors and the Former Trustee and the Trustee.[22]

///

///

---

[18] *See Id.*

[19] Though 35 claims were filed in the Claims Registry, claim number 34 was withdrawn.  As such, the MAC Creditors, proofs of claim 22-29, only represent 8 of the remaining 34 active creditors in the Gayler Claims Registry.

[20] Proof of claim number 29 claims an unknown amount, therefore the Trustee does not include this value in these figures.

[21] In its opposition, MAC seems appalled that the Trustee submitted the pending Motion to Approve Settlement Agreement without consulting them.  *See MAC Opp* [Dkt. No. 543] at pg. 25 ¶ 1-2.  That is how it always should have been.  The Trustee, as an unbiased fiduciary for the estate, is to do what is in the best interests of the estate and ALL of the creditors.  While the Court is free to consider the disapproval of specific creditors to the Trustee's actions, by way of filed oppositions and the like, the Trustee has no duty to adhere to the whims of specific creditors in fulfilling his fiduciary duty to the estate.

[22] The conflict that has now materialized, should have materialized back in 2012.  The only reason it did not is because MAC, as counsel for the Trustee, was able to use its position to prevent the Trustee from pursuing a settlement that the MAC Creditors opposed.  The interests of the estate and the interests of the MAC Creditors were never aligned, as argued by MAC.  MAC was merely able to give the appearance of alignment by not pursuing motions in the bankruptcy that the MAC Creditors would have opposed.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST, SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

### G.  MAC Cannot Imply Consent from the January 23, 2013 Hearing

MAC and Larson claim that the Trustee gave "informed" consent by representations made at a January 23, 2013 hearing.[23]  Even if the court were inclined to view these statements as consent, it cannot be said that this consent was "informed."  After all, in its opposition, MAC states that at the February 4, 2013 meeting (to be discussed more fully below), the Trustee was new to the Gayler matters and was just learning the case.[24]  Similarly, in Larson's opposition, he states that at the time of the February meeting, "Trustee Rosenberg had no knowledge of the case."[25]  Taking MAC and Larson's assertions as true, than any perceived consent given by the Trustee two weeks earlier at the January hearing certainly could not have been "informed" for the purposes of NRCP 1.9.

### H.  MAC Grossly Mischaracterizes the February 4, 2013 Meeting

On February 4, 2013, the Trustee, Howard C. Kim of Howard Kim & Associates, Phillip Aurbach of MAC, Terry Coffing of MAC, Larson of MAC, Liane Wakayama of MAC, and Dale Hayes of MAC, met for over two hours and discussed the Trustee's concerns regarding the state court litigation and bankruptcy proceedings.  Contrary to MAC's assertion that this meeting was to get the Trustee up to speed, the Trustee demanded the meeting so that MAC could explain its actions in the case.  The number of attorneys and partners in attendance at this meeting evidences the gravity of the Trustee's concerns.

In his opposition, Larson faults the Trustee for not objecting to the participation of any counsel present at the February 4, 2013 meeting on the basis of an alleged conflict.[26]  However, as the application that employed MAC as special counsel did not specify individual attorneys that were to be acting as counsel to the Trustee, the Trustee reasonably believed that all of the attorneys present, including Larson, were his attorneys in the Gayler bankruptcy.  As such, the Trustee had no reason to object to anyone's participation at the meeting, especially not when he made it clear to MAC that he expected every lawyer involved in the Gayler representation to attend.

---

[23] *See MAC Opp* [Dkt. No. 543] at pg. 30 ¶ 20-22; *see also Larson Opp* [Dkt. No. 547] at pg. 18 ¶ 25-28.
[24] *See MAC Opp* [Dkt. No. 543] at pg. 22 ¶ 3-5.
[25] *See Larson Opp* [Dkt. No. 547] at pg. 14 ¶ 4-7.
[26] *See Larson Opp* [Dkt. No. 547] at pg. 5 ¶ 26-28 and pg. 6 ¶ 1-2.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

**I.    MAC Cannot Manufacture Consent By Pointing to the February 14, 2013 Filing**

In their oppositions, MAC and Larson contend that the Trustee also gave "informed" consent to the conflict by and through statements made in the Motion for Partial Summary Judgment, filed on February 14, 2013.[27]  Again, MAC reaches too far on too little.

Statements made in the Motion for Partial Summary Judgment, drafted by MAC as counsel for the Trustee, are not the equivalent of a sworn declaration by the Trustee.  In fact, these statements do nothing more than show that the Trustee was prepared to fight for the estate in state court to avoid multiple conflicting judgments on the matter.  Nowhere did the Trustee ever agree to allow disgorgement or permit his own counsel to represent adverse parties seeking disgorgement of what the Trustee believes is property of the bankruptcy estate.

Moreover, even if the Court could construe these statements as amounting to implied consent, surely it cannot be said that such implied consent was "informed".  As stated previously, MAC believes that at the February 4, 2013 meeting, the Trustee was new to the Gayler case and was just getting up to speed.[28]  Moreover, Larson is convinced that at the time of the February 4, 2013 meeting, the Trustee had no knowledge of the case.[29]  Given MAC and Larson are so sure that the Trustee knew nothing, their claims here that the Trustee gave informed consent by permitting MAC to file this motion has no foundation.  Again, pursuant to Rule 1.9 of the NRPC, any implied consent that may have been given here cannot be said to be "informed".

**J.    MAC Voluntarily Withdraws as Counsel for the Trustee**

In its opposition, MAC argues that since the Trustee did not object to the representation earlier, he has waived his right to object now.[30]  Though the Trustee was suspicious of the conflict after he was appointed to the case in December of 2012, he was careful not to make accusations before he fully understood the extent of the conflict.  Moreover, the Trustee felt it was in the best interest of all creditors not to prematurely move to disqualify, if the conflict could be avoided through settlement.  As such, any delay by the Trustee in objecting to the conflict was

---

[27] *See MAC Opp* [Dkt. No. 543] at pg. 23 ¶ 9-20 and pg. 24 ¶ 1-11; *see also Larson Opp* [Dkt. No. 547] at pg. 18 ¶ 22-26.
[28] *See MAC Opp* [Dkt. No. 543] at pg. 22 ¶ 3-5.
[29] *See Larson Opp* [Dkt. No. 547] at pg. 14 ¶ 4-7.
[30] *See MAC Opp* [Dkt. No. 543] at pg. 36 ¶ 2-3.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST, SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

reasonable in this case.  Furthermore, delay alone is insufficient to establish a waiver.  *See Yellow Cab Corp.*, 123 Nev. at 49, 152 P.3d at 740 ("Waiver requires the intentional relinquishment of a known right.  If intent is to be inferred from conduct, the conduct must clearly indicate the party's intention.  Thus, the waiver of a right may be inferred when a party engages in conduct so inconsistent with an intent to enforce the right as to induce a reasonable belief that the right has been relinquished.  However, delay alone is insufficient to establish a waiver.").

In this case, when the time was right, the Trustee discussed with MAC its voluntary withdrawal as counsel and its agreement not to seek fees.  On April 11, 2013, MAC voluntarily withdrew as Trustee's counsel and did not file an application for compensation of the million dollars in fees accumulated over almost two years of representation.  *See In re Kobra Properties*, 406 B.R. 396, 403 (Bankr. E.D. Cal. 2009) ("Moreover, representing or holding at any time during the case an "interest adverse to the interest of the estate with respect to the matter on which such professional person is employed" constitutes a basis to deny all compensation.").  Trustee thought that, along with its withdrawal as Trustee's counsel, MAC would also withdraw from representing the MAC Creditors.  When MAC made it known that it was continuing its representation of the MAC Creditors at the expense of the estate, the Trustee had no choice but to object.

### K.  MAC Reappears After the Motion to Approve Settlement Agreement Was Filed

On July 3, 2013, after efforts were taken to reach an acceptable settlement agreement with Gayler, the Trustee filed a Motion to Approve Settlement Agreement [Dkt. No. 516].  While the Trustee does not feel it is necessary to defend the merits of this pending settlement in this Motion to Disqualify, as the Court will be ruling on that motion at a later date, the Trustee believes it is important to set a few things straight.

First, Larson contends that the settlement agreement will do nothing but provide the estate with something that is already property of the estate, that being Gayler's legal and equitable interests in the various entities listed in his schedules (the "Gayler Entities").[31]  This is

---

[31] *See Larson Opp* [Dkt. No. 547] at pg. 15 ¶ 24-26.

**HOWARD KIM & ASSOCIATES**
400 N. STEPHANIE ST, SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

HOWARD KIM & ASSOCIATES

400 N. STEPHANIE ST. SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

an incorrect statement.[32]  After all, for over a year and a half, by and through Adversary Case No. 11-01410, the Former Trustee, with MAC as his special counsel, has been trying to bring the Gayler Entities into the estate, with minimal success.

Furthermore, in bringing the Motion to Approve Settlement Agreement, the Trustee has not ignored his fiduciary duties and aligned himself with Debtor, as MAC and Larson have so accused.[33]  Rather, the Trustee is satisfying his fiduciary duty to do what is in the best interest of the estate and ALL of the creditors.  Again, MAC and Larson seem to confuse the fact that the Trustee's duties are to benefit ALL of the creditors of the estate, not just the MAC Creditors.  The Trustee does not seek to condone Gayler's alleged wrongdoing, by bringing the Motion to Approve Settlement Agreement; the Trustee is doing what he believes is in the best interest of the estate (which is not necessarily pursing Gayler at all costs).  The Trustee, with a fresh, unbiased perspective on the case, concluded that it was in the estate's best interest to settle with Gayler and bring assets quickly into the estate rather than punish Gayler for his wrongdoing.

In his opposition, Larson states, "…if an opposition is filed to the Settlement Motion, none of the information utilized…would be 'confidential' information provided by the trustee to Larson or L&Z.  Rather, all of it would be information gathered through discovery or information that is already part of the Court record."[34]  Again, the problem with this lies in the fact that MAC admits it shared discovery information and used its position as Trustee's counsel to further discovery efforts in the MAC Creditors' state court litigation.[35]  Accordingly, the Trustee is justifiably hesitant to believe Larson when he states that any opposition filed would not utilize information obtained by MAC as counsel for the Trustee.

///

///

///

---

[32] In the Court's Order on Trustee's Motion for Turnover of Non-Exempt Personal Property and Funds Purusant to 11 U.S.C. §§ 541 and 542 [Dkt. No. 460], the Court found that "The Trustee can pursue recovery of the Debtor's interests in the scheduled entities, including proceeds of the sale of real estate by the Sunset Entities, only through an adversary proceeding."
[33] *See MAC Opp* [Dkt. No. 543] at pg. 31 ¶ 11-15; *see also Larson Opp* [Dkt. No. 547] at pg. 17 ¶ 18-19.
[34] *See Larson Opp* [Dkt. No. 547] at pg. 14 ¶ 28 – pg. 15 ¶ 3.
[35] *See E-mail*, Exhibit 2.

**L.   Larson and L&Z Must Be Disqualified**

1.   Larson is Imputed by His Association with MAC

In his opposition, Larson contends that he did not do any work and was not involved in the representation of the Trustee as Special Counsel.[36]  Larson also contends that he did not do any work and was not involved in the representation of any of the other creditors in the Gayler bankruptcy or in any other matter until on or about December 15, 2012.[37]

Despite these contentions, Larson filed a Reply in Support of Trustee's Motion for Turnover of Non-Exempt Personal Property and Funds Pursuant to 11 U.S.C. §§ 541 and 542 [Dkt. No. 453] in Gayler's bankruptcy case on June 4, 2012.  Moreover and more importantly, Larson filed several documents in Adversary Action No. 1-01410-mkn on behalf of the Former Trustee, including a Stipulation [Adv. Dkt. No. 202], a Motion for Summary Judgment [Adv. Dkt. No. 219], a Statement of Undisputed Material Facts in Support [Adv. Dkt. No. 220], and a Notice of Hearing [Adv. Dkt. No. 221].  All four of these documents were filed by Larson in the adversary action prior to December 15, 2012.

From these filings, in addition to the fact that Larson attended the February 4, 2013 meeting where Gayler's bankruptcy was being discussed, it is reasonable to infer that Larson was involved in the representation of the Former Trustee and the Trustee as Special Counsel and was privy to confidential information.  *See Waid v. Eighth Judicial Dist. Court ex rel. Cnty. of Clark*, 121 Nev. 605, 610, 119 P.3d 1219, 1222 (2005) ("The court should instead undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter.").  As such, Larson must be disqualified.

2.   L&Z Must Be Disqualified

No member of a law firm is allowed to represent a client if any one of them would be prohibited from undertaking the representation.  N.R.P.C. 1.10.  As shown above, Larson cannot represent the MAC Creditors in the CH Angelus II, LLC bankruptcy proceeding due to his previous association with MAC.  Importantly, Larson has provided no evidence that he was timely screened from any participation in the matter or that he is not going to receive any part of

---

[36] *See Larson Opp* [Dkt. No. 547] at pg. 3 ¶ 7-10.
[37] *See Larson Opp* [Dkt. No. 547] at pg. 3 ¶ 9-12.

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

the fee obtained from the MAC Creditors, in accordance with N.R.P.C. 1.10.[38]  Larson is

therefore prohibited from undertaking this representation and L&Z must also be disqualified as

counsel for the MAC Creditors.

### 3.  Disqualification is Appropriate Under the Brown Factors

When analyzing a potential disqualification, courts must balance three competing

interests:  (1) the individual right to be represented by counsel of one's choice; (2) each party's

right to be free from the risk of even inadvertent disclosure of confidential information; and (3)

the public's interest in the scrupulous administration of justice.  *See Brown v. Eighth Judicial*

*Dist. Court ex rel. County of Clark*, 116 Nev. 1200, 1205 (Nev. 2000).  While the MAC

Creditors certainly have a right to be represented by counsel of their choice, it cannot be said that

this right is absolute.  Here, where Gayler's bankruptcy case is substantially related to the state

court litigation initiated by the MAC Creditors, and, further, MAC admits that it shared

discovery information in these cases, the risk of inadvertent disclosure of confidential

information gained as counsel to the bankruptcy estate is substantial.  The Trustee should not be

subjected to this inherent risk, particularly when it was MAC that created this risk in the first

///

---

[38]  **Rule 1.10.    Imputation of Conflicts of Interest.**
    (a)  While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.9, or 2.2, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.
    (b)  When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm unless:
        (1)  The matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
        (2)  Any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter.
    (c)  A disqualification prescribed by this Rule may be waived by the affected client under the conditions stated in Rule 1.7.
    (d)  Reserved.
    (e)  When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under Rule 1.9 unless:
        (1)  The personally disqualified lawyer did not have a substantial role in or primary responsibility for the matter that causes the disqualification under Rule 1.9;
        (2)  The personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
        (3)  Written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.
    [Added; effective May 1, 2006.]

HOWARD KIM & ASSOCIATES
400 N. STEPHANIE ST, SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

place by agreeing to represent both the Trustee and the MAC Creditors.  All things considered, disqualification is appropriate in this case under the Brown factors.

## II.  CONCLUSION

For the reasons stated above, disqualification of MAC, Larson, and L&Z as counsel for the MAC Creditors is appropriate in this case.

DATED this 28th day of August, 2013.

**HOWARD KIM & ASSOCIATES**

*/s/Howard C. Kim*
Howard C. Kim, Esq.
Nevada Bar No. 10386
Jacqueline A. Gilbert, Esq.
Nevada Bar No. 10593
Katherine C.S. Carstensen, Esq.
Nevada Bar No. 10656
400 N. Stephanie St. Suite 160
Henderson, Nevada 89014

*Attorneys for David A. Rosenberg, Chapter 7 Trustee*

**HOWARD KIM & ASSOCIATES**
400 N. STEPHANIE ST., SUITE 160
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

- 17 -

# EXHIBIT 1

# Marquis-Aurbach-Coffing Conflicts
# William Gayler Estate
# Summary

*The law firm of Marquis-Aurbach has been representing Gayler or companies Gayler is directly or indirectly affiliated with since the late 1990s. In addition Dale Hayes was a member in the DA 1147 LLC investment I formed in early 2000s; his firm MA represented this company in several transactional legal issues. MA also represented CBM in his defense against DA 1147 for being overcompensated. Phil Aurbach was also a member is several LLC investments Gayler formed those being Sunset V LLC, Sunset 8 LLC and 360Life Media LLC.*

## Maya I-215 LLC vs Barry Moore Creditor

Maya I-215 LLC (M) co-developed and owned Trop-Beltway JV with Weingarten REIT (WR) a 650,000 sf retail center. Screaming Eagle LLC (SE) managed by Gayler & Moore was the Manager of M. In 2007 WR utilized a buyout clause in the JV agreement to purchase the 50% in the JV owned by M for $40M. After the transaction had closed Creditor Barry Moore (CBM) sued Gayler in state court for allegedly not paying CBM all the fees he was entitled under the SE operating agreement. CBM was sued by (M) thru its counsel Pengilly & Robbins (PR) on the basis that (SE) were paid SE a real estate commission of $1,200,000 that may not have been earned. Originally SE asserted that a commission was earned upon the sale of the asset however an asset sale never occurred. M did sell its 50% ownership but the transfer was a stock sale and there was never an asset transfer shown in the Clark County records. Several of the Class B members brought this discrepancy to my attention at which time Gayler notified CBM that they had better address this breach of contract issue with a membership meeting and be prepared to repay the entity the if the issue could not be resolved with the membership however CBM never responded. Subsequently I authorized a lawsuit to be filed on behalf of M in an attempt to recover the unearned commission. CBM retained MA to defend the lawsuit (while they were also CFT on the Gayler estate) and coerced what they claim was a majority of the membership to file a motion to dismiss and Judge Gonzales granted their motion on what is believed to be a rewriting of the operating agreement. An unbiased CFT could have joined in the suit with PR because had they been successful in recovering any funds from CBM it would have been distributed to both the Class A and Class B members which would have included a distribution to the Gayler estate. MA with their lack of action in trying to recover money for the estate and instead looking the other way for their clients have damaged the Gayler estate.

## DA 1147 LLC vs Barry Moore & Diversified Realty

DA 1147 LLC (DA) owned 18 +/- acres located on the I-215 and was managed by Screaming Eagle II LLC (SE2). The property was sold in late 2007 for approximately $20M with SE2, ICON RE (I) & Diversified Realty (DR) receiving a total 5% real estate commission at the time of the sale. Gayler after having been previously sued by CBM with regards to the Maya fees re-reviewed both the DA & SE2 operating agreements and determined that SE2, I, CBM & DR were only supposed to receive a 3% fee and also that CBM & DR were overpaid by SE2 by several hundred thousand dollars. CBM was notified shortly thereafter of the overpayment issue and Gayler Stated a need to have a membership meeting to discuss resolving the overpayment and breach of contract issues but CBM once again chose to ignore the correspondence. CBM was sued by DA thru its counsel Pengilly & Robbins (PR) on the basis that SE2 (Gayler & Moore were the Managers of SE2) the Manager of DA paid SE. I, DR a real estate commission

of approximately $1,000,000 when only $600,000 was due.  Subsequently I authorized a lawsuit to be filed on behalf of DA in an attempt to recover the unearned commissions from CBM & DR. CBM & DR retained MA to defend the lawsuit (while they were also CFT on the Gayler estate) and again coerced what they claim was a majority of the membership to file a motion to dismiss and Judge Gonzales granted their motion on what is believed to be a rewriting of the operating agreement. An unbiased CFT could have joined in the suit with PR because had they been successful in recovering any funds from CBM or DR it would have been distributed to both the Class A and Class B members which would have included a distribution to the Gayler estate. MA with their lack of action in trying to recover money for the estate and instead looking the other way for their clients have damaged the Gayler estate. This litigation is on appeal in the Nevada Supreme Court

### Sunset V LLC

Sunset V LLC (SV) owned 2.5 acres along the I-215 adjacent to Jones Blvd acquired in the late 1990s. Phil Aurbach (PA) owned a 20% interest in SV as did Creditor John O'Brien (CJO) The Gayler estate owned a 5% interest in SV and owned 50% of Axios LLC which owned a 10% membership interest in SV. Axios LLC was owned 50/50 with Byron Lebow who also was a creditor.  CJO was one of the 3 creditors to file the involuntary Bk action forcing William Gayler into a chapter 7 liquidation of his estate. PA has invested in numerous investments with Gayler in the past including 360 Life Media LLC & Sunset 8 LLC. In the past when investors have not paid their pro rata share of the company expenses when due Gayler was always in the position to lend those members their share of the expenses until the property sold. During the course of the investment PA was one of those members who were not timely with their payments and Gayler or his entities paid the PA share for approximately 9 years.  PA owed SV or the Gayler entities over $20,000 in accrued expenses. After having to endure numerous state lawsuits from the MA law firm and their clients since 2008 and whom most are creditors in the Gayler Bk the Manager of SV authorized a default letter to be sent to PA and a demand to bring his account current or he would be removed from the roster and his shares diluted among the other members. PA ignored the default demand and Gayler was subsequently served personally with a state court lawsuit on behalf of SV even though PA had no authority to file a suit on behalf of the SV.  This lawsuit was filed while I was in bankruptcy and while PA was acting a CFT in the Gayler estate. PA in conjunction with CJO owning a 40% membership in SV called an improper meeting of the membership where they basically conveyed to the other members that if they did not get the votes to have me removed as manager then they would not pay their pro rata share of the property taxes that were due and that the prospect of losing the property to a tax sale was imminent. The manager was voted out and removed by PA & CJO without regard to getting bankruptcy court approval to remove Gayler. PA & CJO also appointed a non member Mark Schnippel (MS) to manage the company which was not in conformity to the operating agreement language and also increased the management fees from what the current manager of $500 to $2500. PA & CJO also had the operating agreement amended to remove the commission that the ICON RE broker (Gayler) was to receive when the property was sold and assigned it to MS. PA took these actions while in the capacity of  acting as CFT for the Gayler estate but also without a court order to do so.  I personally borrowed over $10,000 to defend the lawsuit filed by PA on behalf of SV.  PA as CFT forced me to execute a document partitioning Byron Lebow from Axios so that only my estate owned Axios.  During the state court settlement conference MS and the assistant to PA, Ms. April Bonnafatto (who to my knowledge had only been acting the capacity of a CFT) assisted MS in negotiating a reduced monetary settlement of $5,000 to be repaid to ICON Trust B account upon the sale of the SV property and that any sale distributions due the Gayler entities or the estate would be held in a blocked account. This all being done with a state court action rather than thru the chapter 7 rules. The property was sold in December of 2013 with MS receiving the approximately $40,000 in real estate commission that was due to ICON RE or the estate prior to the state court law suit.

PA also evidently charged SV egregious legal fees for his state court lawsuit work over the last several years that were ultimately deducted from the SV sales proceeds which also damaged the Gayler estate.


**DA 1148 LLC & 100 Year LLC**

2.9 acres sold in 2007 along with the contiguous DA 1147 parcel previously mentioned above for $4,900,000, the sales proceeds were utilized in an exchange to purchase an undivided 87.5% of a 5 acre parcel on the corner of Warm Springs and Buffalo in 2008 for $6.9M. A portion of these funds approximately $1.9M was from Gayler estate and used to pay off a hard money loan on the 5 acre exchanged property and also for Ch. Angelus II (now in chapter 7). The two lenders were MS and Alexander Dawson Foundation (ADF). Upon the original loan on the exchanged parcel and the A2 property being retired a new loan of $2.7M was placed on the 5 acre exchanged parcel in the name of Angelus Partners LLC, 100 Year LLC & DA 1148 LLC by ADF. In 2009 the interest reserve had been depleted on the ADF loan and CBM & CJO retained MA to file a law suit to have the 100 Year LLC put in receivership with MS as the receiver along with stipulations that I could not do anything further with the property without a court order. CBM & CJO alleged thru their motions that I did not have a right to place debt on the property at acquisition and that the members had been harmed by the debt encumbering the parcel. District Court Judge Johnson granted the receivership however CBM & CJO holding together the largest membership interest holder (62%) refused to allow a refinance and ultimately ADF foreclosed on the parcel. CJO is Chairman of ADF. CFT was aware of this transfer yet to the best of my knowledge refused investigated if there was conspiracy to at worst hide money from the trustee at best damage the estate.

It is my position that MS as the receiver for the 100 Year LLC asset breached his fiduciary duties to 100 Year LLC by not;
1. Attempting to refinance the loan or file a chapter 11 or 7
2. Did not file a law suit in an attempt to invalidate the ADF loan as they allege that the manager did not have the authority to encumber the property
3. The CFT claimed in motions that there was conspiracy in the case of 23 Golden Sunray LLC between the debtor and the lenders. 23GS was a 13,000 sf custom home built for future sale with approximately $6M in debt that ultimately got foreclosed on then sold. The CFT alleged that Gayler schemed the estate with the lenders to hide money from the trustee. This case was eventually denied but if that was a plausible allegation by the CFT then why would it not be a plausible concept for any of the assets that were foreclosed on by lenders that were also my partners in associated real estate investments? The CFT failed to look into any of these investments if their clients were affiliated with them.


**Dominus M-B LLC**

Dominus LLC (D) is a company that developed and owns 50% of Apache Gardens, a tax credit funded 274 unit apartment complex located on Tropicana & Ft. Apache, the other 50% is owned by Nevada Hand (NH) a non-profit entity. The D company is managed by Gayler & MS; the members are the Gayler Family IRR Trust (GFIT) 40%, MS Family Limited Partnership (MSLP) 50% & CJO 10%. The trustee or CFT is holding approximately $300K in cash distributions that were designated for the GFIT but were intentionally given to the trustee by without the knowledge of GFIT or Gayler and without a court order. When confronted MS conveyed to the GFIT that the PA & CFT demanded the distribution to be handed over and threatened MS with a federal lawsuit if he didn't comply. The position of the GFIT was that MS breached the D operating agreement by forfeiting the distributions to the trustee without any legal authority to do so and the GFIT would follow up with any legal remedies available upon Gayler being discharged for bankruptcy. When confronted MS called for a meeting of the membership and attempted to form a coalition with CJO to have me removed as manager from D and also to inform me that MS

would hand over any and all distributions to the trustee because he did not want to have to pay for legal fees. I informed MS that CJO had no voting rights as per the operating agreement and the meeting adjourned with CJO stating that I no longer had any association with the D company.  Subsequently I discovered that the CFT had agreed to take an offer submitted to the trustee by NH for approximately $179K subject to a judge's approval. I believe that the CFT, MS, CJO & NH colluded and conspired to purchase the 40% membership interest at an under market value based on what the asset is really worth. Had NH been able to acquire the GFIT interest they would have also acquired ½ of $500K development fee that is owed to the Dominus entity and ultimately to the managers for no compensation to the estate. It is my position that NH was used as a straw buyer for the eventual buyers MS & CJO and who were colluding to cut up the GFIT 40% membership interest which would have only damaged the estate.

## Ch Angelus LLC & Ch Angelus II LLC (Part 1)

Ch Angelus LLC (A1), Ch Angelus II (A2), Eliot Alper (the lender) and Gayler were sued in state court by CBM & CJO in conjunction with Don Campbell (CDC) & Colby Williams (CCW) who are also creditors.  The law suit alleged that I placed an unauthorized $2M loan on two 5 acre parcels owned respectively by A1& A2.  Although evidence was presented that CJO, Doug Thomas & the Gayler entity owning 70% signed off on the loan District Court Judge Denton ruled that even though CJO executed a ballot approving the loan it was not his X next to his signature. Denton did not address the 5% owned by Thomas and the 50% owned by the Gayler entity and articulated that I was guilty of "Manifest Self Dealing" and voided the deed of trust that was placed on the both parcels. Judge Denton also did not address the fact that CJO owned majority membership interests in the 3 LLC's that held a majority interest in the parcel owned by A2 or the fact that a few months previous to the Alper loan being placed on the A2 parcel there was a $3.5M loan encumbering the property by the Alexander Dawson Foundation in which CJO is the Chairman of the Board.  CJO claimed during the trial that he never signed the approval authorizing the loan and with regards to the ADF loan he never put two and two together.  Once the note had been voided erasing the $2M Alper loan and his investment his title company began secret negotiations with CJO, CBM and MA to settle out of court the appeal to the Nevada Supreme Court.

After discovering this information the manager followed up with correspondence to MA demanding that they terminate any association with A1 & A2.  They did not comply and eventually attempted to call for an improper membership meeting to discuss a settlement offer from the title company with several of the members. I eventually called a proper membership meeting for December of 2011 and a quorum was formed with MA in attendance as the plaintiff's representative although both CBM & CJO were present.  Because of the contentiousness between Gayler, CBM & CJO I made a motion to elect a member (John Waroe) of Ch Pichon LLC which owns 30+/-% of A2 to act as the temporary manager and conduct the meeting for both A1 & A2 for that meeting only. JW agreed and the motion was passed.  The meeting lasted for approximately 90 minutes with only two items of business voted on and approved.

Authorizing MA to continue to negotiate a settlement of no less than $1.3M

Approving a settlement proceeds split between A1 & A2 of 58%/42%

Subsequently I was informed by my contact with the title company attorney that a settlement agreement had been reach for a $1.4M and was covertly provided the draft settlement agreement.  The firm that provided me the agreement also conveyed to me that MA would not allow Gayler as manager to be involved with the negotiations of the agreement nor the execution of the agreement. I called for another membership meeting in January to discuss the amount, terms and conditions and a vote.  I was extremely concerned that the agreement clearly stated that all the funds were to be placed in the MA trust account on behalf of the A1 & A2 yet a majority of the members never agreed to that language or to have a law firm control the company's funds. The same attendees were present with the addition of CDC.  I attempted to name JW as the temporary manager and was blocked by CDC and CJO who then nominated CBM to be the manager of the meeting for both A1 & A2.  Several outside members spoke up and were clearly not in favor of the motion to elect CBM as they said they would not trust him as far as they could throw him. CDC began to belittle myself and several other attendees and the meeting became unmanageable and out of control.

CDC leaned over to Dale Hayes of MA and said in front of the other attendees that he would just get Judge Denton to enforce a settlement agreement and not to worry about what these other members think.  I informed the members that a formal meeting had never been brought to order and no votes had been taken on any motions and terminated the meeting after 45 minutes.  MA then subsequently filed a secret motion in Denton's court that falsely stated a meeting of A1 & A2 had been held and JW had been appointed by a majority of the members as the new manager and for him to be approved by the court to execute the settlement agreement on behalf of A1 & A2.  The motion was approved by Denton. Upon JW discovering the approved motion JW called MA and asked what and why and they told him basically that it was beyond his control and he was required to sign the agreement.  Upon hearing this information JW then sent a letter to Denton resigning and terminating himself as the court approved manager. Where was the trustee or the CFT during these hearings?? Once the resignation had been sent and accepted MA filed another motion to approve CJO with the authority to execute the agreement.  The agreement clearly states that a majority of the membership in both A1 & A2 would need to vote and approve the settlement agreement for it to be ratified yet no meeting was ever held and CJO executed the settlement agreement without a vote. I caused correspondence to be sent to MA & CJO notifying those parties that if CJO executed the agreement without approval from the majority of the membership he was doing so at his own peril. Once the agreement was executed by all parties including CJO I assumed that the title company deposited the $1.4M into the MA trust account however neither I nor my attorney were ever notified about the transaction.  This failure to disclose to my attorney was not past standard operating procedures for the CFT as anytime they heard or knew about any distributions that my entities were entitled to or possible due they did not hesitate in their attempts to block or get a stipulation that all funds were to be placed into a blocked escrow account until a trial was held to determine if the estate was entitled to the distributions. Subsequently CJO by and thru MA sent a letter out informing the membership that CJO now was acting manager of A1 & A2 by Denton's court order and was calling a meeting for the purpose of several items of business.

1. Reimburse all attorney fees paid by CJO, CBM, CDC
2. Reimburse all delinquent and current taxes associated with the A1 & A2 parcels
3. The allocation and disbursement of the settlement proceeds among the members
4. To bar payment of the settlement proceeds to entities of Barrett, Loerwald and Gayler
5. Remove Gayler as Manager and Appoint CBM as new Manager of A1 & A2

The meeting was held on June 14, 2012 without a quorum of either A1 or A2; as Gayler owned 50% of A1 and also controlled the majority interest of A2 by the being the duly elected manager of a majority of the A2 membership. A package of documents provided of the court reporters transcripts of the June 14th meeting has previously been delivered to Mr. Kim. The membership meeting continued and all items were voted on and approved by the attendees some of which voted yet on company business were not even members of either A1 or A2.  In addition to the meeting agenda items CJO also made 3 motions to elect himself Manager of Groth LLC, Ch Pichon LLC, & Harlan LLC then as he stated in the transcript "since I am the only member in attendance for these companies I approve of the motion and am now Managing Member".  MA filed another false motion to have the meeting and the ballots ratified by Judge Denton. Upon reading the motion and knowing MA was perpetrating a fraud among themselves to steal money from the other members I persuaded JW to loan Ch Pichon $5,000 to retain Sylvester & Polednek (SP) to represent the majority of the membership in A2 which consisted of Groth LLC, Ch Pichon LLC, Harlan LLC, Loerwald and Gayler IRR Trust.  SP attended the hearing and was able to convey a truthful account of the what was going on to the court but Denton nonetheless approved items 1-3 based on his opinion that it was a supplemental ruling to the trial however chose to not rule on items 4 & 5 and said it should be dealt with in future arbitration.  I was informed that MA subsequently mailed out checks to several of the members and to several of the members of members without a full accounting or verification that those names were bonafide members in good standing.  To this day A1 or A2 have not been given an accounting of the disbursed proceeds. MA ultimately filed a motion with Denton to interplead the distributions not previously allocated to purported members with the court to

hold the remaining funds designated for the Gayler IRR Trust or the estate. To my knowledge the CFT was never involved in any of the state court hearings relating to the settlement agreement nor did they attempt to negotiate a stipulation with SP for those funds designated to the Gayler entity. From my perspective each and every one of the individuals involved CBM, CJO, CDC, Dale Hayes, PA, MA have colluded and conspired to circumvent the language or the A1 & A2 operating agreement for their own self interest, purposely to damage the Gayler estate and loot the Gayler estate by any fraudulent means available through these numerous state court actions.

## Part 2

## Ch Angelus II

A2 acquired 1.25+/- acres prior to the acquisition of the 5 acres involved in the settlement above. Harlan LLC was not one of the original members of A2 and only is involved for distribution purposes with the 5 acre parcel. After the Denton approved the reimbursement of the property taxes or Vote #3 and the settlement proceeds were deceitfully distributed to the purported members it was expected by the manager that the delinquent property taxes on the 1.25 acres would have been paid concurrently but had not. Knowing full well that getting funds to pay the taxes on the 1.25 were not possible from CBM & CJO I authorized the filing of chapter 7 liquidation primarily to:

1. Stay any future tax sale that would harm the membership.
2. The chapter 7 also had the ability to assist dissolving the company by forcing the sale of its only asset the 1.25 acre parcel
3. The trustee could look back on the fraudulent transfers A2 made to insiders and bring those funds back for a proper distribution to bonafide members including the Gayler IRR Trust or the estate
4. The final dissolution of the company by getting the open A1 & A2 state court lawsuits closed and dismissed
5. Obtain a court order to sell the property to Eliot Alper for $215,000

Upon the filing the chapter 7, CBM & CJO thru their counsel MA filed a motion to dismiss the Bk alleging that Gayler was not the duly elected manager and therefore had no authority to file the chapter 7. To my knowledge the CFT was not present at these hearings or file any kind of motion to state its position on the plaintiff's motion. The MA, CFT, CBM & CJO acted in concert to deprive the A2 membership of its final sales distribution by filing the motion to dismiss the chapter 7 and also by filing a state court law suit that claims the manager did not have the right to enter into an agreement to sell the property to Chad Laposky for $200,000 which is patently false.

## Sunset 8 LLC vs Alexander Dawson Foundation, Caine Five LLC, Mario Borini, Oz Guetche, MS, CJO, CDC, PA

Sunset 8 LLC (S8) acquired 10 acres for $4.5M in 2005; the property is worth approximately $3.5M today. Caine Five LLC (CF) owned 47.8% of S8, Gayler 20%, MS 20% & CJO 20% own the majority interest of 60% of the CF membership interests. Gayler & MS acted as managers of CF. The balance of S8 was owned by individual membership interests including all the above plaintiffs with ADF owning 20% of S8. CF invested via a 1031 exchange approximately $2.1M including $650K in carry forward debt that was its responsibility to either payoff or service the debt. The operating agreement clearly includes language relating to the debt and all members where appraised. The debt was held by Nevada Commerce Bank and was serviced by the members of CF and never in default until the loan was called due. The balance of the acquisition price was funded by individual membership interests. Nevada Commerce Bank extended our loan numerous times however in 2009 it went into default for not paying it off. MS and Gayler attempted to secure a one year extension with interest reserve and were in what I thought was the process when I discovered that the loan had been purchased from the bank by an unidentified party. MS informed me that he would attempt to ascertain who the new lender was and get a dialogue started to obtain an extension. I was informed by MS a few days later that surprisingly ADF had purchased the loan from the bank. MS

said he would call ADF to inquire what their intentions were and Gayler also agreed to call ADF to work out a deal to continue the monthly interest payments. I contacted Oz Guetche who at the time was the President of ADF and spoke with him about the purchase and his intentions for about 15 minutes. I inquired about his reasons for buying the note, his answer; I was trying to protect ADF's interest. I inquired what his objectives were, his answer; to foreclose on the property and own it. I inquired if he was inclined to let the borrower continue to pay the monthly debt service until we sell the parcel or refinance the loan, his answer, you can pay me off in full before the trustee sale. I inquired why he would involve ADF in S8 company business when it was clearly a breach of the operating agreement, his answer, he really didn't care. I conveyed that S8 would be pursuing legal actions, his answer, don't threaten me or you will be sorry and he hung up the phone. I did not discover until last year when attorney Dennis Prince seeking discovery for another case uncovered that MS had actually brokered the loan purchase between Nevada Commerce and ADF.  S8 filed a chapter 11 in an attempt to stay the ADF foreclosure but at that time the company had no revenue to pay the attorney fees t pursue legal action against ADF nor was there a market to sell the property even at a discounted price. There are several interesting and telling facts about the events that lead up to and followed the ADF foreclosure of the property:

1.  ADF did not disclose the loan purchase transaction from Nevada Commerce to the manager nor to the S8 membership
2.  When ADF foreclosed on the membership it wiped out the investment of every member of S8 including Mario Borini (ADF past Chairman and Bianca Borini (his wife) Joe Borini (his son), CJO (current ADF Chairman) CDC (ADF counsel) PA (CFT and counsel for ADF).
3.  After ADF purchased the note there was not written demand to membership to pay off the debt nor were the members given an opportunity to contribute to buying the note from the bank.
4.  One would think once PA found out that his $62,000 suddenly evaporated thru the ADF foreclosure he would have personally pursued all legal remedies to invalidate the foreclosure either by filing a law suit against the manager for an unauthorized loan or one against ADF for breach of contract, unjust enrichment and conspiracy which MA has recent history litigating successfully. To the best of my knowledge PA in his capacity as CFT he never pursued the matter to recover funds from a fraudulent transfer for the good of the estate either.
5.  After the foreclosure I drove by the property several times and noticed that there was a for sale sign placed in front of the parcel that advertised the real estate brokerage firm in which MS is the broker of record.  It has since been removed but I have heard innuendo that MS now provides real estate consulting services for ADF.

The CFT claimed in motions that there was conspiracy in the case of 23 Golden Sunray LLC between the debtor and the lenders. 23GS was a 13,000 sf custom home built for future sale with approximately $6M in debt that ultimately got foreclosed on then sold. The CFT alleged that Gayler schemed the estate with the lenders to hide money from the trustee. This case was eventually denied but if that was a plausible allegation by the CFT then why would it not be a plausible concept for any of the assets that were foreclosed on by lenders that were also my partners in associated real estate investments? The CFT failed to look into any of these investments if their clients were affiliated with them.

## Sunset III LLC

Sunset III (S3) conflict is a simple one. The Gayler entity owns approximately 16% in a 5 acres parcel that was foreclosed on by Byron Lebow, a creditor. The members purportedly held a secret meeting to remove me and appoint another member as manager and gave the authority to file a lawsuit alleging that the previous manager did not have the right to encumber the property. The Lebow defendant countersued all the members individually because the LLC operating agreement was never modified from a general partnership to an LLC agreement and that document allowed full liability to each member for legal fees. The lawsuit was settled and the members are now to

get 25% of the future sales price when sold (in escrow now). It is my understanding the other members agreed to disgorge my interest which I don't believe they have a right to do and it is also my understanding that the CFT agreed to abandon that asset. S3 has had past legal work done by MA.

## GCS LLC & GCS Enterprises

GCS LLC (GCS) owns a 5000 sf building containing as a tenant Jackpotters Tavern (GCSE), MS is the manager and majority interest hold in both entities. MS retains MA for his personal legal requirements and to my best recollection MA has represented both of these companies relating to legal issues.

## Sunset 7 LLC

Sunset 7 (S7) ADF foreclosed on the parcel in 2010. CJO is Chairman of ADF and was also a member of S7 as well as CDC. CFT was aware of this transfer yet to the best of my knowledge refused investigated if there was conspiracy to at worst hide money from the trustee at best damage the estate.

## Redstone Grill/Arietta LLC
## RG/A

Formed to develop and operate a tavern with gaming in the Maya I-215 LLC retail center with CBM as a co-managing member and two other individuals as the operating members. The total investment was $1M and $330K for the Gayler portion. Gayler at the time held two other restricted Nevada gaming licenses for a bar and a convenience store and was now required to seek an unrestricted license. While attempting to obtain the new unrestricted license I was forced to give up my membership interest in RG and become a lender to the project until the license was granted by the Gaming Control Board. I resigned as manager and Redstone Grill executed a promissory note (which I do not have) in favor of Gayler. Upon my license being granted I sent correspondence to CBM and requested my name be placed back on the roster as a member and to execute an amendment reinstating Gayler as a co-manager to the company. CBM refused to respond and Gayler was never returned the membership interest nor has Gayler ever been payed back on the promissory note. The CFT was made aware of the potential assets value of the note and requested the CFT to pursue the possible asset but to my knowledge PA has never investigated RG or their client CBM in an attempt to recover these assets. The CFT claimed in motions that there was conspiracy in the case of 23 Golden Sunray LLC between the debtor and the lenders. 23GS was a 13,000 sf custom home built for future sale with approximately $6M in debt that ultimately got foreclosed on then sold. The CFT alleged that Gayler schemed the estate with the lenders to hide money from the trustee. This case was eventually denied but if that was a plausible allegation by the CFT then why would it not be a plausible concept for any of the assets that were foreclosed on by lenders that were also my partners in associated real estate investments? The CFT failed to look into any of these investments if their clients were affiliated with them.

## Ch Angelus III

## Ch Angelus III (A3)

A free and clear property of 1.25 acres CBM has attempted to remove Gayler as Manager and replace with himself, he has also attempted to amend the operating agreement to remove the 10% Gayler broker's commission due when the property is sold which damages the estate. He has not obtained permission from the CFT or the court to validate any of these actions nor has the CFT been involved in any way relating to this LLC.

# EXHIBIT 2

**From:** Phillip Aurbach [mailto:PSA@maclaw.com]
**Sent:** Wednesday, April 17, 2013 5:27 PM
**To:** howard@hkimlaw.com
**Cc:** Terry Coffing
**Subject:** FW: 1785675_3.DOCX [IWOV-iManage.FID796824] Gayler

Howard
This is the email I mentioned in my 4/17/2013 email to you where we were close to settling and getting all of Gayler's interests on December 16, 2012.  I believe David was appointed 12-12-2012.

I am available to help you and David in any way necessary since we have all the institutional knowledge that was behind our lawsuits that put Gayler in the position of settlement.

Phil
Ps we also have raw video footage of the 2004 examination (I attached the transcript) that I took of Gayler where he admitted
1—that Morpheus was the general partner of TGF before the bankruptcy and it resigned after the bankruptcy with Gayler individually becoming the general partner of TGF (see page 16, 17 and 18) thus putting him in control of over a million dollars of property that arguably most of which should have come into the bankruptcy estate
2—that he transferred 40 interests in various LLC's for no consideration in January 2009, before his bankruptcy in Nov 2009 (see pages 25, through 30).  Plus on those pages, he admitted he was concerned about the downturn in the real estate market and his motive to transfer those assets to other entities to protect him from creditors—remember that he had lawsuits and judgments against him in January 2009.


**From:** Phillip Aurbach [mailto:PSA@maclaw.com]
**Sent:** Sunday, December 16, 2012 1:12 PM
**To:** darosenberg@7trustee.net
**Cc:** Jessica M. Goodey; Katie J. Johnson
**Subject:** 1785675_3.DOCX [IWOV-iManage.FID796824]

**David**
**I have modified the settlement agreement along the lines we spoke.  What about settling by paying something to Gayler as a partial distribution from Dominus, and bring everything else into the bankruptcy estate?**

**I am opposing Sylvesters motion for summary judgment on the 727 claim for relief and we may lose that because Lisowski knew from the 341 hearing about the assets Gayler was getting through 23 Golden Sunray.**

**Anyway, it may be helpful for you to have a conversation with Sylvester.**
**Thanks**
**Phil**

# EXHIBIT 3

**From:** Phillip Aurbach [mailto:PSA@maclaw.com]
**Sent:** Saturday, February 04, 2012 8:20 AM
**To:** Jeff Sylvester
**Cc:** April N. Bonifatto
**Subject:** Re: Settlement Calculations- Amount to Estate & Gayler (Version 3 - ANB & PSA).XLS

We try to keep that separate. ==Dale does not know the details of what I do, although some discovery info is shared.== If there is a settlement and the judge says that gayler's % of the commissions is exempt, that would protect him. The other distribution through LLC's could be fair game and they will get a copy of the settlement as an attachment to the bk settlement motion  However Dale's clients are limited to charging orders and if we settle, there would be no bk judge finding of alter ego. If we don't settle, that is certainly a potential outcome.

Phil A
Sent from my cell phone

On Feb 4, 2012, at 7:19 AM, "Jeff Sylvester" <Jeff@SylvesterPolednak.com> wrote:

Yep. If the intent is for your other clients to attach all settlement proceeds settle discussions will be seriously undermined.

Sent from my iPhone

On Feb 4, 2012, at 5:34 AM, "Phillip Aurbach" <PSA@maclaw.com> wrote:

**Jeff**
**regarding the commissions--couldn't anyone seeking a nondischargable judgment be able to seize Gayler's post bk commissions with an attachment? i.e. if Gayler did not settle with the trustee?**
**Phil**

---

**From:** April N. Bonifatto
**Sent:** Friday, February 03, 2012 2:17 PM
**To:** 'Jeff Sylvester'
**Cc:** Phillip Aurbach
**Subject:** Settlement Calculations- Amount to Estate & Gayler (Version 3 - ANB & PSA).XLS

Dear Jeff,

I have attached an excel sheet displaying the values and formulas to arrive at those values based upon the information the Trustee has received.  Should there be any discrepancy in these formulations or variable of the formulation, please let me know and I will implement the necessary changes.

Thank you!

April

**April Bonifatto, Esq.**

10001 Park Run Drive
Las Vegas, NV 89145
t | 702.207.6071
f | 702.382.5816
abonifatto@maclaw.com
maclaw.com

 **Please consider the environment before printing this e-mail!**

Pursuant to IRS Circular 230, any tax information or written tax advice contained herein (including any attachments) is not intended to be and can neither be used by any person for the purpose of avoiding tax penalties nor used to promote, recommend or market any tax-related matter addressed herein.

DO NOT read, copy or disseminate this communication unless you are the intended addressee. This e-mail communication contains confidential and/or privileged information intended only for the addressee. If you have received this communication in error, please call us (collect) immediately at (702) 382-0711 and ask to speak to the sender of the communication. Also please e-mail the sender and notify the sender immediately that you have received the communication in error. Thank you. Marquis Aurbach Coffing - Attorneys at Law

# EXHIBIT 4

Page 1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

In Re:                          )
                                )
WILLIAM A. GAYLER,              ) Case No.
                                ) 09-31603-MKN
                                )
         Debtor.                )
                                )

RULE 2004 EXAMINATION OF WILLIAM GAYLER

Taken at the Offices of Marquis Aurbach Coffing

10001 Park Run Drive

Las Vegas, Nevada

On Monday, October 3, 2011

At 9:36 a.m.

Reported by:  Jane V. Efaw, CCR #601, RPR

**Depo International, L.L.C.**
**703 South Eighth Street, Las Vegas, NV 89101 (800) 982-3299**

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

```
 1   Appearances:
 2   For Chapter 7 Trustee James F. Lisowski:
 3        PHILLIP S. AURBACH, ESQ.
          APRIL N. BONIFATTO, ESQ.
 4        Marquis Aurbach Coffing
          10001 Park Run Drive
 5        Las Vegas, Nevada 89145
          (702) 382-0711
 6
     For Debtor William Gayler:
 7
          MATTHEW T. KNEELAND, ESQ.
 8        Sylvester & Polednak, Ltd.
          1731 Village Center Circle
 9        Las Vegas, Nevada 89134
          (702) 952-5200
10
     For Byron Lebow Family LP:
11
          BRIAN WHITAKER, ESQ.
12        Woods Erickson Whitaker & Maurice LLP
          1349 West Galleria Drive
13        Suite 200
          Henderson, Nevada 89014
14        (702) 433-9696
15
     For James Kay and Sunset III:
16
          JESSICA K. PETERSON, ESQ.
17        Flangas McMillan Law Group
          3275 South Jones Boulevard
18        Suite 105
          Las Vegas, Nevada 89146
19        (702) 307-9500
20   Also Present:
21        JOHN O'BRIEN
22
                    * * * * * * * *
23
24
25
```

**Depo International, L.L.C.**
**703 South Eighth Street, Las Vegas, NV 89101 (800) 982-3299**

William Gayler - October 3, 2011
In Re: William A. Gayler

Page 3

1                    I N D E X

2

3   WITNESS                              PAGE

4   WILLIAM GAYLER

5   Examination by Mr. Aurbach                4

6   Examination by Ms. Peterson    127, 161, 165

7   Examination by Mr. Whitaker        152, 163

8

9

                     E X H I B I T S

10

    NUMBER              DESCRIPTION          PAGE

11

    1      Schedule B, Personal Property        8

12

    2      1/2/09 Letter from William Gayler    26

13         To Whom it May Concern; Assignment
           and Transfers

14

    3      Photocopies of checks                79

15

    4      Photocopies of checks; 1/4/08 Memo   148

16         to Sondra Walker from William Gayler

17

18

19

20

21

22

23

24

25

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

Page 4

1    Thereupon --

2                         WILLIAM GAYLER

3    was called as a witness by the Chapter 7 Trustee, and

4    having been first duly sworn, testified as follows:

5

6                         EXAMINATION

7    BY MR. AURBACH:

8        Q.   State your name and spell it for the record.

9        **A.   William Gayler, G-a-y-l-e-r.**

10       Q.   And you understand that your testimony today

11   is under oath as if you were testifying in a court of

12   law.  You have to tell the truth.  Do you understand

13   that?

14       **A.   I do.**

15       Q.   You've had your deposition taken over ten

16   times before.  Correct?  So you know the process?

17       **A.   I do.**

18       Q.   And this exam is being taken in your

19   bankruptcy case.  So it affects all the property in

20   your bankruptcy case.  Do you understand that?

21       **A.   I do.**

22       Q.   And you know that if you don't understand a

23   question, you should ask me to repeat it because I

24   don't mean to try to trick you with my questions.

25   You understand that.  Right?

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

Page 5

1     A.   No.  That's all your intention, is to try to

2     trick.  But I understand I need to answer the

3     question asked.

4     Q.   You're a tough one to trick, though.  You've

5     never been convicted of a felony.  Correct?

6     A.   Have not.

7     Q.   What's your current address?

8     A.   2431 Tech Center Lane, 89128.

9     Q.   And that's your business address?

10    A.   Uh-huh.

11    Q.   Where do you live?

12    A.   I live at my house in Park City.  I live at

13    Suncoast, depending on what's going on.

14    Q.   What's the address of your house in Park

15    City?

16    A.   1953 Mare Drive.

17    Q.   M-a-r-e?

18    A.   Uh-huh.

19    Q.   What's your date of birth?

20    A.   11/16/54.

21    Q.   Did you review any documents before you came

22    today in preparation for this?

23    A.   I looked at the letter that April sent me

24    and request for production.  That's all I did.

25    Q.   And did you meet with an attorney before

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

1  today?

2     **A.   Just Alan Sears.**

3     Q.   Did you meet with anybody else prior to your

4  exam today?

5     **A.   No.**

6     Q.   The first thing I want to talk to you about

7  is Gloria's computer.  Do you remember on August 15th

8  there was a hearing where your attorneys went.  You

9  didn't go.  It was actually Rob Edelman that went.

10  And the judge ordered to allow a copy of Gloria's

11  computer?

12          MR. KNEELAND:  Objection.  Is this about the

13  bankruptcy proceeding or the state court proceeding?

14          MR. AURBACH:  The bankruptcy proceeding.

15  BY MR. AURBACH:

16     Q.   The judge ordered to allow a copy of

17  Gloria's computer.  Were you aware of that?

18     **A.   I guess to answer that, I believe that's**

19  **part of the state court action.  I don't think that**

20  **has anything to do with the bankruptcy.**

21     Q.   So you're not going to answer that question?

22     **A.   I'll answer it.  I just want to let you know**

23  **that was part of the state action, not the**

24  **bankruptcy.**

25     Q.   You were aware that order was entered?

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

Page 7

1      **A.    I was aware there had been a motion and a**

2   **decision by the judge, but I had not seen any kind of**

3   **court order.**

4      Q.    You hadn't seen it, but you had heard that

5   there was an order by the judge?

6      **A.    Verbal orders I don't believe are relevant.**

7      Q.    Right.  But I was just saying that you knew

8   of the court order on Monday, August 15th?

9      **A.    My attorneys kept me informed of what**

10  **happened in the hearing.**

11     Q.    The computer that was at issue was Gloria's

12  computer.  Does she have more than one computer?

13     **A.    Again, I don't know what that has to do with**

14  **my 2004 Examination.**

15     Q.    Well, the question is who owns the computer.

16  So I'm kind of coming around to that.  I assume that

17  Icon does.  There's a lot of Icons.  What's the main

18  Icon?  Real Estate?  Is that the one you own a

19  hundred percent stock in and that you do most of your

20  business out of?  Is it Icon Real Estate?

21     **A.    Icon Real Estate is the brokerage company.**

22     Q.    Is that the company that owns Gloria's

23  computer?

24     **A.    I can't tell you who bought the computer.  I**

25  **can only tell you it's the office computer.**

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

Page  43

1    percent or any other percent was sold to another

2    person, a woman?

3        A.   Not that I recall.

4        Q.   Has Diamante Rose ever been in bankruptcy?

5        A.   You're asking questions about an adverse

6    legal complaint.  I don't know I have any answers.

7        Q.   I don't know what you're talking about.

8        A.   Diamante Rose is part of a bankruptcy

9    litigation.

10       Q.   I don't understand.  I don't know that.

11   Tell me what's happening.

12       A.   Ask your client, John O'Brien.

13       Q.   He's not my client.  My client is the

14   trustee.

15       A.   He is your client within this law firm, is

16   he not?

17       Q.   He's not my client.

18       A.   Is he the law firm's client?

19       Q.   I want to know what Diamante Rose is doing.

20   What are you talking about?  You don't know?

21       A.   Phil, all I can tell you is there's a

22   lawsuit against me in the bankruptcy court with

23   Diamante Rose's name on it.

24            And I don't think I have to talk to you

25   about that because that would be trying to get your

**William Gayler - October 3, 2011**
**In Re: William A. Gayler**

Page 44

1   discovery process started.  All I can tell you is to

2   the best of my knowledge, I have 11.25 percent

3   invested in TGF Holding LP.

4        Q.   11.25 percent, okay.  Axios on page 7 near

5   the bottom.

6        A.   Yes.

7        Q.   TGF Holding owns 50 percent of Axios?

8        A.   Yes.

9        Q.   Who owns the other 50 percent?

10        A.   The Byron LeBow Limited Partnership, I

11   believe.

12        Q.   On the previous page, page 6 of 11, Polyrus.

13   How do you pronounce that?

14        A.   Polyrus.

15        Q.   TGF Holding owns 20 percent of Polyrus.  Who

16   owns the other 80 percent?

17        A.   Different partners.  Different members.  I

18   can't give you the names.

19        Q.   Who would have those?  Where would you find

20   that?

21        A.   They would be on the operating agreement.

22        Q.   Does William A. Gayler Separate Property

23   Trust own 20 percent of Polyrus?

24        A.   It appears that they have transferred that

25   interest over to the TGF Holding, LP.

# EXHIBIT 5

**Nancy Knilans**

| | |
|---|---|
| **From:** | April N. Bonifatto [abonifatto@maclaw.com] |
| **Sent:** | Monday, September 24, 2012 3:11 PM |
| **To:** | Phillip Aurbach; bwhitaker@woodserickson.com; ejh@haniganlaw.com; jas@haniganlaw.com; cmiller@millerwrightlaw.com; randerson@millerwrightlaw.com; dprince@princekeating.com; aebinger@princekeating.com; kdp@flangasmcmillan.com; cjm@flangasmcmillan.com; jkp@flangasmcmillan.com; jdo@campbellandwilliams.com; jcw@campbellandwilliams.com; djc@campbellandwilliams.com; bmooremail@aol.com; jpenguilly@penguillylawfirm.com; Jeff Sylvester; dprince@princekeating.com; aebinger@princekeating.com; ecs@nvrelaw.com |
| **Cc:** | Jfltrustee@aol.com; Katie J. Johnson |
| **Subject:** | Follow Up Status Re: Estate of William A. Gayler [IWOV-iManage.FID796824] |

Creditors,

This letter is to follow up on our email communications on September 20, 2010. The Trustee wanted us to contact the creditors to get feedback regarding a potential settlement with Gayler. The active creditors who have or are suing Gayler unanimously did not want the Trustee to settle with Gayler if it meant Gayler received any money. The creditors also did not want the Trustee to dismiss the claims against Gayler preventing his discharge. Thus, the Trustee has decided not to settle and in turn pursue the Estate's litigation to recover assets.

Some of the creditors pointed out a misstatement and miscalculation regarding the CH Angelus settlement in our initial email.

With regard to CH Angelus entities, the issue that remains is who owns Barrett and Loerwald's 40% - Is it Gayler (thus the bankruptcy estate) or CH Angeles I?

Gayler owned 10% of CH Angelus I. Gayler owned a much larger share of CH II, but his ownership was through other entities (Groth, CH Pichon, Harlan and the William A. Gayler Separate Property Trust). These ownership interests were transferred by Gayler to TGF Holdings, another Gayler entity.

The Trustee engaged in settlement negotiations because the Bankruptcy Court denied the Trustee's Motion to allow the Trustee to seize the money that was going to be distributed to all of Gayler's entities. The Trustee argued to the Court that Gayler should not receive any money that would be distributed through the entities. The Judge's ruling can be read to require the Trustee to sue each of the entities, get the transfers set aside, then take steps to seize the money if appropriate. The Trustee has filed such a suit.

Settlement seemed appropriate since money was soon going to be distributed and it may take years to get a decision as to the fraudulent transfers. In the interim, some of the money could get distributed to Gayler. In our haste to explain that there was a settlement and get feedback we didn't explain all of this as well as we should.

The CH Angelus settlement is just one example. There is $1,150,000 million to be distributed. The members of CH Angelus I and CH Angelus II agreed that CH I would get 58% of these proceeds and CH II would get 42%. This money is ready to be distributed.

Some of the members of CH I & II are suing Gayler claiming he breached fiduciary duties and that any money that is to be distributed to him should instead go to those entities. The Trustee agreed to allow that litigation to proceed and be bound by any decision. The Trustee did not agree that CH I or CH II should receive Gayler's distributions.

Here is where the miscalculation was pointed out to us regarding any settlement:

With respect to CH I, Gayler owned 10% (through various entities) from the beginning. Gayler's 10% would be about $29k. Instead of litigating the entitlement to $29k, the Trustee initially agreed to take $14k if the breach of fiduciary duty lawsuit (actually an arbitration) determined that Gayler only owned 10%. The additional 40% of CH I (i.e. Barrett and Loerwald's 40%) becomes a bigger issue because the money used to pay Barrett and Loerwald came from CH I. The Trustee's belief is that there are no solid grounds to become involved in that litigation and thus the trustee will await the outcome of the arbitration. This decision by the Trustee is supported by a trial whereby Judge Denton entered Findings of Fact and Conclusions of Law that the transfers from Barrett and Loerwald to Gayler were invalid pursuant under the operating agreements. The Court found the managing member (Gayler) had no authority to encumber CH I without the non-managing members majority vote as required by its operating agreement.

The Trustee's position is that the Estate will abide by the arbitrator's decision. The Trustee did **not** and does **not** agree to allow disgorgement to CH Angeles members as speculated to in our conference call. If the arbitrator rules that Ch Angelus I loses on the request for disgorgement, the Trustee will take the distributions for the Estate. With respect to CH II, the Trustee miscalculated the percentage coming to Gayler from CH II's 42% of the settlement. The Trustee is not going to only take 5% or 10% of this sum and never intended this result.

Again, and as stated above, the Trustee will be moving forward with litigation.

Thank you for your time,
Phil Aurbach and April Bonifatto, as Special Counsel to the Trustee



## MARQUIS AURBACH COFFING

**April Bonifatto, Esq.**
10001 Park Run Drive
Las Vegas, NV 89145
t | 702.207.6071
f | 702.856.8971
abonifatto@maclaw.com
maclaw.com

 **Please consider the environment before printing this e-mail!**

Pursuant to IRS Circular 230, any tax information or written tax advice contained herein (including any attachments) is not intended to be and can neither be used by any person for the purpose of avoiding tax penalties nor used to promote, recommend or market any tax-related matter addressed herein.

DO NOT read, copy or disseminate this communication unless you are the intended addressee. This e-mail communication contains confidential and/or privileged information intended only for the addressee. If you have received this communication in error, please call us (collect) immediately at (702) 382-0711 and ask to speak to the sender of the communication. Also please e-mail the sender and notify the sender immediately that you have received the communication in error. Thank you. Marquis Aurbach Coffing - Attorneys at Law