**MOT**                                             E-filed on:  March 5th, 2014
HOWARD C. KIM, ESQ.
Nevada Bar No. 10386
E-mail: howard@hkimlaw.com
JACQUELINE A. GILBERT, ESQ.
Nevada Bar No. 10593
E-mail: jackie@hkimlaw.com
KATHERINE C.S. CARSTENSEN, ESQ.
Nevada Bar No. 10656
E-mail: katherine@hkimlaw.com
HOWARD KIM & ASSOCIATES
1055 Whitney Ranch Drive, Suite 110
Henderson, Nevada 89014
Telephone: (702) 485-3300
Facsimile: (702) 485-3301
*Attorneys for David A. Rosenberg, Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: BK-S-09-31603-MKN<br>Chapter 7 |
| WILLIAM A. GAYLER | |
| Debtor. | **MOTION FOR LEAVE TO APPEAL** |
| | Hearing Date:  N/A<br>Hearing Time:  N/A<br>Place:  Foley Federal Bldg.<br>          300 Las Vegas Blvd. S.<br>          Las Vegas, NV 89101 |
| | Hon. Mike K. Nakagawa |

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

        David A. Rosenberg, Chapter 7 Trustee ("Trustee") for the bankruptcy estate of William

A. Gayler ("Debtor" or "Gayler"), by and through his counsel of record, Howard Kim &

Associates, seeks to appeal the United States Bankruptcy Court District of Nevada's *Order on*

*Trustee's Motion to Disqualify Counsel for John D. O'Brien Profit Sharing Plan and Counsel*

*for Barry R. Moore and Janie Moore as Co-Trustees of the BAMM Living Trust Dated July 16,*

*2003, Groth, LLC, CH Pichon, LLC and Harlan, LLC Through Their Managing Member John*

*O'Brien* ("Order") entered in the above-captioned bankruptcy case on February 24, 2014 [Dkt.

No. 591].  A copy of the Order is attached hereto as "**Exhibit 1**".

The Court may and should find that the Order is appealable under 28 U.S.C. § 158 (a)(1) pursuant to the pragmatic approach to finality that applies in bankruptcy.

Alternatively, if the Court determines that the Order is interlocutory, Trustee respectfully requests leave to appeal pursuant to Fed. R. Bankr. P. 8003 and 28 U.S.C. § 158(a)(3).

Dated this 5th day of March, 2014.

**HOWARD KIM & ASSOCIATES**

*/s/Howard C. Kim*
Howard C. Kim, Esq.
Nevada Bar No. 10386
Jacqueline A. Gilbert, Esq.
Nevada Bar No. 10593
Katherine C.S. Carstensen, Esq.
Nevada Bar No. 10656
1055 Whitney Ranch Drive, Suite 110
Henderson, Nevada 89014
*Attorneys for David A. Rosenberg, Chapter 7 Trustee*

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Prior to the initiation of the above-referenced bankruptcy case, Marquis Aurbach Coffing ("MAC") represented the MAC Creditors[1] in various state court actions, including but not limited to, litigation against the Debtor and several of the entities Debtor claimed an interest in by and through his bankruptcy Schedule B (hereinafter referred to as the "Gayler Entities"). Despite the fact that it was prosecuting five different lawsuits on behalf of the MAC Creditors against the Debtor and despite the fact that two of MAC's attorneys—Phillip S. Aurbach, Esq. ("Aurbach") and Dale A. Hayes, Esq. ("Hayes")—had financial connections with the Debtor[2],

---

[1] The MAC Creditors shall hereinafter refer to some or all of the following:  John O'Brien, individually and as Trustee of the John D. O'Brien Profit Sharing Plan, Donald J. Campbell, J. Colby Williams, William Godfrey, Barry R. Moore, Janie Moore, Barry R. Moore and Janie Moore, Co-Trustees of the Bamm Living Trust Dated July 16, 2003, John Esposito, Lorraine Esposito, Mario P. Borini, Bianca Borini, Joseph Borini, and Eroom Holdings, LP.

[2] *See Memorandum Decision* [Dkt. No. 590], attached hereto as "**Exhibit 2**", at 42:3-15 and 42, fn46.

- 2 -

**HOWARD KIM & ASSOCIATES**
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

1    MAC sought employment as special counsel for James F. Lisowski ("Former Trustee"). After

2 submitting a declaration in support of the application to employ, which conveniently left out all

3 of the above-mentioned connections to the Debtor, the Bankruptcy Court approved MAC's

4 application on May 23, 2011.[3]

5    As counsel for the Former Trustee, MAC initiated an adversary action in Gayler's

6 bankruptcy case wherein MAC sought to bring Gayler's interest in CH Angelus, LLC

7 ("Angelus"), CH Angelus II, LLC ("Angelus II"), et al. into the bankruptcy estate. In January

8 2012, MAC, on behalf of the Former Trustee, began to discuss settlement of the adversary action

9 with Gayler's attorney, Jeff Sylvester, Esq. ("Sylvester"). During negotiations, MAC prepared

10 certain settlement documents but after the proposed settlement was unanimously rejected by the

11 MAC Creditors in September 2012, MAC ended settlement discussions with Gayler and began

12 focusing its efforts on pursuing litigation in the adversary action to recover assets for the estate.

13    While MAC was actively trying to bring Gayler's interests in Angelus and Angelus II

14 into the bankruptcy estate by and through the adversary action, MAC, on behalf of the MAC

15 Creditors, was actively seeking to disgorge Gayler, and thereby the estate, of those same interests

16 in Angelus and Angelus II in the state court. Despite this obvious and blatant conflict of interest,

17 MAC continued to represent the Former Trustee and the Trustee in Gayler's bankruptcy case and

18 the corresponding adversary action.

19    After his appointment, on or around February 4, 2013, the Trustee and Trustee's new

20 general counsel, Howard C. Kim, Esq. ("Kim") of Howard Kim & Associates, met with several

21 of the MAC attorneys to discuss Gayler's bankruptcy case, the adversary action, and the state

22 court litigation that was pending against Gayler. The Trustee, recognizing the inherent conflicts

23 involved in MAC's continued representation of the Trustee and the MAC Creditors, instructed

24 MAC to voluntarily withdraw as counsel in this case. While MAC withdrew as special counsel

25 for the Trustee on or around June 10, 2013, MAC did not withdraw as counsel for the MAC

26

27    [3] The Bankruptcy Court, in its Memorandum Decision on the Motion to Disqualify ("Memorandum Decision"), stated "MAC's failure to disclose Aurbach's current financial

28 connections with the Debtor was an **egregious violation of FRBP 2014(a)**." *See Memorandum Decision* [Dkt. No. 590], Exhibit 2 at 42:4-5 (emphasis added).

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

1    Creditors.  On or around July 3, 2012, after modifying the settlement documents MAC originally

2    drafted for the Former Trustee in January 2012, Trustee filed a Motion to Approve Settlement

3    Agreement ("Motion to Approve Settlement Agreement") wherein the Trustee would be able to

4    bring all of Gayler's interests in the Gayler Entities into the bankruptcy estate, including

5    Gayler's interests in Angelus and Angelus II.  After realizing that MAC had no intention of

6    withdrawing as counsel for the MAC Creditors, but rather intended to oppose Trustee's pending

7    Motion to Approve Settlement Agreement on their behalf, Trustee filed his Motion to Disqualify

8    MAC and Zachariah Larson ("Larson")[4] as Counsel for the MAC Creditors ("Motion to

9    Disqualify") on July 17, 2013.

10    Despite finding that MAC committed an egregious violation of FRBP 2014(a) by failing

11    to disclose its connections to the Debtor[5] and finding that the MAC Creditors and the estate's

12    interests were adverse[6], the Bankruptcy Court denied Trustee's Motion to Disqualify by and

13    through the Order entered on February 24, 2014, to which Trustee now seeks leave from this

14    Court to appeal.[7]

15    An immediate appeal of this Order is necessary for the following reasons:  (1) The appeal

16    involves controlling questions of law to which there is substantial ground for a difference of

17    opinion—specifically it is unclear as to whether Nevada has adopted a rebuttable presumption

18    element in NRPC 1.9 and furthermore, if Nevada has adopted such a presumption, it is unclear

19    whether the mere assertion by a challenged attorney that he was not privy to confidential

20    information is sufficient to rebut that presumption; (2) An immediate appeal, if successful, could

21    materially advance resolution of the dispute as to what property belongs to the bankruptcy estate

22    _____

[4] Larson worked for MAC from January 2012 until June 2013.  Larson is currently representing
23    the MAC Creditors in the Angelus II bankruptcy case, Case No. 12-22209-MKN ("Angelus II
Bankruptcy").  Trustee believes that Larson, by and through his previous association with MAC,
24    obtained knowledge of Gayler's bankruptcy action, including but not limited to, information
applicable to Gayler's defense of his maintained interest in Angelus and Angelus II, as well as
25    Trustee's overall litigation strategy regarding bringing assets into the bankruptcy estates.  As
such, Trustee sought to disqualify MAC and Larson from representing the MAC Creditors in
26    Gayler's bankruptcy and in the Angelus II Bankruptcy.

[5] *See Memorandum Decision* [Dkt. No. 590], Exhibit 2 at 42:4-15.
27
[6] *See Memorandum Decision* [Dkt. No. 590], Exhibit 2 at 11:7-19, 12:1-9, and 12, fn18.
28
[7] Trustee seeks leave to appeal in an abundance of caution, should this Court determine that the
Order is not a final and appealable order in its own right.

- 4 -

which, in turn, would minimize litigation expenses related to the pending adversary action; and (3) Trustee, and thereby the estate, will be harmed irreparably if leave is not granted and MAC is permitted to use information it obtained as counsel for the Former Trustee and the Trustee against the Trustee in his efforts to bring assets into the estate. For these reasons, the Trustee respectfully requests this Court grant the requested leave to appeal the Order.

## II. **STATEMENT OF FACTS**

### A. **District Court Case No. A-09-596777-C**[8]

1.      On August 6, 2009, Barry R. Moore, Janie Moore, Barry R. Moore and Janie Moore, Co-Trustees of the BAMM Living Trust Dated July 16, 2003, Donald J. Campbell, Donald J. Campbell, Trustee of the Donald J. Campbell Professional Corporation Profit Sharing Plan, John D. O'Brien, John D. O'Brien, Trustee of the John D. O'Brien Profit Sharing Plan, John Esposito, and Lorraine Esposito ("777 Plaintiffs"), by and through their counsel of record MAC, filed a complaint against Gayler, Angelus, Angelus II, CH Angelus Partners, LLC ("Angelus Partners"), Apan Wine, LLC ("Apan Wine"), Icon Holdings Company, LLC ("ICON Holdings"), Icon Real Estate Companies, Inc. ("ICON Real Estate Co."), et al. ("777 Defendants") alleging claims for breach of contract, breach of implied covenant of good faith and fair dealing, tortuous breach of the implied covenant of good faith and fair dealing, negligence, breach of fiduciary duty and aiding breach of fiduciary duty, violation of NRS 645 et seq., unjust enrichment, civil conspiracy, misrepresentation, accounting, injunctive relief, quiet title and declaratory relief ("777 Action"). Specifically, the complaint alleged that Gayler borrowed funds and encumbered property owned by Angelus and Angelus II without the consent of the entitys' other members. The funds Gayler borrowed, in the amount of approximately $2.0

[8] Case No. A-09-596777-C  Barry R. Moore, Janie Moore, Barry R. Moore and Janie Moore, Co-Trustees of the BAMM Living Trust Dated July 16, 2003, Donald J. Campbell, Donald J. Campbell, Trustee of the Donald J. Campbell Professional Corporation Profit Sharing Plan, John D. O'Brien, John D. O'Brien, Trustee of the John D. O'Brien Profit Sharing Plan, John Esposito, and Lorraine Esposito vs. William A. Gayler, Martin Barrett, Robin Barrett, Walter Loerwald, Jana Loerwald, Gloria Buonaccorsi, CH Angelus, LLC, CH Angelus II, LLC, CH Angelus Partners, LLC, APAN Wine, LLC, ICON Holdings Company, LLC, ICON Real Estate Companies, Inc., Eliot A. Alper, Trustee of the Eliot A. Alper Revocable Trust Dated March 22, 1999, Alper Limited Partnership, Does I through X, inclusive, and Roes I through X, inclusive. Trustee requests this Court take judicial notice of all pleadings filed in this case.

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

million, came from Defendant Eliot A. Alper, Trustee of the Eliot A. Alper Revocable Trust Dated March 22, 1999 and Defendant Alper Limited Partnership (collectively the "Alper Defendants").

2.    On or around November 12, 2009, the 777 Action was bifurcated and a portion was assigned to arbitration pursuant to the operating agreements for Angelus and Angelus II. The remainder of the case against the Alper Defendants went to bench trial before the Honorable Mark R. Denton.

3.    On March 15, 2011, Findings of Fact and Conclusions of Law were entered by Judge Denton who found the deed of trust securing the $2.0 million dollar loan was invalid as the deed of trust was accomplished without the consent of 51% of the non-managing members of the LLCs and based on Gayler's "manifest self-dealing."[9]

4.    On July 8, 2011, Judge Denton denied the Alper Defendants' Motion for Summary Judgment and granted the 777 Plaintiffs' Cross-Motion for Summary Judgment declaring the promissory note for $2.0 million dollars invalid.

5.    After the Alper Defendants appealed Judge Denton's Findings and Summary Judgment Order to the Nevada Supreme Court, a settlement was reached where the Alper Defendants would pay Angelus and Angelus II $1.4 million dollars and in exchange, the Alper Defendants would be able to reinstate the $2.0 million dollar promissory note and deed of trust to proceed with foreclosure of the property owned by Angelus and Angelus II.

6.    On June 14, 2012, the Angelus and Angelus II members held a meeting to discuss the disbursement of the $1.4 million dollar settlement proceeds. Recognizing the claims pending in the 777 Action against Gayler, et al., a majority of the members further resolved that any interest claimed to be held by any of them would be held in trust until resolution or adjudication of the remainder of the lawsuit.

---

[9] MAC would later try to use these Findings of Fact and Conclusions of Law to try to divest Gayler of his interest in Angelus and Angelus II. *See Second Motion for Relief from Stay* [Dkt. No. 466], where MAC, on behalf of the MAC Creditors, sought to "strip [Gayler] of any alleged membership interests he still claims he owns in Angelus and Angelus II." MAC sought this relief from the Bankruptcy Court while also serving as counsel for the Former Trustee, where MAC was actively trying to bring Gayler's interests in Angelus and Angelus II into the bankruptcy estate in the adversary action.

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

7.      After disbursement of the $1.4 million dollar settlement proceeds, $413,322.25 remained in dispute representing the interests claimed by Gayler in Angelus and Angelus II.  On September 7, 2012, the 777 Plaintiffs requested the Court to allow the deposit of all $413,322.25 into the Court's registry to protect the interests of the parties until the ownership of the membership interests claimed by Gayler was determined and/or resolved.  This request was granted by and through an order dated October 12, 2012.

8.      To date, the entire $413,322.25 amount remains in the Court's registry.[10]

**B.  Main Bankruptcy Case No. 09-31603-MKN**

9.      On November 16, 2009, The Pius Reiger Family Ltd. Partnership, John D. O'Brien Profit Sharing Plan, and Addison Glass, Inc. (collectively the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code on behalf of Gayler [Dkt. No. 1].

10.      On or around March 29, 2010, the Former Trustee was appointed as Chapter 7 Trustee.

11.      On June 28, 2010, Gayler filed a voluntary amended petition ("Petition") for relief under Chapter 7 of the Bankruptcy Code [Dkt. No. 105].

12.      In his Schedule B, Gayler listed ownership interest in approximately sixty entities, including interests in Angelus, Angelus II, CH Angelus IV, LLC ("Angelus IV), Apan Wine, Polyrus, LLC ("Polyrus"), Sunset II, LLC ("Sunset II"), Sunset V, LLC ("Sunset V"), and Sunset VIII, LLC ("Sunset VIII") [Dkt. No. 105].

13.      On April 13, 2011, MAC, on behalf of the MAC Creditors, filed a Motion for Order Confirming Automatic Stay Does Not Apply, Alternatively; Motion for Relief from Stay ("Motion for Relief from Stay") regarding Debtor's interest in Sunset V [Dkt. No. 186].  This Motion for Relief from Stay was supported by a declaration from Aurbach, wherein Aurbach admitted to being a 20% owner of Sunset V [Dkt. No. 188].  On June 3, 2011, this Court issued

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

---

[10] The Trustee is informed and believes that the estate is entitled to all or some of these funds. Despite MAC's direct involvement in the adversary action which sought to bring Gayler's interests in Angelus and Angelus II into the bankruptcy estate, MAC, now on behalf of the MAC Creditors, seeks to divest Gayler and thereby the estate of these interests.

an order approving, in part, MAC's Motion for Relief from Stay ("Order of Relief") [Dkt. No. 209].

14.     One day later, on April 14, 2011, Former Trustee filed an Application to Employ MAC as Special Counsel Under Contingency Fee Basis ("Application to Employ") [Dkt. No. 192].  According to the Application to Employ, MAC was to be retained as special counsel to assist the Former Trustee and the Trustee "with respect to potential fraudulent conveyance and/or preference actions, including but not limited to, preparation of adversary complaints, to conduct discovery, preparation of motions, orders and any other documents and pleadings required incident thereto, attendance at all hearings, and all support services reasonably related thereto, which may include the following:  (1) To institute, prosecute or defend any adversary proceedings and/or contested matters arising out of this bankruptcy proceeding in which Trustee may be a party; (2) To assist in recovery and obtaining necessary Court approval for recovery and liquidation of estate assets, and to assist in protecting and preserving the same where necessary; and (3) To advise Applicant and perform all other legal services for the Applicant which may be or become necessary in this bankruptcy proceeding in connection with the special purpose set forth herein above."  *See Application to Employ*, [Dkt. No. 192].

15.     The Application to Employ was supported by a declaration from Aurbach, submitted under penalty of perjury, wherein Aurbach claimed to "have no connections with the Debtor, creditors or any other party in interest, or their respective attorneys and accountants which connections may constitute a conflict of interest or adverse position."  While Aurbach went on to state that MAC "represented" the MAC Creditors who were "potentially affiliated with the Debtor or creditors of [the] estate", Aurbach claimed that MAC was "disinterested within the meaning of Section 101(14) of the Bankruptcy Code…"  Furthermore, Aurbach submitted that MAC's "representation of the Chapter 7 Trustee as special counsel will not be adverse to the bankruptcy estate."  *See Aurbach Declaration*, Dkt. No. 193.  Based on these representations, the Court granted the Application to Employ on May 23, 2011 [Dkt. No. 205].

16.     On December 23, 2011, Former Trustee, by and through his counsel MAC, initiated an adversary action against Gayler, Apan Wine, ICON Real Estate Co., ICON Holdings,

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

- 8 -

1    et al, asserting alter ego and fraudulent transfer claims in Adversary Case No. 11-01410-MKN

2    ("Adversary Action") [Adv. Dkt. No. 1].

3         17.    In January 2012, presumably with the Former Trustee's informed consent,

4    settlement discussions began between MAC, as special counsel to the Former Trustee, and

5    Gayler's attorney, Sylvester.  During negotiations, MAC prepared settlement documents but after

6    the proposed settlement was unanimously rejected by the MAC Creditors in September 2012,

7    MAC ended settlement discussions with Gayler and began focusing its efforts on pursuing

8    litigation in the Adversary Action to recover assets for the estate.  *See Opposition* [Dkt. No. 543]

9    at 19:11-19 and 20:1-5.

10        18.    On May 10, 2012, the Former Trustee, by and through his counsel MAC, filed a

11   first amended complaint in the Adversary Action against Gayler, Apan Wine, Angelus, Angelus

12   II, ICON Holdings, ICON Real Estate Co., et al.  Among other things, the amended complaint

13   sought an order from the Court declaring that Gayler's interest in Apan Wine, Angelus, Angelus

14   II, et al., belonged to the bankruptcy estate [Adv. Dkt. No. 80].

15        19.    On November 14, 2012, MAC, on behalf of the MAC Creditors, filed a Motion

16   for Determination that the Automatic Stay Does Not Apply, or Alternatively, for Order Granting

17   Relief from the Automatic Stay ("Second Motion for Relief") regarding Debtor's interests in

18   Angelus and Angelus II [Dkt. No. 466].  As stated in the Second Motion for Relief, the MAC

19   Creditors sought to "strip [Gayler] of any alleged membership interests he still claims he owns in

20   Angelus and Angelus II" [Dkt. No. 466].[11]  To date, the Court has not issued an order on the

21   Second Motion for Relief.

22   ───────────────
[11] It should be noted that MAC, in its Opposition to the Motion to Disqualify [Dkt. No. 543],
23   argued that "[t]hroughout MAC's representation of the [MAC] Creditors and Trustee Rosenberg,
     as Special Counsel, no actual conflict existed."  *See* Dkt. No. 543, p38 of 68:5-7.  MAC went on
24   to argue that "[i]t was not until after MAC's voluntary withdrawal as Special Counsel that a
     conflict developed when Trustee Rosenberg switched sides and entered into secret negotiations
25   with Gayler…"  *See* Dkt. No. 543, p38 of 68:9-12.  As this Court can see, conflicts existed prior
     to MAC's voluntary withdrawal in that the Second Motion for Relief sought an order from the
26   Bankruptcy Court to allow MAC, on behalf of the MAC Creditors, to strip Gayler (and thereby
     the estate) of any interests he or it had in Angelus and Angelus II in the district court all the
27   while arguing in the bankruptcy court adversary action, initiated by MAC as counsel for the
     Former Trustee, that Gayler's interest in Angelus and Angelus II belonged to the bankruptcy
28   estate [Adv. Dkt. No. 80].  Thus, MAC was essentially arguing with itself as to Gayler's interest
     in Angelus and Angelus II.  As is quite evident, MAC was hopelessly conflicted out of
     representation of the Trustee prior to the Trustee's appointment as successor trustee in this case.

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

20.    On December 12, 2012, Trustee was appointed as successor trustee in Gayler's bankruptcy case, replacing the Former Trustee [Dkt. No. 482].

21.    On February 4, 2013, the Trustee, Kim, Aurbach, Terry Coffing, Esq. of MAC, Larson, Liane Wakayama, Esq. of MAC ("Wakayama"), and Hayes met for over two hours and discussed everything related to the state court litigation and bankruptcy proceedings.

22.    On February 19, 2013, Trustee filed a Motion to Employ Howard Kim & Associates and Substitution of General Counsel Nunc Pro Tunc as of February 4, 2013 [Dkt. No. 488]. Trustee's motion was granted by the Bankruptcy Court in an order entered on March 15, 2013 [Dkt. No. 500].

23.    On April 11, 2013, MAC filed a Motion to Withdraw as Special Counsel Attorneys for Chapter 7 Trustee, David A. Rosenberg ("Motion to Withdraw") [Dkt. No. 507]. This Motion to Withdraw was granted by the Court on June 10, 2013 [Dkt. No. 513].

24.    At this time, Trustee believed MAC would also be voluntarily withdrawing as counsel for the MAC Creditors as well, given the conflicts involved in this case.

25.    On July 3, 2013, after modifying the settlement documents MAC drafted for the Former Trustee in January 2012, Trustee filed the Motion to Approve Settlement Agreement between the Trustee, Gayler, Sylvester, Walter Loerwald aka Leroy Loerwald, Martin Barrett, and the Gayler Entities [Dkt. Nos. 514 and 516]. Pursuant to the terms of the settlement agreement, Trustee will pay Gayler $100,000.00, which will be paid directly to Sylvester for Gayler's attorney's fees, and in exchange, Gayler agrees that all of his remaining assets, including but not limited to his ownership and management interests in the Gayler Entities, including his interests in Angelus, Angelus II, Angelus IV, Angelus Partners, ICON Holdings, ICON Real Estate Co., and Sunset V, will become part of the bankruptcy estate. Upon approval of the settlement agreement, the Trustee will dismiss its claims asserted in Adversary Action.

26.    After realizing that MAC and Larson had no intention of withdrawing as counsel for the MAC Creditors[12], but rather intended to oppose Trustee's pending Motion to Approve

---

[12]    On July 10, 2013, at a status check hearing on a motion to dismiss in the Angelus II Bankruptcy case, Larson stated that his clients believe that the settlement proceeds in the 777 Action do not belong to Gayler's bankruptcy estate.

- 10 -

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

1    Settlement Agreement on their behalf, Trustee filed his Motion to Disqualify on July 17, 2013

2    [Dkt. No. 524].

3        27.    On February 24, 2014, this Court issued a Memorandum Decision on Trustee's

4    Motion to Disqualify [Dkt. No. 590] and an Order denying Trustee's motion [Dkt. No. 591], to

5    which the Trustee now submits this Motion for Leave to Appeal.

6        28.    In the Memorandum Decision, the Court made the following findings:

7    a.    Regarding the Dominus Sale Motion, the Court noted, "[i]t is not readily apparent how

8        MAC under the MAC Employment Order was authorized to represent Lisowski in

9        connection with the Dominus Sale Motion."[13] *See Memorandum Decision* [Dkt. No

10       590], Exhibit 2 at 9, fn12.

11   b.    Regarding the Second Motion for Relief, the Court noted, "MAC's representation of

12       Lisowski in connection with the Moore & Campbell RAS Motion clearly was beyond the

13       scope of MAC's employment as special counsel." *See Memorandum Decision* [Dkt. No

14       590], Exhibit 2 at 12, fn19.

15   c.    Despite these findings, the Court found that "[t]he scope of MAC's representation as

16       special counsel was dictated by the MAC Employment Order." *See Memorandum*

17       *Decision* [Dkt. No 590], Exhibit 2 at 40:7-9.

18   d.    In determining substantial relatedness, the Court found that "[a]lthough the moving party

19       need not identify the confidential information that was given…the inference that

20       confidential information was given in the former representation is rebuttable." *See*

21       *Memorandum Decision* [Dkt. No 590], Exhibit 2 at 26:5-8.  The Court went on to find,

22       "[a]s to the evidence offered to rebut the inference, a strict standard of proof is applied

23       requiring the attorney to 'clearly and persuasively show that he was not privy to the

24       confidences and secrets of the client.'" *See Memorandum Decision* [Dkt. No 590],

25       Exhibit 2 at 26:12-14.  Finally the Court found, "[a]ny doubt as to the existence of a

26   _____

27   [13] On September 15, 2011, MAC filed on behalf of the Former Trustee a motion confirming
     Debtor's 40% membership interest and management rights in an entity known as Dominus M-B,
     LLC ("Dominus Sale Motion") [Dkt. No. 300].  The motion also sought to allow the Former
28   Trustee to sell the Debtor's membership interest and management rights to an entity identified as
     Hand Enterprises, Inc. for $170,556.00.  *See Memorandum Decision* [Dkt. No. 590] at 8:15-19.

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

- 11 -

disabling conflict of interest must be resolved in favor of disqualification." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 26:15-16.

e.    "The court can infer that Lisowski may have given confidential information to MAC in connection with MAC's investigation and pursuit of fraudulent transfer and preferential transfer actions." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 43:4-6.

f.    "Other than the inference that may be drawn from the attorney-client relationship, however, there is no evidence in the record to establish that Lisowski provided confidential information to MAC or discussed strategies regarding his management of the litigation." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 43:8-11.

g.    "With respect to former trustee Lisowski, there is no evidence before the court as to any information obtained from the former Chapter 7 trustee that would be relevant to either MAC's or Larson's representation of their current clients in connection with the instant case." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 28:19-21.

h.    "Based on the MAC Employment Order, the court also can infer that Rosenberg may have given confidential information to MAC in connection with MAC's investigation and pursuit of fraudulent transfer and preference actions." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 44:7-9

i.    "Other than the inference that may be drawn from the continued attorney-client relationship between MAC and Rosenberg as successor trustee of the bankruptcy estate, there is no evidence in the record to clearly establish that Rosenberg provided confidential information to MAC or Larson, or discussed strategies regarding his oversight of the existing litigation." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 44:14-17.

j.    "Several of the declarations do not state that they are submitted under penalty of perjury as required by 28 U.S.C. § 1746, see Third Rosenberg Declaration, Wakayama Declaration, First Hayes Declaration, Second Hayes Declaration, and Second Aurbach Declaration, but no objections to their consideration on this basis have been raised. The

///

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

court therefore will consider all of the declarations for their full probative value, if any." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 20, fn31.

k.  "MAC's failure to disclose Aurbach's current financial connections with the Debtor was an egregious violation of FRBP 2014(a). The Aurbach Verified Statement accompanying the MAC Employment Application represented that Aurbach had no connections with the Debtor, his creditors or other parties in interest even though the Aurbach RAS Declaration revealed that Aurbach had a 20% interest in Sunset V. And even that was not Aurbach's only financial connection as he only disclosed in response to the Disqualification Motion that he also had an interest in Polyrus, LLC, Sunset 8, LLC, and possibly Sunset II, LLC (through Polyrus, LLC)." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 42:4-11.

l.  The Court went on to note that "Hayes also had a prior financial connection to the Debtor through his investment in DA 1147, LLC, see note 42, *supra*, which was required to be disclosed under FRBP 2014(a)." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 42, fn46.

m.  "By contrast, Aurbach, Hayes, Wakayama, and Larson are categorical in denying their receipt of any confidential information from either Lisowski or Rosenberg." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 45:8-9.

n.  "For the reasons discussed, the court concludes that MAC and Larson have sufficiently demonstrated that they were not privy to confidential information or strategies of Lisowski or Rosenberg during their tenure as special counsel. Any inference of receipt of confidential information as a result of their prior representation of the bankruptcy trustees has been rebutted. Additionally, Rosenberg has failed to independently establish that MAC or Larson received confidential information. As such, Rosenberg has not met his burden under NRPC 1.9(a) of establishing that the MAC and Larson's former representation is substantially related to their representation of their current clients." *See Memorandum Decision* [Dkt. No 590], Exhibit 2 at 46:4-11.

///

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

- 13 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

## C.  STATEMENT OF QUESTIONS PRESENTED AND RELIEF SOUGHT

Trustee raises the following issues on appeal:

1.  Did the Bankruptcy Court err in finding that the Trustee failed to meet his burden under NRPC 1.9 by showing that MAC and Larson's former representation is substantially related to their current representation by:

   a.  Limiting its analysis of the scope of MAC's representation to that dictated by the Application to Employ, despite having specifically found that the record indicated MAC exceeded the scope of its approved employment?

   b.  Performing an inquiry into whether MAC and/or Larson actually acquired confidential information in their representation of the Former Trustee and Trustee, when the law states that such inquiry should not occur but that the court should instead undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that would be harmful to the client in the later matter?[14]

   c.  Adding a rebuttable presumption element in NRPC 1.9, when the Nevada Supreme Court's analysis under that provision has never included that element and insists that courts must refrain from inquiring into whether confidential information was actually acquired?[15]

---

[14] *See Robbins v. Gillock*, 109 Nev. 1015, 1018, 862 P.2d 1195, 1197 (1993) ("In proving that a prior representation is substantially related to present litigation, however, the moving party is not required to divulge the confidences actually communicated, nor should a court inquire into whether an attorney actually acquired confidential information in the prior representation which is related to the current representation. *Commonwealth Ins. Co.*, 808 F.Supp. at 1204; *Satellite Fin. Planning*, 652 F.Supp. at 1283. The court should instead undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter. *Commonwealth Ins. Co.*, 808 F.Supp. at 1204; *Satellite Fin. Planning*, 652 F.Supp. at 1283.").

[15] *See Id.*; *see also Waid v. Eighth Judicial Dist. Court ex rel. Cnty. of Clark*, 121 Nev 605, 610, 119 P.3d 1219, 1222-23 (2005) citing *Robbins* ("We have recognized that [i]n proving that a prior representation is substantially related to present litigation, however, the moving party is not required to divulge the confidences actually communicated, nor should a court inquire into whether an attorney actually acquired confidential information in the prior representation which is related to the current representation. The court should instead undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter.").

2.  If the Bankruptcy Court was correct in adding a rebuttable presumption element in NRPC 1.9, which is unprecedented in Nevada Supreme Court cases that address disqualification under this provision, did the Bankruptcy Court err in finding that the declarations submitted by the MAC attorneys, several of which were not made under penalty of perjury as required by 28 U.S.C § 1746, met the strict standard of proof required to rebut the presumption that confidential information was provided in MAC and Larson's representation of the Former Trustee and the Trustee, where any doubt as to the existence of a disabling conflict of interest must be resolved in favor of disqualification and where the circumstances show that the MAC attorneys had a history of making false representations to the Court in this case?

**D.  STATEMENT OF REASONS WHY AN APPEAL SHOULD BE GRANTED**

**A.  The Order is a Final Order Appealable by Right**

A final order may be appealed as a matter of right under 28 U.S.C. § 158(a)(1). "The Ninth Circuit has adopted the pragmatic approach to finality in bankruptcy cases, according to which an order is final and thus appealable if it:  (1) resolves and seriously affects substantive rights and (2) finally determines the discrete issue to which it is addressed." *See In re 3DFX Interactive, Inc.*, BAP NC-07-1240-KJUMK, 2008 WL 8448326 (B.A.P. 9th Cir. Feb. 6, 2008). "Finality in the bankruptcy context does not require complete adjudication of the underlying bankruptcy case but rather only of the given issue." *Id.* "Moreover, flexibility of the finality test in the bankruptcy context has allowed some courts to conclude that a disqualification order is a final judgment." *Id.*

Here, the Order should be deemed a final order as it resolved a substantive issue by stating that, "Trustee's Motion to Disqualify Counsel for John D. O'Brien Profit Sharing Plan and Counsel for Barry R. Moore and Janie Moore as Co-Trustees of The Bamm Living Trust Dated July 16, 2003, Groth, LLC, CH Pichon, LLC, and Harlan, LLC Through Their Managing Member John O'Brien, Docket No. 524, be, and the same hereby is, DENIED." This determination seriously affects the substantive rights of the Trustee to not have confidential information he disclosed to his former counsel used against him in his efforts to bring assets into

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

the estate.  Moreover, the Order made a final determination as to the discrete issue to which it addressed, that being MAC's disqualification pursuant to NRPC 1.9.  As such, the Court should determine that the Order is a final, appealable order.

**B.  Alternatively, the Order is an Appealable Interlocutory Order**

Even if the Court determines that the Order is not final, interlocutory orders are appealable with leave of courts pursuant to 28 U.S.C. § 158(a)(3) which provides that the district courts of the United States shall have jurisdiction to hear appeals "with leave of the court, from other interlocutory orders and decrees."  Whether to grant leave to appeal an interlocutory order is within the discretion of the court.  *See In re Bertain*, 215 B.R. 438, 441 (B.A.P. 9th Cir. 1997).  Further, Rule 8003(a) governs the procedure for leave to appeal.  A court may grant leave if the order "involves a controlling question of law as to which there is substantial ground for a difference of opinion, and an immediate appeal, if successful, would materially advance the termination of the underlying litigation."  *Id.*; *see also In re Burke*, 95 B.R. 716, 717 (B.A.P. 9th Cir. 1989).  Another factor to consider is whether refusal to grant the appeal would result in wasted litigation and expense.  *See In re NSB Film Corp.*, 167 B.R. 176, 180 (B.A.P. 9th Cir. 1994); *see also In re Roderick Timber Co.*, 185 B.R. 601, 604 (B.A.P. 9th Cir. 1995); see also In re Cutter, 398 B.R. 6, 16-17 (B.A.P. 9th Cir. 2008) aff'd, 468 F. App'x 657 (9th Cir. 2011) ("Granting leave is appropriate when, as here, an appeal would materially advance resolution of the dispute and minimize further litigation expenses.").  Additionally, the court may consider whether the movant seeking leave to appeal will be harmed irreparably if leave not granted.  *See Shurance v. Planning Control Int'l, Inc.*, 839 F.2d 1347, 1348 (9th Cir. 1988).

Here, the Order involves two controlling questions of law to which there is substantial ground for a difference of opinion.  First, it is unclear whether Nevada has adopted a rebuttable presumption element in NRPC 1.9.  *Compare Robbins*, 109 Nev. at 1018, 862 P.2d at 1197 (finding that proof of substantial relatedness does not require the moving party to divulge confidences and the court should not inquire into whether confidences were actually acquired); *and Wade*, 121 Nev. at 610, 119 P.3d at 1222-23 (finding that the court should not inquire into whether actual confidential information was obtained but instead should undertake a realistic

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

appraisal of whether confidences might have been disclosed in the prior matter that would be harmful to the client in the later matter) *with Edwards v. 360 Commc'ns*, 189 F.R.D. 433, 439 (D. Nev. 1999) (adding a rebuttable presumption element to a disqualification analysis) *and SHFL Entm't, Inc. v. DigiDeal Corp.*, 2:12-CV-01782-GMN, 2013 WL 178130 (D. Nev. Jan. 16, 2013) (adding a rebuttable presumption element to a disqualification analysis). Moreover, if it is found that Nevada has adopted this rebuttable presumption element in NRPC 1.9, then it is unclear whether the mere assertion by a challenged attorney that he was not privy to confidential information is sufficient to rebut a presumption of shared confidences. *See Edwards v. 360 Commc'ns*, 189 F.R.D. 433, 439 (D. Nev. 1999) ("It is true that courts have disagreed as to whether the mere assertion by the challenged attorney that he was not privy to any confidential information is sufficient to rebut a presumption of shared confidences.").

Additionally, this immediate appeal, if successful, could materially advance resolution of the Adversary Action and this very complicated bankruptcy case. At this time, there is a pending Motion to Approve Settlement Agreement wherein the Trustee could conclusively and determinately bring all of the Debtor's assets into the bankruptcy estate once and for all. This feat—which MAC, as counsel for the Former Trustee and Trustee, was unable to accomplish in over a year and a half of litigation in the Adversary Action—would resolve the issues pending in the Adversary Action and thus would minimize litigation expenses in this case. MAC, as counsel for the MAC Creditors, intends to oppose this settlement agreement that they originally drafted for the Former Trustee. The Trustee believes that MAC, in opposing this settlement, will use confidential information it acquired as counsel for the Former Trustee and Trustee— including but not limited to its intimate knowledge of the strengths and weaknesses of the agreement—against the Trustee in his efforts to bring assets into the estate.[16] If this appeal were dismissed, it would be resurrected in its same form after the Motion to Approve Settlement Agreement had been heard and by that time, the immediate harm the Trustee seeks to avoid may
///

---

[16] It should be noted that MAC, as counsel for the Former Trustee and the Trustee, attempted to bring many of these same assets into the estate by and through the Adversary Action, with minimal success.

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

have already occurred. To re-litigate these matters would significantly waste time and resources. For the sake of judicial economy, Trustee believes this appeal is appropriate at this time.

**E.  CONCLUSION**

For the reasons stated herein, the Trustee should be afforded an appeal of the Order as an appealable final order. However, in the event that the Court determines the Order to be an interlocutory order, Trustee respectfully requests that leave to appeal be granted.

Dated this 5th day of March, 2014.

**HOWARD KIM & ASSOCIATES**

*/s/Howard C. Kim*
Howard C. Kim, Esq.
Nevada Bar No. 10386
Jacqueline A. Gilbert, Esq.
Nevada Bar No. 10593
Katherine C.S. Carstensen, Esq.
Nevada Bar No. 10656
1055 Whitney Ranch Drive, Suite 110
Henderson, Nevada 89014
*Attorneys for David A. Rosenberg, Chapter 7 Trustee*

HOWARD KIM & ASSOCIATES
1055 WHITNEY RANCH DRIVE, SUITE 110
HENDERSON, NEVADA 89014
(702) 485-3300 FAX (702) 485-3301

- 18 -

# EXHIBIT 1

_____
Honorable Mike K. Nakagawa
United States Bankruptcy Judge

**Entered on Docket**
**February 24, 2014**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                          )        Case No.: 09-31603-MKN
                                                )        Chapter 7
WILLIAM A. GAYLER,                              )
                                                )        Date:   September 19, 2013
                    Debtor.                     )        Time:   9:30 a.m.
_____ )

**ORDER ON TRUSTEE'S MOTION TO DISQUALIFY COUNSEL FOR JOHN D. O'BRIEN PROFIT SHARING PLAN AND COUNSEL FOR BARRY R. MOORE AND JANIE MOORE AS CO-TRUSTEES OF THE BAMM LIVING TRUST DATED JULY 16, 2003, GROTH, LLC, CH PICHON, LLC AND HARLAN, LLC THROUGH THEIR MANAGING MEMBER JOHN O'BRIEN**

The court having entered its Memorandum Decision on Trustee's Motion to Disqualify Counsel for John D. O'Brien Profit Sharing Plan and Counsel for Barry R. Moore and Janie Moore As Co-Trustees of The Bamm Living Trust Dated July 16, 2003, and Groth, LLC, CH Pichon, LLC, and Harlan, LLC through Their Managing Member John O'Brien concurrently herewith,

        **IT IS HEREBY ORDERED** that the Trustee's Motion to Disqualify Counsel for John D. O'Brien Profit Sharing Plan and Counsel for Barry R. Moore and Janie Moore As Co-Trustees of The Bamm Living Trust Dated July 16, 2003, Groth, LLC, CH Pichon, LLC, and Harlan, LLC Through Their Managing Member John O'Brien , Docket No. 524, be, and the same hereby is, **DENIED**.

Notice and Copies sent through:

1

CM/ECF ELECTRONIC NOTICING AND/OR BNC MAILING MATRIX

and sent via FIRST CLASS MAIL BY THE COURT AND/OR BNC to:

WILLIAM A GAYLER
9960 WEST CHEYENNE AVENUE, SUITE 160
LAS VEGAS, NV 89129

John O'Brien
Marquis Aurbach Coffing
Attn: David A. Colvin, Esq.
10001 Park Run Drive
Las Vegas, NV 89145

April Bonifatto, Esq.
Marquis Aurbach Coffing
10001 Park Run Drive
Las Vegas, NV 89145

Albert Marquis, Esq.
Marquis Aurbach Coffing
10001 Park Run Drive
Las Vegas, NV 89145

James Patrick Shea, Esq.
Erika M. Wright, Esq.
Shea & Carlyon, Ltd.
701 Bridger Ave., Suite 850
Las Vegas, NV 89101

John R. McMillan, Esq.
Jessica K. Marsh, Esq.
FLANGAS MCMILLAN LAW GROUP
3275 S. Jones Blvd., Suite 105
Las Vegas, NV 89146

Jacqueline A. Gilbert, Esq.
Katherine C.S. Carstensen, Esq.
Howard Kim & Associates
400 N. Stephanie St., Suite 160
Henderson, NV 89014

# # #

2

# EXHIBIT 2

_____
Honorable Mike K. Nakagawa
United States Bankruptcy Judge

**Entered on Docket**
**February 24, 2014**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:                                     )     Case No.: 09-31603-MKN
                                           )     Chapter 7
WILLIAM A. GAYLER,                         )
                                           )     Date:   September 19, 2013
                    Debtor.                )     Time:   9:30 a.m.
_____    )

**MEMORANDUM DECISION ON TRUSTEE'S MOTION TO DISQUALIFY COUNSEL FOR JOHN D. O'BRIEN PROFIT SHARING PLAN AND COUNSEL FOR BARRY R. MOORE AND JANIE MOORE AS CO-TRUSTEES OF THE BAMM LIVING TRUST DATED JULY 16, 2003, GROTH, LLC, CH PICHON, LLC AND HARLAN, LLC THROUGH THEIR MANAGING MEMBER JOHN O'BRIEN[1]**

On September 19, 2013, the court heard the Trustee's Motion to Disqualify Counsel for John D. O'Brien Profit Sharing Plan and Counsel for Barry R. Moore and Janie Moore As Co-Trustees of The Bamm Living Trust Dated July 16, 2003, and Groth, LLC, CH Pichon, LLC, and Harlan, LLC through Their Managing Member John O'Brien ("Disqualification Motion"). The appearances of counsel were noted on the record. After the oral arguments were presented, the matter was taken under submission.

_____

[1] Unless otherwise specified, all "Section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure. All references to "LR" are to the Local Rules of Practice for the District of Nevada. All references to "ECF No." are to the numbers assigned to the documents filed in the bankruptcy case or the minute entries of the court as they appear on the docket maintained by the clerk of the court.

1

**BACKGROUND**

On November 16, 2009, an involuntary Chapter 7 petition was filed against William A. Gayler ("Debtor"). (ECF No. 1). The three petitioning creditors were The Pius Reiger Family Ltd. Partnership, the John D. O'Brien Profit Sharing Plan, and Addison Glass, Inc. ("Petitioning Creditors"). On November 25, 2009, the Petitioning Creditors filed a motion to appoint a bankruptcy trustee. (ECF No. 8). On December 8, 2009, Debtor filed an answer to the involuntary petition. (ECF No. 15). On December 14, 2009, Debtor filed an opposition to the motion to appoint a trustee. (ECF No. 19).

On December 17, 2009, the court approved interim relief that, <u>inter alia</u>, enjoined the Debtor from causing any entity that he owns or controls, directly or indirectly, from transferring any real or personal property exceeding $10,000 in value without further order of the court or the majority vote of non-related members of the entity ("Interim Involuntary Order"). (ECF No. 32).

On January 6, 2010, a scheduling conference was held on the involuntary petition. On January 20, 2010, a conditional order was entered scheduling a trial on the involuntary petition to be held on March 16, 2010. (ECF No. 50).[2]

On March 16, 2010, the court proceeded with trial of the involuntary petition. At the trial, a settlement between the Petitioning Creditors and the Debtor was placed on the record. Among other things, the settlement provided that the involuntary petition would be dismissed on the condition that the Debtor paid $100,000 to the Petitioning Creditors no later than March 19, 2010. Debtor agreed that if he failed to meet the terms of the settlement, an order for relief could

---

[2] The Petitioning Creditors previously had filed a motion for summary judgment on the merits of the involuntary petition. (ECF No. 27). On January 11, 2010, Debtor filed opposition requesting a deferred ruling until actual trial of the involuntary petition. (ECF No. 47). On February 5, 2010, the Petitioning Creditors filed a reply. (ECF No. 66). On February 12, 2010, a hearing was held and an order denying summary judgment was entered on February 16, 2010. (ECF No. 69). On the same date, an order was entered scheduling a pretrial conference for the trial of the involuntary petition. (ECF No. 70).

2

be entered.

On March 29, 2010, a conditional order of dismissal memorializing the terms of the settlement was entered. (ECF No. 84). Because the Debtor already had failed to meet the deadline for payment to the petitioning creditors, on March 29, 2010, an order for relief under Chapter 7 also was entered. (ECF No. 85). Also on the same date, a notice of the Chapter 7 proceeding was issued disclosing the appointment of James F. Lisowski, Sr. ("Lisowski") as the bankruptcy trustee to administer the case.[3] (ECF No. 86). The notice further stated the date and time of the meeting of creditors. The notice also set forth a deadline of June 29, 2010 ("Discharge Deadline"), for parties in interest to file complaints objecting to discharge under Section 727 ("727 Actions") or to determine dischargeability of debt under Section 523 ("523 Actions").

On June 24, 2010, a motion to extend the Discharge Deadline was filed by the law firm of Marquis & Aurbach, predecessor to the law firm of Marquis Aurbach Coffing ("MAC"). (ECF No. 98). The motion was brought on behalf of John D. O'Brien individually and as Trustee of the John D. O'Brien Profit Sharing Plan ("O'Brien Extension Motion")[4], the latter of which was one of the original Petitioning Creditors. The motion also was brought on behalf of Donald J. Campbell, J. Colby Williams, William Godfrey, Barry R. Moore, Janie Moore, Barry R. Moore and Janie Moore, Co-Trustees of the BAMM Living Trust Dated July 16, 2003, John Esposito, Mario P. Borini, Bianca Borini, Joseph Borini, and Eroom Holdings, LP.

On June 28, 2010, Lisowski also filed a motion to extend the Discharge Deadline. (ECF No. 103). On the same date, Debtor filed a voluntary Amended Chapter 7 petition that included schedules of his assets. (ECF No. 105). Debtor's personal property Schedule "B" listed the

---

[3] At the time of his appointment, Lisowski was on a panel of bankruptcy trustees in this judicial district who would be randomly assigned Chapter 7 cases as they were filed.

[4] Collectively, John D. O'Brien individually and as Trustee of the John D. O'Brien Profit Sharing Plan will be referred to as "O'Brien" unless otherwise indicated.

1  Debtor's management or ownership interests in numerous entities, some of which Debtor

2  claimed as exempt on his Schedule "C." The entities in which the Debtor claims to have a

3  management or ownership interest include CH Pichon LLC, Sunset II LLC, Sunset V LLC,

4  Harlan LLC, CH Angelus LLC, CH Angelus II LLC, CH Angelus IV LLC, Dominus M-B LLC,

5  Diamante Rose LLC, and 23 Golden Sunray LLC.

6      On September 7, 2010, Debtor filed an amended Schedule "F" listing unsecured claims

7  exceeding $21,792,000.  (ECF No. 120).  On the same date, an order was entered granting

8  Lisowski's motion to extend the Discharge Deadline (ECF No. 121) as well as an order granting

9  the O'Brien Extension Motion.  (ECF No. 122).

10      On September 24, 2010, the meeting of creditors was concluded.

11      On October 21, 2010, an objection to certain of the Debtor's claimed exemptions was

12  filed by City National Bank ("CNB").  (ECF No. 136).  CNB specifically objected to Debtor's

13  claimed exemption in more than sixty entities.  On October 25, 2010, Lisowski filed a joinder in

14  the exemption objection filed by CNB.  (ECF No. 141).  On October 27, 2010, MAC also filed

15  on behalf of O'Brien a joinder in the exemption objections filed by CNB and Lisowski.  (ECF

16  No. 143).  On October 27, 2010, Eliot A. Alper as Trustee of the Eliot A. Alper Revocable Trust

17  dated March 22, 1999, filed a joinder in the exemption objections filed by CNB and Lisowski.

18  (ECF No. 144).  On October 28, 2010, Byron Lebow ("Lebow") also filed a joinder in the

19  exemption objection filed by CNB.  (ECF No. 146).[5]

20      On November 1, 2010, Lisowski filed a motion requesting a further extension of the

21  Discharge Deadline to February 1, 2011.  (ECF No. 148).[6]  Lisowski's motion was noticed to be

23      [5] On November 5, 2010, Flamingo Tenaya, LLC, filed a joinder in the exemption
24  objection filed by CNB.  (ECF No. 159).

25      [6] On October 25, 2010, a stipulation between CNB and the Debtor was filed extending
    the Discharge Deadline.  (ECF No. 140).  An order approving that stipulation was entered on
26  November 12, 2010.  (ECF No. 160).

4

1    heard on December 1, 2010.  (ECF No. 149).  Also on November 1, 2010, O'Brien filed a similar

2    request for an extension of the Discharge Deadline to December 31, 2010.  (ECF No. 151).  That

3    motion was noticed to be heard on December 8, 2010.  (ECF No. 153).  Additionally, Lebow

4    filed a joinder in O'Brien's request to extend the Discharge Deadline.  (ECF No. 154).  On

5    November 24, 2010, Debtor filed an objection to O'Brien's request (ECF No. 161) as well as to

6    Lebow's attempt to join in O'Brien's request.  (ECF No. 162).

7        On December 1, 2010, the court heard and granted Lisowski's motion to extend the

8    Discharge Deadline as no opposition had been filed by the Debtor.

9        On December 8, 2010, the court heard and took under submission O'Brien's motion to

10   extend the Discharge Deadline as well as Lebow's joinder.

11       On January 7, 2011, an order was entered sustaining CNB's objection to the exemptions

12   claimed by the Debtor.  (ECF No. 164).

13       On January 28, 2011, MAC commenced an adversary proceeding against the Debtor to

14   determine dischargeability of debt under Sections 523(a)(2) and 523(a)(4), on behalf of John D.

15   O'Brien, as Trustee of the John D. O'Brien Profit Sharing Plan, Donald Campbell, Colby

16   Williams, and Mario P. Borini, individually and as Chairman of the Board of the Trustees of the

17   Alexander Dawson Foundation.  That adversary proceedings is denominated Adversary

18   Proceeding No. 11-01027-MKN ("O'Brien 523 Action").

19       On February 1, 2011, Lisowski filed a motion for an additional extension of the

20   Discharge Deadline through May 1, 2011.  (ECF No. 166).  It was noticed to be heard on March

21   10, 2011.  (ECF No. 167).

22       On February 22, 2011, an order was entered granting O'Brien's motion and extending the

23   Discharge Deadline to March 15, 2011.  (ECF No. 172).  The order further denied Lebow's

24

25

26

                                        5

1    request to join in the extension.[7]

2         On March 2, 2011, Lisowski filed an application to employ the Lisowski Law Firm,

3    Chtd., as counsel to the bankruptcy estate nunc pro tunc to Lisowski's appointment as Chapter 7

4    trustee.  (ECF No. 175).  The application was noticed to be heard on April 7, 2011.  (ECF No.

5    176).

6         On March 15, 2011, MAC commenced a separate adversary proceeding against the

7    Debtor to determine dischargeability of debt under Sections 523(a)(2) and 523(a)(4), on behalf of

8    Barry R. Moore, Janie Moore, Eroom Holdings, LP, and Barry R. Moore and Janie Moore, Co-

9    Trustees of the BAMM Living Trust Dated July 16, 2003 ("the Moore Parties").  That adversary

10    proceeding is denominated Adversary Proceeding No. 11-01088-MKN ("Moore 523 Action").

11         On March 19, 2011, Lisowski's motion for an additional extension of the Discharge

12    Deadline through May 1, 2011, was granted as unopposed.[8]

13         On April 13, 2011, MAC filed a motion for relief from stay in the Debtor's bankruptcy

14    proceeding on behalf of creditors identified as "65% of the Owners of Sunset V, LLC,"

15    apparently consisting of Cynthia E. Brown as to 10%, William Godfrey as to 5%, Richard Plaut

16    as to 10%, Phillip S. Aurbach as to 20%, and John O'Brien as to 20% ("65% Owners RAS

17    Motion").  (ECF No. 186).  The motion was accompanied by the Declaration of Phillip S.

18    Aurbach ("Aurbach RAS Declaration") in support of the relief requested.  (ECF No. 188).

19    Phillip S. Aurbach ("Aurbach") is a principal of MAC and according to his declaration, owns a

20    twenty percent interest in an entity known as Sunset V, LLC ("Sunset V").  The 65% Owners

21    RAS Motion sought an order confirming that the Debtor's interest as managing member of

22    Sunset V is not encompassed by the automatic stay arising from the filing of the Debtor's

23    _____

24       [7] On the same date, a memorandum decision also was entered with respect to O'Brien's
    motion and Lebow's joinder.  (ECF No. 171).

25       [8] It does not appear, however, that a written order granting the motion was submitted or

26    entered on the docket.

1  bankruptcy petition.  Alternatively, the motion sought relief from stay to allow the members of

2  Sunset V, including Aurbach, to vote to remove the Debtor as the managing member.

3         On April 14, 2011, MAC filed an application seeking approval for Lisowski to employ

4  MAC as special counsel to the Debtor's bankruptcy estate ("MAC Employment Application").

5  (ECF No. 192).[9]  The application sought to employ MAC on a contingency fee basis "for the

6  purpose of investigating and proceeding with specific litigation issues regarding multiple

7  potential fraudulent conveyance actions and/or preference actions."  MAC Employment

8  Application at 2:9-11.[10]  The application states that the firm has represented various individuals

9  and entities related to the bankruptcy case.  Id. at 2:15-22.[11]  In support of the application, a

10  "Verified Statement/Declaration of Professional" signed by Aurbach was filed ("Aurbach

11  Verified Statement").  (ECF No. 193).  Paragraph 5 of that statement attests that "Neither I nor

12  any of my partners or employees has any present connection with the Debtor, his creditors or

13  other parties-in-interest other than having represented the following individuals and entities in

14  the cases discussed in paragraph 7, below."  Paragraph 7 states that "To the best of my

15  knowledge, I have no connections with the Debtors, creditors or any other party in interest, or

16  their respective attorneys and accountants which connections may constitute a conflict of interest

17  or adverse position."  The MAC Employment Application was noticed to be heard on May 18,

18

19         [9]  The signature pages indicates that the MAC Employment Application was signed by
Lisowski but prepared by Aurbach.

20

21         [10]  The order for relief was entered on March 29, 2010.  Under Section 546(a)(1)(A),
Lisowski had until March 29, 2012, to commence fraudulent transfer or preference actions
pursuant to Sections 548, 544 and 547.

22

23         [11]  The clients identified in the MAC Employment Application were as follows: "Barry R.
Moore, Janie Moore, Eroom Holdings, LP and Barry R. Moore and Janie Moore, Co-Trustees of

24  the BAMM Living Trust dated July 16, 2003, John D. O'Brien, as the Trustee of the John D.
O'Brien Profit Sharing Plan, Donald Campbell, Colby Williams, Mario P. Borini, Individually as

25  a Chairman of the Board of Trustee of The Alexander Dawson Foundation, John and Lorraine
Esposito, CH Angelus, LLC, CH Angelus II, LLC, ICON Real Estate Services, of which William

26  Gayler was the President, in a real estate transaction."

7

2011.  (ECF No. 194).

On April 18, 2011, an order was entered granting Lisowski's motion to employ the Lisowski Law Firm as general counsel to the bankruptcy estate <u>nunc pro tunc</u>.  (ECF No. 198).

No objection to the MAC Employment Application was filed.  On May 23, 2011, an order was entered authorizing Lisowski to employ MAC as special counsel on a contingency fee basis ("MAC Employment Order").  (ECF No. 205).

On June 3, 2011, an order was entered granting the 65% Owners RAS Motion.  (ECF No. 209).

On June 8, 2011, MAC filed on behalf of Lisowski a motion to conduct an examination of the Debtor pursuant to FRBP 2004(a) ("2004 Examination").  (ECF No. 213).  On June 9, 2011, an order was entered granting that motion.  (ECF No. 214).  On June 20, 2011, MAC filed on behalf of the 65% Owners of Sunset V a motion to conduct a separate 2004 Examination of the Debtor.  (ECF No. 220).  On the same date, an order was entered granting that motion.  (ECF No. 222).

On September 15, 2011, MAC filed on behalf of Lisowski a motion confirming the Debtor's 40% membership interest and management rights in an entity known as Dominus M-B, LLC ("Dominus Sale Motion").  (ECF No. 300).  The motion also sought to allow Lisowski to sell the Debtor's membership interest and management rights to an entity identified as HAND Enterprises, Inc. for cash in the amount of $170,556.  In addition to declarations from Lisowski in support of the Dominus Sale Motion, MAC also filed the declarations of Mark A. Schnippel (ECF No. 302), who is a managing member of the subject entity, and John D. O'Brien (ECF No. 303), who apparently owned 100% of the non-managing members' interests in the entity and perhaps 10% of the managing membership interest in the same entity.  The motion was noticed to

be heard on October 19, 2011.  (ECF No. 304).[12]

On October 5, 2011, Debtor filed an objection to the Dominus Sale Motion.  (ECF No. 332).  On October 11, 2011, MAC filed a reply on behalf of Lisowski.  (ECF No. 335).  The motion was heard on October 19, 2011, and an order denying the Dominus Sale Motion was entered on November 15, 2011.  (ECF No. 354).

On December 20, 2011, MAC filed on behalf of Lisowski a motion to turnover estate assets ("First Turnover Motion").  (ECF No. 377).  By that motion, Lisowski sought an order requiring the Debtor to turnover the hard drive to his business computer.  The motion was noticed to be heard on January 26, 2012.  (ECF No. 378).

On December 23, 2011, MAC on behalf of Lisowski commenced an adversary proceeding against seventeen named defendants, including the Debtor, various trusts, certain limited liability companies managed by the Debtor, certain entities owned by the Debtor, and others.  The complaint seeks, inter alia, a determination that the Debtor is the alter ego of various entities, including 23 Golden Sunray LLC, that the assets of such entities are property of the bankruptcy estate, and that certain fraudulent transfers between entities may be avoided pursuant to Section 548.  The adversary proceeding was denominated Adversary Proceeding No. 11-01410-MKN ("Golden Sunray Action")[13].

On January 25, 2012, Lisowski and the Debtor stipulated to continue the hearing on the First Turnover Motion to February 16, 2012.  (ECF No. 424).  On February 6, 2012, the parties stipulated to further continue the hearing to February 29, 2012.  (ECF No. 428).  On February 17, 2012, Debtor filed opposition.  (ECF No. 431).  On February 24, 2012, Lisowski filed a reply.  (ECF No. 434).  The First Turnover Motion was heard on February 29, 2012, and an order

[12]  It is not readily apparent how MAC under the MAC Employment Order was authorized to represent Lisowski in connection with the Dominus Sale Motion.

[13]  Documents filed and docketed in the Golden Sunray Action will be referenced as "GS ECF No.".

9

1  granting the motion was entered on March 5, 2012.  (ECF No. 438).

2       On May 9, 2012, MAC on behalf of Lisowski filed another turnover motion ("Second

3  Turnover Motion") but this time with respect to the Debtor's interest in the various entities listed

4  in his schedules.  (ECF No. 443).

5       On May 10, 2012, MAC filed an amended complaint in the Golden Sunray Action.  (ECF

6  No. 446).[14]  Among other things, the amended complaint includes an objection to the Debtor's

7  discharge pursuant to Section 727(a)(6)(A).  The amended complaint alleges that the Debtor

8  refused to obey the Interim Involuntary Order by causing his interests in estate property to be

9  transferred, conveyed or concealed.

10       A hearing on the Second Turnover Motion was calendared for June 6, 2012, pursuant to

11  an order shortening time.  (ECF No. 447).  On May 30, 2012, Debtor filed opposition (ECF No.

12  451) and Lisowski filed a reply.  (ECF No. 453).

13       The Second Turnover Motion was heard on June 6, 2012, and taken under submission.

14  On July 6, 2012, an order was entered denying the Second Turnover Motion.  (ECF No. 460).

15       On October 22, 2012, MAC on behalf of the Moore Parties filed a motion to approve a

16  settlement agreement.  (ECF No. 463).  The settlement provided for a judgment in the amount of

17  $750,000 to be entered against the Debtor in the Moore 523 Action and excepted from discharge

18  under Section 523(a)(2)(A).  The judgment amount is to be paid over a five-year period at

19  $150,000 per installment.  The motion was scheduled to be heard on November 28, 2012.  (ECF

20  No. 464).

21       On October 30, 2012, a voluntary Chapter 7 petition was filed by an entity known as CH

22

23       [14]  The amended complaint was docketed in the Debtor's bankruptcy case and also was

24  docketed in the adversary proceeding at docket number 80.  Both the original complaint and the
   amended complaint in the Golden Sunray Action were filed on behalf of Lisowski by attorney

25  Aurbach and attorney April N. Bonifatto ("Bonifatto") of the MAC law firm.  On December 12,
   2012, MAC filed a substitution indicating that attorney Jessica M. Goodey ("Goodey") had

26  replaced attorney Bonifatto with respect to the Golden Sunray Action.  (GS ECF No. 280).

10

1   Angelus II, LLC ("Angelus II") commencing Case No. 12-22209-MKN.[15]  The petition was

2   signed by the Debtor on behalf of Angelus II and was filed by attorney Spencer Judd ("Judd").

3   David A. Rosenberg ("Rosenberg") was assigned as the Chapter 7 trustee to administer the

4   Angelus II case.  On November 6, 2012, an order was entered authorizing Rosenberg to employ

5   Howard Kim & Associates ("Kim") as general bankruptcy counsel for the estate. (Angelus II

6   ECF No. 11).

7          On November 14, 2012, MAC, on behalf of Barry R. Moore, Janie Moore, Barry R.

8   Moore and Janie Moore, Co-Trustees of the BAMM Living Trust Dated July 16, 2003, Donald J.

9   Campbell, individually, Donald J. Campbell, Trustee of the Donald J. Campbell Professional

10  Corporation Profit Sharing Plan, John Esposito, individually, and Lorraine Esposito, individually

11  ("the Moore & Campbell Parties"), filed a motion for relief from stay in the Debtor's bankruptcy

12  case ("Moore & Campbell RAS Motion").  (ECF No. 466).  The Moore & Campbell Parties

13  sought an order determining that the automatic stay does not apply to certain pending state court

14  proceedings[16] encompassing an adjudication of the Debtor's membership interests in entities

15  identified as CH Angelus, LLC ("Angelus I") and Angelus II.  Alternatively, the motion sought

16  relief from stay to allow the 777 State Action to proceed to determine the Debtor's interest in the

17  two entities.  A hearing on the relief from stay motion was scheduled for December 19, 2012.

18  (ECF No. 471).

19         On November 28, 2012, a final judgment was entered with respect to the Debtor in the

20

21         [15]  The documents filed in the Angelus II bankruptcy proceeding will be referenced as

22  "Angelus II ECF No."

23         [16]  That action was commenced on August 6, 2009, in the Eighth Judicial District Court

24  for the State of Nevada, Clark County ("State Court"), and is styled as Barry R. Moore, et al. v.
    William A. Gayler, et al., Case No. A-09-596777-C.  Also named as defendants in that action are

25  Angelus I, Angelus II, CH Angelus Partners, LLC, a Nevada limited liability company, and
    numerous others.  In this memorandum decision, that lawsuit will be referred to as the "777 State

26  Action."

1   O'Brien 523 Action.  (ECF No. 472).[17]  The judgment awarded the total amount of $500,000 to

2   John D. O'Brien as Trustee of the John D. O'Brien Profit Sharing Plan, Donald Campbell, and

3   Colby Williams, which amount is excepted from discharge under Section 523(a)(2).

4        On December 5, 2012, Debtor filed opposition to the Moore & Campbell RAS Motion.

5   (ECF No. 476).  On the same date, MAC on behalf of Lisowski also filed a response even though

6   MAC also had filed the actual motion, i.e., MAC represented the moving party as well as a

7   responding party.[18]  (ECF No. 478).  That response states only that Lisowski does not oppose the

8   motion that MAC had filed on behalf of the Moore & Campbell Parties and that Lisowski will

9   abide by the state court's ruling.[19]

10

11        [17]  The judgment was entered in the Debtor's bankruptcy case as well as in the adversary

12   proceeding at docket number 155.

13        [18]  Parties who take both sides of a two-sided dispute are assured of prevailing in some

14   fashion.  See Lodi v. Lodi, 173 Cal.App.3d 628, 631-32, 219 Cal.Rptr. 116, 118-19 (3rd Dist.
     1985) ("In the circumstances, this result cannot be unfair to Mr. Lodi.  Although it is true that, as

15   plaintiff and appellant, he loses, it is equally true that, as defendant and respondent, he wins!  It is
     hard to imagine a more even handed application of justice.  Truly, it would appear that Oreste

16   Lodi is that rare litigant who is assured of both victory and defeat regardless of which side
     triumphs.").  Unlike pro se parties who might not know better, however, attorneys have

17   responsibilities to represent each of their clients' interests and the same attorney cannot represent
     both sides where there is an actual conflict.

18

19        [19]  On the date MAC filed the response, Lisowski also was the Chapter 7 trustee in a
     separate case pending in this judicial district, In re Silver State Helicopters, LLC ("SSH"), Case

20   No. 08-10926-MKN ("SSH Proceeding").  In connection with a dispute in that case, Lisowski
     represented that he underwent emergency back surgery in Colorado on or about November 14,

21   2012, was admitted to a hospital in Wisconsin for pneumonia through November 22, 2012, and
     flew to Las Vegas in a debilitated condition to meet with the Office of the U.S. Trustee

22   ("OUST") from December 10 through 13, 2012.  See Reply to Opposition of the Acting United
     States Trustee's Office and Student Creditor's Objections to the Trustee's Final Report and

23   Application for Compensation and Expenses at ¶¶ 17 through 21 (SSH Docket No. 2905);
     Declaration of James F. Lisowski, Sr. at ¶¶ 13 and 14 (SSH Docket No. 2905-2); Declaration of

24   Julie A. Lisowski at ¶¶ 4 through 7 (SSH Docket No. 2906).  MAC's representation of Lisowski
     in connection with the Moore & Campbell RAS Motion clearly was beyond the scope of MAC's

25   employment as special counsel.  Moreover, it is not clear how MAC could even communicate

26   with Lisowski given his apparent medical condition.  Noticeably absent from the record is a

1    On December 7, 2012, an order was entered approving the settlement of the Moore 523

2  Action.  (ECF No. 480).

3    On December 12, 2012, the OUST filed a notice stating that Rosenberg had been

4  appointed as successor Chapter 7 trustee in the Debtor's case in light of Lisowski's resignation

5  that had been communicated the previous day.  (ECF No. 482).  On the same date, MAC on

6  behalf of the Moore & Campbell Parties filed a reply to the opposition that the Debtor had filed

7  to the Moore & Campbell RAS Motion.  (ECF No. 483).

8    On December 18, 2012, MAC on behalf Barry Moore as managing member of Angelus

9  II, and equity holders Barry R. Moore and Janie Moore as Co-Trustees of the BAMM Living

10  Trust dated July 16, 2003, and Groth, LLC, CH Pichon, LLC, and Harlan LLC through their

11  managing member John O'Brien, filed a motion to dismiss the Angelus II bankruptcy proceeding

12  ("Angelus II Dismissal Motion").  (Angelus II ECF No. 14).  Zachariah Larson ("Larson") was

13  the attorney at MAC who signed and filed the motion.  The motion was accompanied by the

14  declarations of Barry Moore (Angelus II ECF No. 15) and John O'Brien (Angelus II ECF No.

15  16).  The motion alleges that the Debtor had no authority to sign the bankruptcy petition or

16  authorize its filing on behalf of the limited liability company.  The motion was noticed to be

17  heard on January 23, 2013.  (Angelus II ECF No. 17).

18    On December 19, 2012, the Moore & Campbell RAS Motion was heard.  MAC, through

19  attorney Dale Hayes ("Hayes") and attorney Goodey, appeared on behalf of both the Moore &

20  Campbell Parties as well as the bankruptcy estate.  Debtor also appeared through counsel.  Hayes

21  argued on behalf of the Moore & Campbell Parties that the Debtor's interest in Angelus I and

22  Angelus II can be determined expeditiously in the 777 State Action without additional

23

24

25  declaration from Lisowski attesting to his assent to the relief sought by the Moore & Campbell

26  Parties.

13

1  administrative expense to the bankruptcy estate.[20]  Goodey argued that the bankruptcy trustee

2  would abide by any state court resolution: if the state court determines that the interests in

3  Angelus I and Angelus II belong to the Debtor, then the interests would be administered through

4  the bankruptcy proceeding; but if the state court determines that the interests belong to the other

5  members of Angelus I and Angelus II (represented by MAC) or to the limited liability companies

6  themselves, rather than the Debtor, then the interests would not be administered by the Debtor's

7  bankruptcy trustee.  After arguments were presented, the matter was taken under submission.

8      On January 9, 2013, Debtor filed opposition to the Angelus II Dismissal Motion (Angelus

9  II ECF No. 20) accompanied by his own declaration (Angelus II ECF No. 21).  Concurrently,

---

11  [20]  Hayes argued that the 777 State Action encompasses claims against the Debtor and
12  others for civil conspiracy, breach of fiduciary duty, aiding and abetting a breach of fiduciary
   duty, fraud, negligence, quiet title, and declaratory relief.  Debtor's counsel argued that such
13  claims as a personal liability of the Debtor would be discharged in bankruptcy unless the Moore
   & Campbell Parties or other plaintiffs in the 777 State Action timely commenced an adversary
14  proceeding against the Debtor in the bankruptcy court under Sections 727 or 523.  As of the date
   of the hearing on the Disqualification Motion, the O'Brien 523 Action, the Moore 523 Action,
15  and the Golden Sunray Action were the only adversary proceedings commenced in the case.  A
   comparison between the plaintiffs named in the 777 State Action and the plaintiffs named in the
16  O'Brien 523 Action and the Moore 523 Action reflects that John Esposito, individually, and
   Lorraine Esposito, individually, have not objected to the Debtor's discharge or sought to
17  determine the dischargeability of their claims.  In the Golden Sunray Action that was commenced
   by Lisowski on December 23, 2011, no objection to the Debtor's discharge under Section 727
18  was alleged until MAC on behalf of Lisowski filed an amended complaint on May 20, 2012.
   None of the plaintiffs named in the 777 State Action are named as co-plaintiffs in the Golden
19  Sunray Action.  As previously discussed at 10, supra, Lisowski's discharge objection alleged in
   the Golden Sunray amended complaint is brought solely under Section 727(a)(6) and is based on
20  an alleged postpetition violation of the Interim Involuntary Order.  Obviously a violation of the
   Interim Involuntary Order cannot be the subject of the 777 State Action.  Thus, simply allowing
21  the 777 State Action to proceed would not resolve the discharge claim asserted in the Golden
   Sunray Action.  As the court cannot retroactively extend the deadline to object to discharge or to
22  determine dischargeability of debt, see Anwar v. Johnson, 720 F.3d 1183, 1188 (9th Cir. 2013)
   and Willms v. Sanderson, 723 F.3d 1094, 1101-03 (9th Cir. 2013), the remaining hopes of
23  creditors to pursue fraud and otherwise nondischargeable claims against the Debtor is for
   Rosenberg to prevail on the discharge objection in the Golden Sunray Action.  In contrast, the
24  plaintiffs named in the O'Brien 523 Action and the Moore 523 Action do not have to depend on
25  the outcome of that proceeding.

14

1  Judd filed a "Resolution of CH. Angelus II, LLC," which ostensibly authorizes the filing of the

2  bankruptcy petition.  The resolution is undated and is signed only by the Debtor, ostensibly as

3  managing member and as managing member of various non-managing member entities.

4  (Angelus II ECF No. 22).

5        On January 16, 2013, MAC through Larson, on behalf of the moving parties, filed a reply

6  to the Debtor's opposition to the Angelus II Dismissal Motion.  (Angelus II ECF No. 24).  A

7  hearing on the motion was conducted on January 23, 2013.  At the hearing ("January 23

8  Hearing"), Larson appeared on behalf of the moving parties, Judd appeared on behalf of Angelus

9  II, and Kim appeared on behalf of Rosenberg as trustee of the Angelus II bankruptcy estate.  As

10  Rosenberg had only recently been appointed the Chapter 7 trustee in the Debtor's case, the court

11  continued the hearing to allow Rosenberg time to familiarize himself with the facts and activity

12  in both cases.[21]

13        On January 29, 2013, a stipulation between the parties in the Golden Sunray Action was

14  filed.  (ECF No. 487).  That stipulation, apparently signed by MAC on behalf of the bankruptcy

15  estate, as well as counsel for the Debtor and counsel for Sunset II, LLC, addressed the disposition

16  of certain proceeds from the sale of real property owned by Sunset II, LLC ("Sunset II

17  Stipulation").  On February 1, 2013, MAC on behalf of the bankruptcy estate, filed a notice

18  scheduling a hearing on the Sunset II Stipulation to be held on February 28, 2013.

19        On February 14, 2013, MAC on behalf of Rosenberg, filed a motion for partial summary

20  judgment in the Golden Sunray Action ("GS MSJ-1").  (GS ECF No. 317).  By that motion,

21  Rosenberg sought a declaration that the William A. Gayler Separate Property Trust, Morpheus

22  Enterprises, LLC and the Gayler Family Limited Partnership are property of the bankruptcy

23  estate.  The motion also sought summary judgment as to the first, twenty-third and twenty-fourth

24  _____

25        [21]  The motion to dismiss the Angelus II proceeding initially was continued for status

purposes to April 3, 2013.  After numerous additional continuances, the parties stipulated to

26  continue the motion to November 6, 2013.  (Angelus II ECF No. 59).

15

1    claims for relief for avoidance of various transfers to an entity identified as TGF Holding Limited

2    Partnership.  The motion was noticed to be heard on April 22, 2013.  (GS ECF No. 329).  On

3    February 26, 2013, MAC on behalf of Rosenberg, filed a second motion for partial summary

4    judgment as to the eighteenth claim for relief in the Golden Sunray Action ("GS MSJ-2").  (GS

5    ECF No. 338).  That motion sought summary judgment determining that 23 Golden Sunray, LLC

6    is the alter ego of the Debtor.  The latter motion also was noticed to be heard on April 22, 2013.

7    (GS ECF No. 341).

8         On February 19, 2013, Rosenberg filed an application to employ Kim as his general

9    bankruptcy counsel in the Debtor's case in place and instead of the Lisowski Law Firm ("Kim

10   Employment Application").  (ECF No. 488).  Among other things, the application asserts that

11   substitute counsel is required to investigate potential claims against Lisowski "and his

12   representatives in the case."  The application also asserts that "Due to the actual conflict and

13   other pending litigation matters, Trustee is also investigating whether MAC can continue to serve

14   as Trustee's special counsel."  Pursuant to an order shortening time, a hearing on the Kim

15   Employment Application was scheduled for March 13, 2013.  (ECF No. 496).  No opposition to

16   the application was filed or presented, and an order authorizing Rosenberg to employ Kim was

17   entered on March 15, 2013.  (ECF No. 500).

18        On March 12, 2013, Rosenberg filed a stipulation to stay further proceedings in the

19   Golden Sunray Action to permit settlement discussions.  (GS ECF No. 347).  On March 13,

20   2013, an order was entered staying further proceedings in accordance with the stipulation.  (GS

21   ECF No. 348).

22        On April 5, 2013, MAC on behalf of Rosenberg, filed a motion to approve a compromise.

23   (ECF No. 503)[22].  That motion sought to approve the terms of the Sunset II Stipulation.  The

24   motion was noticed to be heard on May 8, 2013.  (ECF No. 504).

25   _____

26        [22]  The motion also was filed in the Golden Sunray Action.  (GS ECF No. 357).

16

1    On April 11, 2013, MAC filed a motion to withdraw as special counsel for Rosenberg.

2  (ECF No. 507).  That motion was noticed to be heard on May 15, 2013.  (ECF No. 509).

3    On May 30, 2013, an order was entered approving the Sunset II Stipulation.  (ECF No.

4  512).

5    On June 10, 2103, an order was entered granting MAC's motion to withdraw.  (ECF No.

6  513).

7    On July 3, 2013, Kim, on behalf of Rosenberg, filed a separate motion to approve a

8  settlement between the bankruptcy estate, the Debtor, Debtor's counsel, certain individuals, and

9  various "Gayler Entities" ("Gayler Settlement Motion").  (ECF No. 516).  Among others, the

10  Gayler Entities include 23 Golden Sunray, Limited Liability Company, CH Angelus, LLC, CH

11  Angelus II, LLC, Ch Pichon I, LLC, Dominus M-B, LLC, Groth Limited Liability Company,

12  Harlan, LLC, Sunset II, Limited Liability Company, and Sunset V, Limited Liability Company.

13  The motion was noticed to be heard on August 12, 2013.  (ECF No. 522).[23]

14    On July 10, 2013, a continued status hearing was held in the Angelus II proceeding.  Once

15  again, Larson appeared on behalf of the moving parties, Judd appeared on behalf of Angelus II,

16  and Kim appeared on behalf of Rosenberg.  At the status hearing, Larson indicated that his

17  clients would "strenuously disapprove" of a settlement encompassing the Debtor's alleged

18  management and ownership interest in Angelus II.

19    On July 17, 2013, Rosenberg filed the instant Disqualification Motion[24] by which he

20  seeks to preclude MAC from continuing to represent the John D. O'Brien Profit Sharing Plan.

21

22

23

24    [23] The motion also was filed in the Golden Sunray Action.  (GS ECF No. 361).

25    [24] Attached to the Disqualification Motion as Exhibit "1" is a copy of an order filed on
August 24, 2012, in the 777 State Action regarding legal expenses and property taxes paid out of
26  certain settlement proceeds.

17

1  (ECF No. 524).[25]  Rosenberg further seeks to preclude Larson as well as the law firm of Larson

2  & Zirzow, from continuing to represent Barry R. Moore and Janie Moore as co-trustees of the

3  BAMM Living Trust dated July 16, 2003, Groth, LLC, CH Pichon, LLC, and Harlan LLC

4  through their managing member John O'Brien.  The Disqualification Motion is supported by a

5  declaration from Rosenberg ("First Rosenberg Declaration").  (ECF No. 525).

6          On July 23, 2013, an order was entered approving a stipulation to have the

7  Disqualification Motion heard on September 4, 2013, and for the Gayler Settlement Motion to be

8  heard on November 6, 2013.  (ECF No. 529).

9          On August 21, 2013, MAC filed opposition to the Disqualification Motion ("MAC

10  Opposition") (ECF No. 543) accompanied by the declaration of attorney Hayes ("First Hayes

11  Declaration") (ECF No. 544), the declaration of attorney Liane K. Wakayama ("Wakayama

12  Declaration") (ECF No. 545), and a further declaration of attorney Aurbach ("First Aurbach

13  Declaration") (ECF No. 546).[26]  On the same date, opposition was filed by Larson on behalf of

14  himself and his current firm ("Larson Opposition") (ECF No. 547)[27], accompanied by a

15

16          [25]  In the Disqualification Motion, Rosenberg alleges that on May 18, 2010, MAC

17  commenced an additional State Court proceeding denominated Case No. A-10-616929-B, on
    behalf of Barry Moore, John D. O'Brien, Don Campbell, J. Colby Williams, William Godfrey

18  and Eroom Holdings, LP alleging claims for breach of contract, unjust enrichment, and civil
    conspiracy.  The defendants named in that action included the Debtor, and CH Angelus IV, LLC,

19  as well as other individuals and entities ("929 State Action").  Rosenberg represents that the
    action was dismissed as against the Debtor (presumably in light of the automatic stay) but

20  proceeded as to the remaining parties.  After a non-jury trial, the state court apparently entered an
    order quieting title to real property in the name of CH Angelus IV free of a note and deed of trust

21  that had been executed by the Debtor.

22

23          [26]  Attached as Exhibit "A" to the MAC Opposition is a copy of a transcript of the
    January 23, 2013 hearing ("Jan23 Transcript") on the motion to dismiss the Angelus II

24  bankruptcy proceeding.

25          [27]  Attached as Exhibit "A" to the Larson Opposition is a copy of an email chain between
    Kim, Larson, Aurbach and Coffing regarding the basis for and calendaring of the Disqualification

26  Motion.

18

1 declaration from Larson ("Larson Declaration") (ECF No. 548).[28]

2      On August 27, 2013, MAC filed a supplement to its opposition ("MAC Supplement").

3 (ECF No. 551).[29]

4      On August 28, 2013, Rosenberg filed a reply ("Reply") (ECF No. 555)[30], accompanied by

5 an additional declaration of Rosenberg ("Second Rosenberg Declaration").  (ECF No. 556).

6      On August 30, 2013, MAC filed a supplemental declaration of Hayes ("Second Hayes

7 Declaration").  (ECF No. 560).

8      On September 2, 2013, Rosenberg filed an additional supplemental declaration ("Third

9 Rosenberg Declaration").  (ECF No. 562).

10      On September 3, 2013, Aurbach filed another declaration ("Second Aurbach

11 Declaration").  (ECF No. 565).

12      An initial hearing on the Disqualification Motion was held on September 4, 2013.  At the

13 hearing, counsel for MAC orally moved to strike the Reply that Rosenberg had filed on August

14 28, 2013, and also presented a written "bench brief" that had not previously been served on

15 Rosenberg or his counsel.  The hearing was continued to allow Rosenberg an opportunity to

16 ───────────────

17    [28] Larson attests that on January 1, 2012, he became an independent contractor of MAC,
but did no work and had no involvement with the Debtor's bankruptcy case until December 15,
18 2012.  <u>See</u> Larson Declaration at ¶¶ 5-6.

19    [29] Attached as Exhibits "R" through "T" of the MAC Supplement are copies of a
subpoena to and the documents produced by Rosenberg in connection with the Angelus II
20 bankruptcy proceeding.  Exhibit "T" consists primarily of email messages between counsel for
21 Rosenberg and the Debtor concerning the Gayler Settlement Motion.

22    [30] Attached as Exhibit "1" to the Reply is a document apparently prepared by the Debtor
that summarizes his view of MAC's alleged conflicts of interest.  The summary is not
23 accompanied by a declaration or affidavit from the Debtor.  As long as the Debtor is under
criminal indictment, <u>see</u> Exhibit "O1" attached to First Hayes Declaration, such a declaration or
24 affidavit may never be obtained.  Also attached as Exhibits "2" through "5" are copies of certain
25 emails from Aurbach to Rosenberg or Kim, Aurbach or Bonifatto to Sylvester, and Bonifatto to
various creditors, as well as a transcript of a 2004 Examination of the Debtor taken on October 3,
26 2011.

1    respond.[31]  MAC filed the bench brief the following day.  (ECF No. 567).  In addition to filing

2    the bench brief, MAC also filed a supplement.  (ECF No. 570).

3         On September 11, 2013, Rosenberg filed a response to the bench brief as well as a request

4    to strike the supplement filed by MAC.  (ECF No. 574).  The response was accompanied by an

5    additional declaration ("Fourth Rosenberg Declaration").  (ECF No. 575).

6         On September 16, 2013, an order was entered denying MAC's request to strike the Reply

7    and also denying Rosenberg's request to strike the supplement.  (ECF No. 578).  The order also

8    specified the time limits for the parties to present oral argument.

9         On September 19, 2013, the Disqualification Motion was heard by the court.  After

10   presentation of arguments, the matter was taken under submission based on the written record.

11                              **APPLICABLE LEGAL STANDARDS**

12        A bankruptcy trustee has a fiduciary duty to all creditors of the bankruptcy estate.  See

13   generally 3 (collier on bankruptcy) ¶ 3-23.02[1] and 6 (collier on bankruptcy) ¶ 6-704.04[1]

14   (Alan N. Resnick and Henry J. Sommer, eds., 16th rev. ed. 2013).[32]  Attorneys employed by the

15   trustee on behalf of the estate also have a fiduciary duty to the bankruptcy estate.  See In re

16   Taxman Clothing Co., 49 F.3d 310, 314 (7th Cir. 1995); Pierson & Gaylen v. Creel & Atwood

17   _____

18        [31] The court inquired of the parties as to whether live witness testimony would be
     presented.  Counsel indicated that the Disqualification Motion would be submitted on the briefs
19   and written documents, and that an evidentiary hearing would not be necessary.  No request was
     made to close the hearing or to submit any evidence under seal. Thus, the only percipient witness
20   testimony before the court is contained in the various declarations filed on behalf of Rosenberg,
     MAC and Larson.  Several of the declarations do not state that they are submitted under penalty
21   of perjury as required by 28 U.S.C. § 1746, see Third Rosenberg Declaration, Wakayama
     Declaration, First Hayes Declaration, Second Hayes Declaration, and Second Aurbach
22   Declaration, but no objections to their consideration on this basis have been raised.  The court
     therefore will consider all of the declarations for their full probative value, if any.
23

24        [32] Section 704 sets forth a variety of duties that must be performed by a Chapter 7 trustee
     which include collecting the assets of the bankruptcy estate, investigating the debtor's financial
25   affairs, objecting to creditor claims if a purpose would be served, and, opposing, if advisable, the
     debtor's discharge.
26

1  (In re Consol. Bancshares, Inc.), 785 F.2d 1249, 1256 n.7 (5th Cir. 1986). Compare Woodson v

2  Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 614 (9th Cir. 1988) ("As [Chapter 11]

3  debtor in possession he is the trustee of his own estate and therefore stands in a fiduciary

4  relationship to his creditors."); Everett v. Perez (In re Perez), 30 F.3d 1209, 1219 (9th Cir. 1994)

5  (fiduciary responsibility also rests with bankruptcy counsel for Chapter 11 debtor in possession).

6  See also In re Count Liberty, LLC, 370 B.R. 259, 280 (Bankr.C.D.Cal. 2007) (collecting cases).

7       Section 327(a) authorizes a bankruptcy trustee to employ attorneys and other

8  professionals "that do not hold or represent an interest adverse to the estate, and that are

9  disinterested persons" to assist the trustee in carrying out his or her duties. 11 U.S.C. § 327(a).[33]

10 Section 327(c) provides in pertinent part that "a person is not disqualified for employment

11 ...solely because of such person's employment by or representation of a creditor, unless there is

12 objection by another creditor or the United States trustee, in which case the court shall

13 disapprove such employment if there is an actual conflict of interest." 11 U.S.C. § 327(c).

14 Section 327(d) also authorizes a bankruptcy trustee to act as an attorney for the estate. See 11

15 U.S.C. § 327(d). Section 327(e) authorizes a trustee to employ, "for a specified special purpose,

16 other than to represent the trustee in conducting the case, an attorney that has represented the

17 debtor, if in the best interest of the estate, and if such attorney does not represent or hold any

18 interest adverse to the debtor or to the estate with respect to the matter on which such attorney is

19 to be employed." 11 U.S.C. § 327(e).[34]

20

21  [33] Section 101(14) defines a "disinterested person" to mean a person that "(A) is not a
    creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the
22  date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not
    have an interest materially adverse to the interest of the estate or of any class of creditors or
23  equity security holders, by reason of any direct or indirect relationship to, connection with, or
    interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14).
24

25  [34] Although the MAC Employment Application did not cite Section 327(e), the prayer of
    the motion sought authorization for Lisowski to employ counsel "for the special purpose set forth
26  herein". MAC Employment Application at 6:3.

21

1    FRBP 2014(a) applies to all professionals who seek to be employed under Section 327.

2    Every application for employment must be accompanied by a verified statement from the

3    professional "setting forth the person's connections with the debtor, creditors, any other party in

4    interest, their respective attorneys and accountants, the United States trustee, or any person

5    employed in the office of the United States trustee." FED.R.BANKR.P. 2014(a).  The Ninth

6    Circuit has stated that "'The duty of professionals is to disclose all connections with the debtor,

7    debtor-in-possession, insiders, creditors, and parties in interest...They cannot pick and choose

8    which connections are irrelevant or trivial...No matter how old the connection, no matter how

9    trivial it appears, the professional seeking employment must disclose it.'"  See Neben & Starrett,

10   Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.), 63 F.3d 877, 882 (9th Cir. 1995), quoting

11   In re EWC, Inc., 138 B.R. 276, 280-81 (Bankr.W.D.Okla. 1992).  All personal, professional,

12   financial and business connections must be disclosed.  See, e.g., United States v. Azevedo (In re

13   Azevedo), 92 B.R. 910, 911 (Bankr.E.D.Cal. 1988)("Thus, by way of example, if the trustee's

14   son-in-law is to be employed in any professional capacity, such fact must be disclosed.  The court

15   will then decide whether the professional satisfies the statutory standards and should be

16   employed."); In re Kings River Resorts, Inc., 342 B.R. 76  (Bankr.E.D.Cal. 2006) (real estate

17   broker's failure to disclose prior employment by Chapter 7 debtor); COM-1 Info, Inc. v.

18   Wolkowitz (In re Maximus Computers, Inc.), 278 B.R. 189 (B.A.P. 9th Cir. 2002) (special

19   counsel's failure to disclose payment from and continued representation of creditor during

20   trustee's employment of counsel to prosecute fraudulent transfer action); In re A.W. Logging,

21   Inc., 356 B.R. 506 (Bankr.D.Idaho 2006) (attorney's failure to disclose postpetition purchase

22   transaction with Chapter 11 debtor in possession).

23        The purpose of the required disclosures is to permit the court to determine whether the

24   professional is a "disinterested person" within the meaning of Section 101(14) or to determine

25   that the person "does not represent or hold any interest adverse to the debtor or to the estate"

26   within the meaning of Section 327(e).  See In re Sundance Self Storage-El Dorado LP, 482 B.R.

22

1    613, 630-31 (Bankr.E.D.Cal. 2012)("It is the bankruptcy court that determines whether a

2    professional's connections render him or her unemployable under §327(a) - not the other way

3    around."). See also, Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347

4    B.R. 679 (B.A.P. 9th Cir. 2006)(adequate disclosure of connections required for court to

5    determine disinterested status for purpose of awarding professional compensation).  By its

6    express terms, FRBP 2014(a) also requires that the proposed professional disclose his or her

7    connections with the attorneys and accountants who represent other parties in interest in the case.

8        Failure to disclose connections is a serious matter.  Professionals who fail to comply with

9    the disclosure requirements of FRBP 2014(a) may be disqualified from further employment by

10   the bankruptcy estate, see In re Plaza Hotel Corp., 111 B.R. 882, 891 (Bankr.E.D.Cal.), aff'd,

11   Horner v. Webster, 123 B.R. 466 (B.A.P. 9th Cir. 1990), denied compensation for services

12   rendered, see Park-Helena Corp., 63 F.3d at 882, and required to disgorge any fees previously

13   paid from the estate.  See Plaza Hotel Corp., 111 B.R. at 892.  See also Law Offices of Ivan W.

14   Halperin v. Occidental Fin. Grp., Inc. (In re Occidental Fin. Grp., Inc.), 40 F.3d 1059, 1063 (9th

15   Cir. 1994).

16       Attorneys admitted to practice in this judicial district also are required to adhere to the

17   standards prescribed by the rules of professional conduct adopted by the Supreme Court of

18   Nevada.  See LR 1A 10-7(a).   Rule 1.9 of the Nevada Rules of Professional Conduct ("NRPC")

19   provides as follows:

20       (a)    A lawyer who has formerly represented a client in a matter
21              **shall not thereafter** represent another person in the same
               or **a substantially related matter in which that person's**
22              **interests are materially adverse to the interests of the**
               **former client** unless the former client gives informed
23              consent, confirmed in writing.

24       (b)    A lawyer shall not knowingly represent a person in the
               same or a substantially related matter **in which a firm with**
25              **which the lawyer formerly was associated had**
               **previously represented a client:**
26              **(1) Whose interests are materially adverse to that**

23

**person; and**
**(2) About whom the lawyer had acquired information**
**protected by Rules 1.6 and 1.9(c) that is material to the**
**matter**;
(3) Unless the former client gives informed consent,
confirmed in writing.

(c)    A lawyer who has formerly represented a client in a matter
or whose present or former firm has formerly represented a
client in a matter **shall not thereafter:**

**(1) Use information relating to the representation to the**
**disadvantage of the former client except as these Rules**
**would permit or require with respect to a client, or**
**when the information has become generally known; or**

**(2) Reveal information relating to the representation**
**except as these Rules would permit or require with**
**respect to a client.**

(Emphasis added).  "Information protected by [Rule] 1.6" refers to "information relating to

representation of a client."  (nev.r.prof.c.)1.6(a).

NRPC 1.10 addresses the disqualification of an entire law firm where one of its attorneys

is subject to disqualification.  It provides as follows:

(a)    While lawyers are associated in a firm, **none of them shall**
**knowingly represent a client when any one of them**
**practicing alone would be prohibited from doing so** by
Rules 1.7, 1.9, or 2.2, unless the prohibition is based on a
personal interest of the prohibited lawyer and does not
present a significant risk of materially limiting the
representation of the client by the remaining lawyers in the firm.

(b)    When a lawyer has terminated an association with a firm,
the firm is not prohibited from thereafter representing a
person with interests materially adverse to those of a client
represented by the formerly associated lawyer and not
currently represented by the firm **unless**:
(1) The matter **is the same or substantially related** to that
in which the formerly associated lawyer represented the
client; **and**

(2) **Any lawyer remaining in the firm has information**
**protected by Rules 1.6** and 1.9(c) that is material to the
matter.

24

(c)    A disqualification prescribed by this Rule may be waived by the affected client under the conditions stated in Rule 1.7.

(d)    Reserved.

(e)    When a lawyer becomes associated with a firm, no lawyer associated in the firm shall knowingly represent a person in a matter in which that lawyer is disqualified under Rule 1.9 unless:
(1) The personally disqualified lawyer did not have a substantial role in or primary responsibility for the matter that causes the disqualification under Rule 1.9;
(2) The personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
(3) Written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

(Emphasis added).

The party seeking to disqualify opposing counsel bears the burden of establishing the factual basis for the request.  See, e.g., Coles v. Arizona Charlie's, 973 F.Supp. 971, 973 (D. Nev. 1997) (motion to disqualify former counsel).  See also Hernandez v. Guglielmo, 796 F.Supp.2d 1285, 1289 (D. Nev. 2011), quoting Kelly v. CSE Safeguard Ins. Co., 2010 WL 3613872 at *1 (D.Nev. Sep. 8, 2010) ("The moving party bears the burden of establishing an ethical violation or other factual predicate upon which the motion depends.").  A party seeking to disqualify its former attorney under NRPC 1.9(a) must establish that (1) an attorney-client relationship previously existed, (2) the former representation is substantially related to the attorney's current representation of another party, and (3) the current representation is materially adverse to the former client.  See Sanchez v. Am. Family Mutual Ins. Co., 2012 WL 4498226 at *1 (D.Nev. Sep. 28, 2012), citing Nev. Yellow Cab Corp. v. Eighth Judicial Dist. Court ex rel. Cnty. of Clark, 123 Nev. 44, 50, 152 P.3d 737, 741 (Nev. 2007).

In determining whether the former representation is substantially related, the court must "(1) make a factual determination concerning the scope of the former representation, (2) evaluate

1  whether it is reasonable to infer that the confidential information allegedly given would have

2  been given to a lawyer representing a client in those matters, and (3) determine whether the

3  information is relevant to the issues raised in the present litigation." SHFL Entm't, Inc. v.

4  DigiDeal Corp., 2013 WL 178130 at *2 (D.Nev. Jan. 16, 2013), citing Waid v. Eighth Judicial

5  District Court, 119 P.3d 1219, 1223 (Nev. 2005).  Although the moving party need not identify

6  the confidential information that was given, see Robbins v. Gillock, 109 Nev. 1015, 1018, 862

7  P.2d 1195, 1197 (Nev. 1993), the inference that confidential information was given in the former

8  representation is rebuttable.  See SHFL Entm't, Inc. v. DigiDeal Corp., 2013 WL 178130 at *8

9  and *12, citing, e.g., La Salle Nat'l Bank v. Cnty. of Lake, 703 F.2d 252, 255-56 (7th Cir. 1983);

10  Edwards v. 360° Commc'ns, 189 F.R.D. 433, 439-440 (D.Nev. 1999).[35]  See also Coles v.

11  Arizona Charlie's, 973 F.Supp. at 974; Jones & Henry, Engineers, Ltd. v. Town of Orland, Ind.,

12  942 F.Supp. 1202, 1207 (N.D. Ind. 1996).[36]  As to the evidence offered to rebut the inference, a

13  strict standard of proof is applied requiring the attorney to "clearly and persuasively show that he

14  was not privy to the confidences and secrets of the client." La Salle Nat'l Bank, 703 F.2d at 257.

15  Any doubt as to the existence of a disabling conflict of interest must be resolved in favor of

16  disqualification.  See SHFL Entm't, Inc. v. DigiDeal Corp., 2013 WL 178130 at *7.

17  **DISCUSSION**

18  By his current motion, Rosenberg seeks to disqualify MAC from continuing to represent

19  O'Brien, particularly with respect to any opposition to the Gayler Settlement Motion.  Rosenberg

---

21  [35]  In Waid, the former client's in-house counsel submitted an affidavit attesting to the
22  attorney's recent receipt of confidential information.  In his opposition to the motion to
    disqualify, the attorney did not dispute the assertion of receipt of confidential information nor did
23  he provide a contrary affidavit.  119 P.3d at 1224.

24  [36]  But compare N.Am. Deed, Inc. v. Joseph (In re N.Am. Deed), 334 B.R. 443, 451
    (Bankr. D.Nev. 2005) ("To preserve public confidence in the legal profession and the trust to be
25  accorded to attorney-client communications, 'the presumption that the lawyer *did* learn what he
    could (reasonably) have learned in the first representation is an irrebuttable one.' (HAZARD &
26  HODES, *supra* § 13.5, at p. 13–16 (emphasis in original).").

26

1  also seeks to disqualify Larson (and his current law firm) from continuing to represent in this

2  bankruptcy proceeding, the parties for whom Larson filed the Angelus II Dismissal Motion[37],

3  also particularly in opposition to the Gayler Settlement Motion.

4        In its response, MAC argues that Rosenberg has failed to establish grounds for

5  disqualification under NRPC 1.9.  Moreover, even if such grounds were established, MAC

6  maintains that Rosenberg has waived any "right" to disqualify MAC, and that disqualification

7  would unduly prejudice creditors whose interests are jeopardized by the Gayler Settlement

8  Motion.

9        In his response, Larson also argues that Rosenberg has failed to establish the requirements

10  for disqualification under NRPC 1.9, that MAC fully disclosed its connections when it applied

11  for employment as special counsel, and that Rosenberg has consented "in writing" to his

12  continued employment.

13        1.        **The Disqualification Requirements Under NRPC 1.9.**

14        There is no dispute that an attorney-client relationship previously existed between MAC

15  and Lisowski in connection with the Debtor's case.  There is no dispute that an attorney-client

16  relationship existed between MAC and Rosenberg in connection with the Debtor's case.  There is

17  no dispute that Larson was an independent contractor of MAC during MAC's attorney-client

18  relationship with both Lisowski and Rosenberg in connection with the Debtor's case.  There is no

19  dispute that Lisowski no longer serves as bankruptcy trustee in the Debtor's case.  There is no

20  dispute that MAC no longer represents Rosenberg in connection with the Debtor's case.  There is

21  no dispute that Larson does not represent Rosenberg in connection with the Debtor's case.  There

22  _____

23        [37]  As previously discussed at 13, <u>supra</u>, the parties to the Angelus Dismissal Motion are

24  Barry Moore as managing member of Angelus II, and equity holders Barry R. Moore and Janie
   Moore as Co-Trustees of the BAMM Living Trust dated July 16, 2003, and Groth, LLC, CH

25  Pichon, LLC, and Harlan LLC through their managing member John O'Brien.  Although the
   Disqualification Motion is brought solely in the Debtor's case, the court's conclusions herein

26  apply equally to Larson's representation of the moving parties in the Angelus II proceeding.

is no dispute that MAC currently represents John D. O'Brien individually and as Trustee of the John D. O'Brien Profit Sharing Plan, Donald J. Campbell, J. Colby Williams, William Godfrey, Barry R. Moore, Janie Moore, Barry R. Moore and Janie Moore, Co-Trustees of the BAMM Living Trust Dated July 16, 2003, John Esposito, Lorraine Esposito, Mario P. Borini, Bianca Borini, Joseph Borini, and Eroom Holdings, LP in connection with the Debtor's case.  There is no dispute that Larson currently represents John D. O'Brien Profit Sharing Plan and Barry R. Moore and Janie Moore as Co-Trustees of the BAMM Living Trust Dated July 16, 2003, Groth, LLC, CH Pichon, LLC, and Harlan LLC Through Their Managing Member John O'Brien in connection with the Angelus II case.

Given these circumstances, the remaining inquiry under NRPC 1.9(a) is whether MAC's and Larson's prior representation of Lisowski or Rosenberg is substantially related to their current representation of other clients, and whether their current representation is materially adverse to either Lisowski or Rosenberg.  See Nev. Yellow Cab Corp., 123 Nev. at 50, 152 P.3d at 741.  In determining whether counsel's former representation of Lisowski and Rosenberg is substantially related to their current representation of other clients, the focus is on the information obtained during the former representation and the relevance of the information to their representation of the current clients.  See Waid, 119 P.3d at 1223.

### a.    Information from Lisowski.

With respect to former trustee Lisowski, there is no evidence before the court as to any information obtained from the former Chapter 7 trustee that would be relevant to either MAC's or Larson's representation of their current clients in connection with the instant case.[38]  There is no declaration or affidavit from Lisowski, nor even a deposition transcript offered into evidence. None of the declarations submitted on behalf of MAC, Larson or Rosenberg in connection with

---

[38]  Rosenberg attests that MAC and therefore Larson received confidential information from Lisowski, see First Rosenberg Declaration at ¶¶ 28, 32, 34, 35, and 45, but has no personal knowledge of whether Larson did so.

28

1   the Disqualification Motion explain why Lisowski's testimony was not sought, obtained, or

2   elicited.[39]  Thus, the only basis on which Rosenberg can establish that MAC and Larson obtained

3   relevant information from Lisowski is the evidentiary presumption arising from the prior

4   attorney-client relationship.  Whether MAC and Larson have provided sufficient evidence to

5   rebut that presumption will be addressed below.

6                    **b.    Information from Rosenberg.**

7         With respect to current trustee Rosenberg, the record primarily consists of four

8   declarations from Rosenberg as well as the communications gleaned from the declarations

9   submitted on behalf of MAC and Larson.

10                 **(1)    The Rosenberg Declarations.**

11         Of the four declarations, only the First Rosenberg Declaration and Second Rosenberg

12   Declaration refer to any actual or alleged communications between Rosenberg and MAC or

13   Larson.[40]  The relevant paragraphs of the First Rosenberg Declaration state as follows:

14         28.    From January 2012 until June 2013, Larson was privy to information gained by
15              MAC in their representation of the Former Trustee and myself for Gayler's
                bankruptcy estate.  As Larson filed the Reply in Support of Trustee's Motion for
16              Turnover of Non-Exempt Personal Property and Funds Pursuant to 11 U.S.C. §§
                541 and 542 [Dkt. No. 453], it is reasonable to infer that Larson had knowledge of

17

---

18       [39]  There is no representation in any of the declarations that any of the parties attempted to
    subpoena Lisowski to appear at the hearing on the Disqualification Motion.  This may be because
19     none of the parties attempted or even desired to subject any witnesses to direct and cross-
    examination.  Ironically, the day before the hearing on the instant motion, Lisowski personally
20     appeared before this court on September 18, 2013, in connection with a hearing in the SSH
    Proceeding described in note 19, supra.  In connection with the latter hearing, MAC had even
21     filed an objection to the relief being sought by Lisowski, but did not appear at the hearing.  It thus
    appears that Lisowski was available to the parties but for some reason no one thought to obtain
22     his testimony on the information he may have shared with MAC or Larson.

23

24       [40]  Additionally, the declarations are replete with expressions of the current trustee's
    feelings and impressions about aspects of the case, including the motivations of other parties,
25     rather than statements based on personal knowledge.  In response to the Second Hayes
    Declaration, the Third Rosenberg Declaration retracts or "clarifies" several of the statements
26     made by the current trustee in the Second Rosenberg Declaration.

1  Gayler's bankruptcy case and may have been one of the primary attorneys assigned to the case.

2  31.  Larson was present at the February 4, 2013 meeting where I, my counsel and five of MAC's attorneys had very frank discussions regarding everything related to the state court proceedings and bankruptcy matters.

3  32.  Moreover, as Larson filed the Reply in Support of Trustee's Motion for Turnover of Non-Exempt Personal Property and Funds Pursuant to 11 U.S.C. §§ 541 and 542 [Case No. 09-31603-MKN, Dkt. No. 453], it is reasonable to infer that confidential information would have been given to Larson and that Larson had knowledge of Gayler's bankruptcy case and the Adversary Proceeding.

34.  The confidential information MAC received in its representation of the Former Trustee and myself in Gayler's bankruptcy case is directly relevant to the instant matter.

35.  As counsel to the Former Trustee and myself in Gayler's bankruptcy case, MAC obtained information related to Gayler's bankruptcy, Gayler's finances, the Adversary Proceeding, the Trustee's position, and Gayler's position, including information pertaining to Gayler's interest in Angelus II. MAC then used this information to argue that Gayler's interest in Angelus II belonged to Gayler's bankruptcy estate.

36.  Moreover, MAC drafted the majority of the settlement agreement currently pending in Gayler's bankruptcy case, and as such, MAC knows the strengths and weaknesses involved in the settlement.

37.  Larson, having been formerly associated with MAC until just recently, was in privy to the information obtained by MAC as counsel to the Former Trustee and myself.

The relevant paragraphs of the Second Rosenberg Declaration are much more numerous and state as follows:

7.  When I inherited this case from James F. Lisowski, Sr. ("Former Trustee"), my first call was to the Former Trustee. My second call was to special counsel already hired on the case, MAC.

8.  My conversations with MAC began in an unsettling manner. At the first meeting with MAC, I was given a brief introduction to the case and brought up to date by Phillip Aurbach ("Aurbach") and Jessica M. Goodey ("Goodey"). In the course of our discussion, Aurbach let it slip that he was an investor in one of the Gayler entities. I expressed my confusion at how he could be representing the estate when he had a personal pecuniary interest in the outcome of some of the very same property disputes we were litigating in bankruptcy. Aurbach was defensive and implied that because he and his firm had been working for free on contingency this did not matter and the estate was not being harmed.

9.  Aurbach presented me with a copy of the settlement agreement that he had drafted for the Former Trustee. According to Aurbach, the Former Trustee did not see much value in the case because the largest creditor was the IRS and there was unlikely to be any distribution to general, unsecured creditors. Aurbach also indicated that the Former Trustee had, for lack of a better word, abdicated control and decision making authority for the case to him. By way of example, he described how the most recent settlement talks had faired and why they broke down. Essentially, Aurbach indicated that the Former Trustee gave him complete authority, with the need to first run it by the Former Trustee, to negotiate the

30

settlement and accept any terms which Aurbach felt were satisfactory. Apparently, the two sides were within $20,000 of a mutually agreeable number that could be paid to Gayler in cash as part of the settlement - yet, Aurbach independently decided to end settlement negotiations and continue with the litigation. When I asked why an agreement could not be reached when the two sides were so close, Aurbach responded that the creditors would never have accepted it anyway because they did not want to see Gayler get a dime. As such, he unilaterally decided that settlement would not be in the best interest of the estate.

11. Following that meeting, I had many occasions to speak with Goodey who, like me, was new to the case. She provided me with many documents that helped me put the case in perspective, as well enough background for me to oversee the continuing litigation.

12. One document which Goodey provided me was a breakdown of how the proceeds from another Gayler entity, Sunset V, were distributed following action brought against that entity in state court. Because this was one of the entities which Gayler had been manager of prior to bankruptcy, I was surprised to find out that it had been liquidated outside of bankruptcy. More surprising, however, was seeing Aurbach's name among the members who were paid when the Gayler entity was dissolved. Also, MAC was listed as having done the legal work that led to the distribution and it had been paid from the proceeds prior to proportionate shares going back to members.

13. I immediately called Goodey and we discussed how MAC had allowed this entity - which was one of the Debtor's companies that the estate was alleging had been fraudulently transferred and should be property of the estate - to have its rights adjudicated in state court. I asked what participation the bankruptcy estate had in the state court proceedings and was told that, despite having, at the very least, an interest in the proceeds, MAC had not filed any documents in the state court proceedings to stay them or to protect the estate's interest in the proceeds.

21. In regard to the litigation strategy followed, even Aurbach admitted that there had been numerous mistakes and setbacks. Though Aurbach had been in charge of the case, he tried to pin the blame for the estate's misfortunes on a junior attorney who worked for MAC (but had since been fired). Aurbach admitted that he was not as proficient in bankruptcy as in other aspects of the law, but felt that, through trial and error, the estate was slowly gaining traction.

23. The final straw was an interaction that I had with Goodey when we met at MAC's office. During that meeting, Goodey closed the door so she could speak to me privately. Goodey confided that she was very uncomfortable with information she was learning in this case and, like me, she wondered whether MAC was putting the estate's interests first. While I do not remember every detail of our conversation, I left that meeting knowing that Aurbach was not the only member of MAC who personally had a stake in Gayler's entities and a history with the Debtor.

24. After discussing my findings with Howard C. Kim ("Kim"), I told him to arrange a meeting with my attorneys at MAC so I could voice my concerns and hear their explanation. Contrary to the recollection given by MAC, this was not a meeting to get me up to speed on the case.

25. That meeting was held on February 4, 2013. In the meeting, in addition to myself and Kim, the following MAC attorneys were in attendance: Aurbach, Terry Coffing ("Coffing"), Dale Hayes ("Hayes"), Zachariah Larson ("Larson"), and Wakayama.

27. I began the meeting by laying all my cards on the table and telling MAC what I had observed and how I felt that the estate's position has been compromised due to the lack of representation in the state court proceedings.

29. I demanded that MAC disclose to me every attorney at the firm with any relationship or interest that in any manner, no matter how tenuous, could be traced to Gayler. I was then informed that only Hayes and Aurbach had prior dealings with Gayler. Aurbach did not appreciate my tone and candor, and told me that MAC would quit right then and there. I responded that he seemed to be overreacting and that his behavior was not giving me confidence that MAC was competent and should continue to represent the estate. I told MAC that I was going to evaluate the situation and would get back to them.

30. Kim also expressed his confusion and concern with what we had already uncovered. Kim asked Hayes how he can be serving two masters. Hayes replied that the estate and the MAC Creditors have been working together and their interests are presently aligned. Kim asked what happens when our interests diverge and he said that MAC would have to choose a side. Kim corrected him and explained that should that day arrive, the estate would expect MAC to withdraw from representing any and all parties in Gayler.

31. Hayes erupted and began yelling at Kim until Hayes was literally red in the face. At this point, I jumped back into the conversation and asked Hayes to explain to me how his other clients and the estate were aligned and why this was a good thing. Hayes proceeded to explain and Aurbach presented a PowerPoint presentation that diagramed how Gayler's assets were being pursued in the state and bankruptcy court litigation.

32. This where I learned, for the first time, that the state court litigation was getting closer to the day when Gayler's right to proceeds in CH Angelus, LLC ("Angelus I") and CH Angelus II, LLC ("Angelus II") would be arbitrated and potentially extinguished. Hayes admitted that when that moment arrived, the MAC Creditors would obviously be adverse to the estate. I responded that I believed they had always been adverse and that MAC should have been representing the estate in the state court litigation all along. Aurbach did not have a good answer as to why the estate had never made an appearance or filed anything in the state court litigation nor why MAC was comfortable leaving it to Gayler to fight for the estate's share of the money.

33. At this point, I inquired of my lawyers from MAC if there was a way to avoid that irreconcilable conflict that was on the horizon. I asked for ideas and suggested that perhaps the estate might consider settling with the MAC Creditors for some percentage of the proceeds.

34. This is because I felt that the estate's position has been severely compromised due to lack of representation in the state court proceeding. Therefore, I told them it would be better to reach a settlement than to litigate the issues at this stage of the litigation.

35. I asked Wakayama and Hayes to find out what the MAC Creditors would agree to for us to avoid litigation.

36. Wakayama's response of "my clients will never accept that" was the first time that any of the attorneys in the room made a direct statement that suggested that the best interests of the estate were not being put first. Kim chimed in and said, "The Trustee is your client."

37. I ordered her, as my attorney, to present the idea to the MAC Creditors and she reluctantly agreed. By this time, the meeting was pretty much over.

38. After the meeting, over a beer from the private tap at MAC's office, I continued to

talk to Kim, Larson, and Coffing about the case and the estate's challenges and opportunities.  I had this conversation with them because I believed that they were part of the MAC team that represented the estate.

### (2)   The Larson Declaration.

The relevant paragraphs of the Larson Declaration state as follows:

4.   Prior to January 1, 2012, I was a partner in my own firm, Larson & Larson ("L&L").  L&L and I had absolutely no involvement or knowledge of the Gayler bankruptcy or any of the associated matters.

5.   On or about January 1, 2012, I became an independent contractor of Marquis Aurbach Coffing ("MAC"), associated as "Of Counsel."  While employed at MAC, I did not do any work and was not involved in the representation of the Trustee as Special Counsel in the In re Gayler bankruptcy.  I also did not do any work and was not involved in the representation of any of the other creditors in the In re Gayler bankruptcy or in any other matter until on or about December 15, 2012.

6.   I have not made any appearances in the In re Gayler bankruptcy until the filing of this Opposition.  I was not involved in MAC's representation of the Trustee as Special Counsel and I have no knowledge of any confidential information related to MAC's representation of the Trustee as Special Counsel.

7.   Of the 539 documents filed in the In re Gayler bankruptcy, only one was filed under my ECF number, a Reply to the Opposition to the Trustee's Motion for Turnover of Non-Exempt Assets [Dkt.No.453 in the In re Gayler bankruptcy] (the "Reply to Turnover Motion").  The Reply to Turnover Motion was not prepared, reviewed or even discussed with me.  I had no knowledge of the Reply to Turnover Motion.

8.   I was unaware that the Reply to Turnover Motion was filed in the In re Gayler bankruptcy under my ECF number until recent discussions with Mr. Howard Kim, Trustee Rosenberg's counsel, just prior to the filing of the Disqualification Motion.  See a true and correct copy of an E-mail Correspondence from Larson v. Mr. Kim dated July 16, 2013, attached to the opposition as Exhibit A.

9.   Upon review of the Court Docket in the In re Gayler bankruptcy and of the Reply to Turnover Motion after the Disqualification Motion was filed, it is clear that the Reply to Turnover Motion was prepared by Phillip Aurbach and April Bonifatto of MAC and signed by Ms. Bonifatto.  See Dkt.No. 453.  All other documents associated with the Turnover Motion were filed under Ms. Bonifatto's ECF number.  See id.

10.   Again, I was not aware that the Reply to Turnover Motion was filed under my ECF number, nor did I knowingly consent to the use of my ECF number in the filing of that document.

11.   I acknowledge that my ECF number should not have been utilized on a document that I did not author, review or sign.  I set forth these facts related to the use of my ECF number, not to excuse the lapse, but rather to simply advise the Court of my lack of knowledge or authorization of the use of my ECF number on the Reply to Turnover Motion.

12.   On or about December 15, 2012, I was contacted to represent John D. O'Brien Profit Sharing Plan and Counsel for Barry R. Moore and Janie Moore as Co-Trustees of the BAMM Living Trust Dated July 16, 2003, Groth, LLC, CH Pichon, LLC, and Harlan LLC Through Their Managing Member John O'Brien

(the "L&Z Clients") in the In re CH Angelus II, LLC bankruptcy. To date, my involvement has been limited to my representation of the L&Z Clients in the CH Angelus II, LLC bankruptcy.

13. In representing the L&Z Clients in the In re CH Angelus II, LLC bankruptcy, I became aware of facts related to the CH Angelus II, LLC bankruptcy as set forth in the filed Motion to Dismiss, the Declarations and the Reply filed in support thereof [Dkt.Nos. 14, 15, 16, and 24 in the In re CH Angelus II, LLC bankruptcy]. Specifically, that Gayler, without corporate authority, caused a Chapter 7 petition to be filed on behalf of CH Angelus II.

14. I was also advised generally of the August 6, 2009 state court litigation filed in the Eighth Judicial District Court in Clark County, Nevada, Case No. A-09-59677-C ("Angelus II 777 State Court Case") wherein the L&Z Clients filed a complaint against Gayler and others, which sought, among other things, to quiet title of the property owned by Angelus II in the name of the respective LLC.

15. I was also advised generally of the September 25, 2012 state court litigation filed in the Eighth Judicial District Court in Clark County, Nevada, Case No. A-12-668997-B ("Angelus II 997 State Court Case") wherein the L&Z Clients filed a complaint against Gayler and others, which sought, multiple causes of action related to Gayler's unauthorized conduct and setting aside the sale and transfer to a third party.

17. I anticipate that the L&Z Clients will request that either L&Z or MAC file an objection to the Trustee's Motion to Approve Settlement in the In re Gayler matter as it is the Creditors' opinion that the Motion solely benefits the Debtors, his attorneys, and the other individuals who have assisted the Debtor in his malfeasance.

18. On or about February 4, 2013, I attended a meeting at the MAC law offices ("the February Meeting") with Trustee Rosenberg, Trustee's Counsel, Howard Kim, and the following MAC attorneys: Phillip Aurbach, Terry Coffing, Dale Hayes and Liane Wakayama.

19. At the February Meeting, the MAC attorneys present conveyed to Trustee Rosenberg and Trustee's Counsel the status of various proceedings pending that were related to Gayler's malfeasance.

20. I attended to discuss the In re CH Angelus II, LLC bankruptcy and, once again, advised Trustee Rosenberg and his counsel of the factual basis for the claims that Gayler had no corporate authority on behalf of CH Angelus II and was no longer the managing member of CH Angelus II.

21. Trustee Rosenberg and Mr. Kim did not share any confidential information at the February Meeting as both were new to the Gayler matters and had no confidential information to provide. Furthermore, Trustee Rosenberg and Mr. Kim fully consented to the participation of all counsel at the February Meeting, including myself, and never once objected to the participation of any counsel present on the basis of any alleged conflict or on the basis that any alleged confidential information was exchanged.

22. On July 3, 2013, Trustee Rosenberg filed a Motion to Approve Settlement in this matter ("Settlement Motion") requesting the Court to approve a Settlement Agreement between Trustee Rosenberg and Gayler, his Counsel, Jeff Sylvester, and Gayler's alleged cohorts in his fraudulent schemes, Martin Barrett ("Barrett") and Walter Loerwald ("Loerwald"). The Settlement Agreement was signed by Gayler, individually and on behalf of 120 entities, including CH Angelus II, LLC.

29. In light of the fact that the Settlement Agreement benefits Gayler and his counsel and was signed without actual corporate authority from CH Angelus II, LLC and

34

likely many of the other entities, I advised Trustee Rosenberg and this Court of the issues surrounding the self-serving Settlement Agreement and of the possibility that the Settlement Motion would be opposed.

30.   Only after I indicated that the Settlement Motion had been rejected previously by the Creditors of the Gayler estate and that I anticipated that it would, therefore, be opposed did Trustee Rosenberg cry "Conflict."

33.   Trustee Rosenberg has previously stated that he intends to take the position previously taken by Former Trustee Lisowski that the estate's interest in the Gayler entities only exists to the extent that Gayler is found to actually still hold an interest.

### (3)    The Wakayama Declaration.

The relevant paragraphs of the Wakayama Declaration state as follows:

3.   Throughout the course of the past three years, I have worked on the cases filed by MAC on behalf of the Creditors identified in the Opposition involving the Ch. Angelus, LLC; Ch. Angelus II, LLC; Ch. Angelus IV, LLC; and Diamonte Rose, LLC investments (the "Gayler Litigation").

6.   I attended a meeting held on February 4, 2013 at the MAC law offices (the "February Meeting"). The February Meeting was attended by Dale Hayes, Phillip Aurbach, Terry Coffing, Zachariah Larson, Jessica Goodey, Trustee David Rosenberg and Howard Kim. At the time, I understood that the purpose of the February Meeting was to aid Trustee Rosenberg and Mr. Kim in the process of getting up to speed on all of the litigation surrounding William A. Gayler.

7.   During the February Meeting, Mr. Hayes and I explained the procedural posture of the Gayler Litigation. Everything that I communicated to Trustee Rosenberg and Mr. Kim was a matter of public record as all information was accessible on the courts' docket and records. Neither Trustee Rosenberg nor Mr. Kim ever communicated any information to me, confidential or otherwise, in relation to the Gayler Litigation.

8.   After the February Meeting, I authored a letter to Mr. Kim dated February 13, 2013. In this letter, I outlined the discussions primarily held at the February Meeting and also reminded Mr. Kim of the upcoming trial concerning Ch. Angelus, LLC investment. A true and accurate copy of the February 13, 2013 letter is attached hereto as Exhibit A2.

9.   On March 2, 2013, Mr. Kim responded to my February 13, 2013 letter via email. A true and accurate copy of the March 2, 2013 email from Mr. Kim to me is attached hereto as Exhibit B2. As a result of Mr. Kim's March 2, 2013 email, MAC delivered all requested documents and videos associated with the Ch. Angelus IV, LLC lawsuit to Mr. Kim on or about April 24, 2013. A true and accurate copy of the signed Receipt of Copy dated April 24, 2013 is attached hereto as Exhibit C2.

As partially referenced in the above paragraphs, copies of a letter and an email message from Wakayama to Kim and from Kim to Wakayama are attached as Exhibits "A2" and "B2" to the Wakayama Declaration. Also attached as Exhibit "C2" is a copy of a receipt apparently executed by Kim acknowledging delivery of a compact disc containing documents in connection with the

35

929 State Action.

### (4)    The Hayes Declarations.

The relevant paragraphs of the First Hayes Declaration[41] state as follows:

3.      Throughout the years, I have represented and continue to represent John O'Brien, individually and as Trustee of the John D. O'Brien Profit Sharing Plan, Donald J. Campbell, J. Colby Williams, William Godfrey, Barry R. Moore, Janie Moore, Barry R. Moore and Janie Moore, Co-Trustees of the Bamm Living Trust Dated July 16, 2003, John Esposito, Lorraine Esposito, Mario P. Borini, Bianca Borini, Joseph Borini, and Eroom Holdings, LP.

4.      As of April 14, 2011, MAC was prosecuting five different lawsuits on behalf of the parties identified in ¶3 in the Eighth Judicial District Court and William A. Gayler's ("Gayler") bankruptcy proceedings:

   [A table appears in this paragraph listing the following matters pending in the State Court and in the Bankruptcy Court: Moore et al v. Gayler et al, Case No. A562214 filed May 1, 2008; Moore et al v. Gayler et al, Case No. A596777, Moore et al v. Ch. Angelus IV et al, Case No. A616929; O'Brien et al v. Gayler, Adv. No. 11-01027; and Moore et al v. Gayler, Adv. No. 11-01188]

True and accurate copies of all Complaints are attached hereto as Exhibits A1, B1, C1 D1 and E1.

27.     On February 4, 2012, I attended a meeting to discuss the status of the cases outlined herein with the Trustee David A. Rosenberg and his counsel, Howard Kim, Esq.  The meeting also was attended by Liane Wakayama, Terry Coffing, Phillip Aurbach, Jessica Goodey and Zach Larson.  All information that I conveyed to Trustee Rosenberg and Mr. Kim were matters within the courts' public record.  At no time during this meeting did Mr. Rosenberg or Mr. Kim relay any information to me, confidential or otherwise, involving Mr. Gayler, the investments or any strategy that Mr. Rosenberg or Mr. Kim intended to employ as a Trustee and counsel for Mr. Gayler's estate.  Quite frankly, the meeting was designed to bring Mr. Rosenberg and Mr. Kim up to speed with respect to Mr. Gayler and the investments he mismanaged so they could have some understanding of what was involved in the cases.

28.     As one of the Creditors' attorneys, I have never been involved in any settlement discussions with Trustee Rosenberg or Mr. Kim.

The Second Hayes Declaration responds to Rosenberg's Reply and does not expand or

---

[41]  Attached as Exhibits "A" through "Q" of the First Hayes Declaration are copies of various pleadings filed in the State Court as well as in the bankruptcy court, various motions filed and orders and judgments entered, a transcript of a meeting held by members of Angelus I and Angelus II, and a copy of an indictment of the Debtor filed in the State Court on March 5, 2013.

detract from the declarant's prior statements concerning the receipt of confidential information.[42]

### (5)    The Aurbach Declarations.

The relevant paragraphs of the First Aurbach Declaration[43] state as follows:

2.  On May 23, 2011, I was appointed Special Counsel to the Gayler Bankruptcy Trustee, Jim Lisowski (Dkt.No. 205) to recover Assets. I have never served as General Counsel to any Trustee appointed over Gayler's bankruptcy proceedings. Mr. Lisowski was succeeded by David Rosenberg on December 12, 2012. My job was limited to bringing assets into the Bankruptcy estate as a result of fraudulent transfers by Gayler. Throughout my engagement as Special Counsel, from 5/23/11 to today, no confidential facts or strategies were ever conveyed by either Trustee to our firm. Neither Jim Lisowski nor David Rosenberg knew anything about Gayler, his numerous entities, or the elaborate fraud perpetrated against investors. It was my job, as Special Counsel, to conduct an investigation and to draft pleadings to recover those assets, which I did. During my investigation of Gayler, including 29 examinations under Rule 2004 and review of over 45,000 documents (bank records, tax returns and transfer documents), I discovered a massive scheme to hide assets from the bankruptcy estate. All of this information was transmitted to Lisowski and Rosenberg.

3.  In relation to the Ch. Angelus, LLC ("Angelus I"); Ch. Angelus II, LLC ("Angelus II"); Ch. Angelus IV, LLC and Diamante Rose, LLC investments, all information came from MAC's representation of the Creditors identified in the Opposition. As Special Counsel, I did not discover, investigate or obtain any of the facts related to any of those investments other than Gayler's transfer of his membership interests related to those entities.

4.  On December 14, 2012, Jessica Goodey and I met with Rosenberg. We tried to bring him up to speed on this incredibly complex case. During our meeting, Rosenberg specifically brought up the fact that Dale Hayes, also a shareholder at MAC, represented creditors in Gayler's bankruptcy proceedings. Mr. Hayes' function on behalf of his clients was to investigate Gayler's fraud upon them. My function was to uncover fraudulent transfers of assets I believed were assets of Gayler's. Rosenberg alluded to a possible conflict, but did not instruct me to withdraw or take any other action.

5.  The only communication from Rosenberg after the December 14, 2012 meeting were requests for information. We complied and probably sent him over 100mb of information.

6.  In Paragraph 28 of his Declaration, Rosenberg references the fact that Zach

---

[42]  Attached as Exhibit "U" to the Second Hayes Declaration is a copy of certain correspondence from the Debtor dated December 17, 2007, regarding an entity identified as DA 1147 LLC, in which attorney Hayes at one time had an interest.

[43]  Attached as Exhibit "A3" to the First Aurbach Declaration is a copy of the same email from Bonifatto to various creditors that is attached as Exhibit "5" to the Reply. Also attached as Exhibit "B3" to the First Aurbach Declaration is a copy of an email chain from Goodey to Rosenberg and his counsel.

Larson signed the Reply in Support of Trustee's Motion for Turnover of Non-Exempt Personal Property and Funds. To the best of my knowledge, that Motion dealt with different matters than the present dispute regarding settlement terms. Furthermore, Zach Larson was never part of the team acting as Special Counsel. Mr. Larson did not sign the Reply, and his name appears nowhere on the Reply. Only certain MAC attorneys are registered with the bankruptcy court to file documents. I believe that April Bonifatto of our firm was not so registered when this Reply was prepared, so I believe she simply asked Zach Larson to file it for her. The fact that he did so is meaningless.

8. By asserting claims in the Adversary Proceeding involving the Ch. Angelus entities, I was preserving any rights to Gayler's claimed interest in these entities on behalf of the Bankruptcy Estate. When certain creditors requested the Bankruptcy Court to determine that the automatic stay does not apply or grant relief from the automatic stay, my recollection is that Trustee Lisowski directed me to not oppose the request, but instead to allow the creditors to proceed with arbitration and monitor the proceedings.

9. In paragraph 30 of David Rosenberg's Declaration, he states that the majority of the settlement agreement now under consideration was drafted by me. I have no knowledge as to whether that's true or not. In or about January 2012, settlement discussions began between me, as Special Counsel to the trustee, and Gayler's attorney, Sylvester. I did in fact draft a proposed settlement agreement at Jim Lisowski's request. This was sent out to creditors, but several objected so Lisowski directed me not to proceed any further regarding this settlement. A true and accurate copy of the September 24, 2012 email to the creditors is attached hereto as Exhibit A3. Based on the unanimous rejection by the creditors, I ended all settlement negotiations with Gayler and began focusing my efforts on pursuing litigation to recover assets for the Bankruptcy Estate. As Special Counsel, I never advocated for or sought further approval of the rejected settlement. The fact that Rosenberg decided to use the form I had created when he later entered into settlement negotiations with Gayler without my knowledge or participation was totally his decision. The fact that I created the template for the settlement agreement has no significance in my mind.

10. On February 4, 2013, Rosenberg and his attorney, Howard, Kim, came to the MAC offices for a meeting with Dale Hayes, Liane Wakayama, Terry Coffing, Jessica Goodey, Zach Larson and me. The purpose of the meeting was to share with Rosenberg and Kim what we had learned about the case. I put on a PowerPoint to explain Angelus I and II, the litigation to void Alper's $2MM Deed of Trust, and ultimate settlement on appeal with approximately $1.4MM coming from the title company to those entities to split. Much of this information, which was a matter of public record, came from Mr. Hayes and Ms. Wakayama. I discussed what I had learned during my investigation of Gayler's numerous fraudulent transfers and how I was going to prove the fraudulent transfers to recover funds for the estate. Mr. Hayes and Ms. Wakayama summarized all of the litigation they had handled on behalf of the Creditors. To my recollection, all facts and strategies we had developed as Special Counsel for the Trustee were not confidential and were disclosed to all persons present at the February 4, 2013 meeting. This was done with the consent and participation of Rosenberg and Kim. There was no way that Mr. Hayes, Ms. Wakayama or Zach Larson could later take advantage of confidential information somehow transmitted to me, because (1) there was no confidential information; and (2) the facts and law relating to my focus on fraudulent transfers had nothing to do with the Ch.

38

Angelus' investments. All such information was disclosed with Rosenberg's consent.

11.  Ms. Goodey and I were in the middle of a very large motion for summary judgment. We didn't feel comfortable stopping in the middle so we finalized it and filed it with the approval of Rosenberg. A true and accurate copy of the email exchange between MAC and Rosenberg's counsel, Kim, is attached hereto as Exhibit B3.

12.  Since the time of his appointment in December 2012, Rosenberg did not involve me in any settlement negotiations with Gayler, his counsel, Martin Barrett or Walter Loerwald.

13.  Because Rosenberg retained Kim, I ultimately withdrew from acting as Special Counsel to the Trustee. We filed a Motion to Withdraw on April 11, 2013, which was granted on June 10, 2013. I am unaware of any "confidential information" that I received during my representation as Special Counsel to the Trustee which could help or hurt the Trustee relating to anything - especially the removal of Gayler as manager of Angelus II, the filing of the Angelus II bankruptcy, or the settlement agreement.

The relevant paragraphs of the Second Aurbach Declaration state as follows:

1.  Background. Mr. Gayler made a lot of money creating entities (usually limited liability companies ("LLCs")), buying real property for the various LLCs, managing and controlling the LLCs, and, as manager, deciding when to sell the property (usually for a profit) subject to the requisite member approval. Mr. Gayler would own a percentage of each LLC, sometimes individually or through another entity. I believe I had invested with Mr. Gayler, in three or 4 of limited liability companies that Gayler manages: Polyrus, LLC 5% (which may own some of Sunset III); Sunset 8, LLC 2.5%; and Sunset V, LLC 20%. Mr. Gayler's business plan worked well until the real estate downturn. Then, in 2008 and 2009, creditors started suing Gayler. According to his 2004 examination, Gayler saw the downturn in the economy coming in 2008 and 2009.

4.  One of Dale Hayes' clients, John O'Brien, who I had known since 1977 when I started practicing law, passed me in the hallway of one of Maclaw's buildings and told me that Mr. Gayler was about to receive over $100,000, which he believed were assets of the estate, and asked if there was any way I could contact Mr. Lisowski to get that money for the bankruptcy estate instead of allowing it to go to Mr. Gayler. I contacted Mr. Lisowski, and he suggested I get appointed as Special Counsel to help get assets into the bankruptcy estate.

5.  In April 2011, I applied and on May 23, 2011, I was appointed Special Counsel to James Lisowski, (former) trustee of the above-captioned bankruptcy estate, to recover, preserve, and protect assets of the bankruptcy estate (the "Estate") for a 1/3 contingency fee. When I applied to be Special Counsel in May 2011, I did not perceive a conflict since I was going after assets owned by Gayler, individually, pre-bankruptcy, usually fraudulent transfers, to bring them into the estate. On the other hand, the Maclaw creditors were suing to invalidate unauthorized loans entered into by Gayler as Managing Member on behalf of non-bankruptcy entities, Angelus I, Angelus II and Angelus IV. These entities were not owned by Mr. Gayler. Mr. Gayler only claimed to hold membership interests in these entities. If Angelus I, Angelus II and Angelus IV were successful in saving the investment property, Gayler's membership interests would not be wiped out through foreclosure. If the Maclaw creditors were not successful, Mr. Gayler would have

39

no ownership interest to claim in Angelus I, Angelus II, or Angelus IV because the investment properties would be gone.  Thus, the interests of the Maclaw creditors and the bankruptcy estate were aligned - save for the investment properties.  There was no conflict.

Paragraphs 7, 8, 9 and 11 of the Second Aurbach Declaration consist of tables setting forth point-by-point responses to both paraphrased and quoted portions of Paragraphs 8, 9, 10, 13, 14, 17, 18, 27, 28, 29 and 30 of the Second Rosenberg Declaration.

        **c.**        **Summary of the Evidentiary Record.**[44]

The scope of MAC's representation as special counsel was dictated by the MAC Employment Order.  That order approved the MAC Employment Application and specified that MAC would be employed for a one-third contingency fee based on the gross recovery of any settlement.  The MAC Employment Application specified that MAC would be employed "for the purpose of investigating and proceeding with specific litigation issues regarding multiple potential fraudulent conveyance actions and/or preference actions."  There is some indication in the record that MAC may have performed services beyond simply fraudulent conveyance and preference actions, e.g., filing the Dominus Sale Motion, but there is no indication that the MAC Employment Order was modified at any point during MAC's tenure as special counsel to Lisowski and Rosenberg.

As to former trustee Lisowski, Rosenberg speculates that MAC and Larson may have received confidential information from Lisowski, see First Rosenberg Declaration at ¶¶ 28, 32, 34, 35, 36 and 37, but he has no personal knowledge of any such exchange.  Rosenberg attests that he immediately contacted Lisowski after being assigned the case, but does not describe even in the vaguest terms what information was provided by Lisowski to MAC or Larson.  There is no declaration or affidavit from Lisowski to support the current trustee's assertions.  It does not appear that a 2004 Examination or deposition of Lisowski was taken or that any effort was made

---

[44] For ease of reference, the meeting between counsel that took place on February 4, 2013, will be referred to as the "February Meeting."

40

1  to subpoena Lisowski to testify at the hearing on the Disqualification Motion.  No emails or

2  correspondence, redacted or unredacted, between Lisowski and MAC or Larson were offered into

3  evidence to establish a pattern of sharing confidential information.[45]

4      As to current trustee Rosenberg, he attests that MAC received confidential information

5  from him, see First Rosenberg Declaration at ¶¶ 34 and 35, and that Larson was privy to that

6  information.  Id. at ¶ 37.  He attests that he had an initial meeting with Aurbach and Goodey, see

7  Second Rosenberg Declaration at ¶¶ 8 and 9, and several additional discussions with Goodey.  Id.

8  at ¶¶ 11, 12, 13 and 23.  He also indicates that he participated in the February Meeting with

9  Aurbach, Coffing, Hayes, Wakayama, Goodey, Larson and Kim.  Id. at ¶¶ 24, 25, 27, 29, 30, 31,

10  32, 33, 34, 35, 36, 37 and 38.

11      Aurbach attests that neither Lisowski nor Rosenberg conveyed any confidential

12  information or strategies to MAC, see First Aurbach Declaration at ¶ 2, that after December 14,

13  2012, the only communications from Rosenberg were requests for information that was provided

14  by MAC, see id. at ¶ 5, that no confidential information was shared at the February Meeting, see

15  id. at ¶ 10, and that he generally is not aware of any confidential information received by MAC as

16  special counsel to the bankruptcy estate.  Id. at ¶ 13.  Hayes attests that no confidential

17  information was received from Rosenberg or Kim at the February Meeting.  See First Hayes

18  Declaration at ¶ 27.  Wakayama also attests that no confidential information was communicated

19  by Rosenberg or Kim at the February Meeting, see Wakayama Declaration at ¶ 7, and that she

20  thereafter provided documents to Kim regarding the Angelus IV Action.  Id. at ¶ 9.  Larson

21  attests that he never had any involvement in the Debtor's bankruptcy at MAC until he was

22  contacted in connection with the Angelus II bankruptcy, see Larson Declaration at ¶¶ 4, 5 and 12,

23

24      [45]  This is somewhat unexpected because Lisowski's law firm also served as general
25  counsel to the Debtor's bankruptcy estate and MAC was special counsel.  One could reasonably
    expect to find a record that activity between the law firms was being coordinated in some aspect
26  to prevent duplication of efforts and expenses in representing the bankruptcy estate.

41

1 and that no confidential information was shared by Rosenberg or Kim at the February Meeting.

2 Id. at ¶ 21.

3     **d. Conclusion under NRCP 1.9.**

4    In this case, MAC's failure to disclose Aurbach's current financial connections with the

5 Debtor was an egregious violation of FRBP 2014(a).  The Aurbach Verified Statement

6 accompanying the MAC Employment Application represented that Aurbach had no connections

7 with the Debtor, his creditors or other parties in interest even though the Aurbach RAS

8 Declaration revealed that Aurbach had a 20% interest in Sunset V.  And even that was not

9 Aurbach's only financial connection as he only disclosed in response to the Disqualification

10 Motion that he also had an interest in Polyrus, LLC, Sunset 8, LLC, and possibly Sunset III, LLC

11 (through Polyrus, LLC).[46]  In view of those connections, neither Aurbach nor MAC were

12 disinterested persons within the meaning of Section 101(14), and so could not have been

13 employed by the bankruptcy estate under Section 327(a).  While special purpose counsel may be

14 employed under Section 327(e), MAC's failure to comply with FRBP 2014(a) likely would have

15 required disqualification from further employment and denial of compensation.

16    But in this case, MAC already has withdrawn as special counsel and is not seeking

17 compensation from the estate.  Instead, the current trustee seeks to disqualify MAC from

18 representing creditors of the estate based on MAC's previous representation as special counsel to

19 Lisowski and Rosenberg.  For the same reason, Rosenberg also seeks to disqualify Larson from

20 representing certain creditors of the estate.

21    As previously discussed, Rosenberg as the moving party has the burden of establishing

22

23

24 _____

25  [46]  Hayes also had a prior financial connection to the Debtor through his investment in
DA 1147 LLC, see note 42, supra, which was required to be disclosed under FRBP 2014(a).  See
26 Park-Helena Corp., 63 F.3d at 882.

that MAC and Larson are in violation of NRPC 1.9.[47]  See SHFL Entm't, Inc. v. DigiDeal Corp.,

2013 WL 178130 at *8; Robbins v. Gillock, 109 Nev. at 1017, 862 P.2d at 1197.

 The scope of MAC's representation of both Lisowski and Rosenberg was dictated by the

MAC Employment Order.  The court can infer that Lisowski may have given confidential

information to MAC in connection with MAC's investigation and pursuit of fraudulent transfer

and preferential transfer actions.  The record establishes that MAC did, in fact, commence the

Golden Sunray Action on behalf of Lisowski seeking, inter alia, the avoidance of fraudulent

transfers under Section 548(a)(1)(a) and postpetition transfers under Section 549(a).[48]  Other than

the inference that may be drawn from the attorney-client relationship, however, there is no

evidence in the record to establish that Lisowski provided confidential information to MAC or

discussed strategies regarding his management of the litigation.  Additionally, none of the

exhibits in the record that may have been created during the period of Lisowski's tenure as

former trustee, see Exhibit "A3" to First Aurbach Declaration, Exhibits "A1" through "M1" to

First Hayes Declaration, Exhibit "U" to Second Hayes Declaration, Exhibit "1" to

Disqualification Motion, and Exhibits "3" through "5" to Reply, evidence the exchange of

---

[47]  NRPC 1.9(a) allows a client to consent in writing to former counsel's representation of another person in the same or substantially related matter.  NRPC 1.9 does not specify, however, the mechanism for the parties to resolve disputes over former client conflicts.  An obvious solution would be for former counsel to simply not represent the new client.  But for former counsel motivated by loyalty to the new client, animus towards the old client, or simply greed, NRPC 1.9 offers little guidance other than "don't do it."  Seeking an advisory opinion from Nevada Office of Bar Counsel may be of limited utility due to the nature of the potential disclosures that would be required.  For the same reason, commencing a lawsuit in the nature of declaratory relief might itself be in violation of the confidences of the former client.  So former counsel typically is left to wait until its former client affirmatively seeks a court order disqualifying counsel.  It is little wonder that disqualification motions, such as this one, draw so much attention and rancor.

[48]  The record indicates that MAC later amended the complaint in the Golden Sunray Action on May 20, 2012, to include a claim under Section 727(a)(6) to deny the Debtor's discharge.  See discussion at 10 and 14 n.20.

1  confidential information between Lisowski and MAC.  Compare LaSalle Nat'l Bank v. Cnty, of

2  Lake, 703 F.2d at 254 and 256 (former counsel's access to written memoranda and documents to

3  prepare formal legal opinion for county defendant); SHFL Entm't, Inc. v. DigiDeal Corp., 2013

4  WL 178130 at *10-11 (patent marking memorandum prepared by former counsel with

5  confidential information from employees; emails between former counsel and employees

6  regarding policies, procedures and strategies).

7       Based on the MAC Employment Order, the court also can infer that Rosenberg may have

8  given confidential information to MAC in connection with MAC's investigation and pursuit of

9  fraudulent transfer and preference actions.  As previously discussed at note 10, however, the

10  deadline for such actions to be commenced on behalf of the bankruptcy estate elapsed on March

11  29, 2012, well before Rosenberg became the current trustee on December 12, 2012.  So as of the

12  date on which Rosenberg became the successor trustee, MAC had commenced all of the

13  avoidance actions encompassed by the MAC Employment Order.

14       Other than the inference that may be drawn from the continued attorney-client

15  relationship between MAC and Rosenberg as successor trustee of the bankruptcy estate, there is

16  no evidence in the record to clearly establish that Rosenberg provided confidential information to

17  MAC or Larson, or discussed strategies regarding his oversight of the existing litigation.  As to

18  Larson, Rosenberg attests only to his belief that Larson was privy to the information that MAC

19  obtained from the bankruptcy trustees.  See First Rosenberg Declaration at ¶¶ 28 and 31.

20  Rosenberg attests that he "began the [February Meeting] by laying all of my cards on the table,"

21  see Second Rosenberg Declaration at ¶ 27, and that the participants "had very frank discussions

22  regarding everything related to the state court proceedings and bankruptcy matters," see First

23  Rosenberg Declaration at ¶ 31, but provides no indication that private information or litigation

24  strategies were discussed.  Likewise, his testimony concerning his interactions with Aurbach and

25  Goodey prior to the February Meeting, see Second Rosenberg Declaration at ¶¶ 8, 9, 11, 12, 13,

26  21 and 23, as well as his animated description of the events at the February Meeting, id. at ¶¶ 29,

44

1  30, 21, 32, 33, 34, 35, 36, 37 and 38, do not state that Rosenberg provided any information at all

2  to Aurbach, Hayes, Goodey, Coffing, Wakayama or Larson.  Additionally, the exhibits in the

3  record that were created after Rosenberg became the successor trustee, see Exhibit "B3" to First

4  Aurbach Declaration, Exhibit "A" to Larson Opposition, Exhibits "A2" through "C2" to

5  Wakayama Declaration, Exhibits "N1" through "Q1" to First Hayes Declaration, Exhibits "R"

6  through "T" to MAC Supplement, and Exhibit "2" to Reply, do not evidence the exchange of

7  confidential information between Rosenberg and MAC.

8          By contrast, Aurbach, Hayes, Wakayama, and Larson are categorical in denying their

9  receipt of any confidential information from either Lisowski or Rosenberg.  Aurbach and Larson

10  provide the only competent testimony regarding Lisowski's communications with MAC or

11  Larson, and both deny that any confidential information was received.  See First Aurbach

12  Declaration at ¶ 2; Larson Declaration at ¶¶ 6, 7 and 12.  Apparently, only attorney Bonifatto

13  assisted Aurbach in representing Lisowski and there is no contrary testimony from Bonifatto.

14  More important, as previously emphasized, there is no contrary testimony from Lisowski.

15          With respect to communications after Rosenberg's appointment as successor trustee on

16  December 12, 2012, Aurbach and Larson are joined by Hayes and Wakayama in their denial of

17  receipt of confidential information from Rosenberg.  Although Rosenberg apparently had several

18  private communications with Goodey, see Second Rosenberg Declaration at 11, 12, 13 and 23,

19  and Goodey participated in the February Meeting, there is no testimony from Goodey to support

20  either Rosenberg's or MAC's characterizations.  Finally, attorney Kim is counsel for the current

21  trustee, was present at the February Meeting, and has interacted with Larson, Wakayama, Hayes

22  and Aurbach.  Yet there is no declaration from Kim attesting in any way that confidential

23  information was shared by Rosenberg or Kim with any of the MAC attorneys or Larson.

24          In this instance, Rosenberg, MAC and Larson eschewed an evidentiary hearing where the

25  differences and discrepancies in the witnesses' testimony could be addressed.  All of them

26  waived their respective opportunities to cross-examine witnesses.  As a result, the court will

1  accept the written testimony for its probative value in light of the burden placed on Rosenberg as

2  the party seeking disqualification, as well as the burden on MAC and Larson to rebut the

3  inference of receipt of confidential information.

4      For the reasons discussed, the court concludes that MAC and Larson have sufficiently

5  demonstrated that they were not privy to confidential information or strategies of Lisowski or

6  Rosenberg during their tenure as special counsel.  Any inference of receipt of confidential

7  information as a result of their prior representation of the bankruptcy trustees has been rebutted.

8  Additionally, Rosenberg has failed to independently establish that MAC or Larson received

9  confidential information.  As a result, Rosenberg has not met his burden under NRPC 1.9(a) of

10  establishing that the MAC and Larson's former representation is substantially related to their

11  representation of their current clients.  As a further result, firm-wide disqualification under

12  NRPC 1.10 does not apply.

13      **2.    <u>Rosenberg's Waiver or Consent.</u>**

14      In addition to maintaining that it received no confidential information from the trustees,

15  MAC argues that Rosenberg consented at the January 23 Hearing in the Angelus II case to

16  MAC's continued representation.  <u>See</u> MAC Opp. at 30:17-23.  MAC asserts that Rosenberg

17  made a written waiver of any objection because the oral representations of his counsel at the

18  hearing were recorded.  <u>See</u> MAC Opposition at 30:12-16.  Additionally, MAC argues that

19  Rosenberg waived any objection by unduly delay in seeking disqualification.  <u>See</u> MAC

20  Opposition at 38:13 to 39:12.

21      Larson argues that Lisowski consented to the employment of MAC with full knowledge

22  of MAC's representation of various creditors.  Larson argues that Lisowski's consent should be

23  extended to Rosenberg.  <u>See</u> Larson Opp. at 18:14-22.  Larson also maintains that by allowing

24  MAC to file the first partial summary judgment motion in the Golden Sunray Action, Rosenberg

25  consented to Larson's clients moving forward in state court to determine their interests in

26  Angelus I and Angelus II.  <u>Id.</u> at 18:23-26.  Like MAC, Larson further argues that Rosenberg

1   consented in writing to MAC's continued employment as special counsel because previous court

2   hearings were recorded at which Rosenberg did not object.  Id. at 18:26-28.

3         The representations made by Kim at the January 23 Hearing do not establish that Kim

4   waived on behalf of Rosenberg any objection to MAC's continued employment.  In response to

5   the court's inquiry as to Rosenberg's retention of counsel in the case, attorney Kim stated as

6   follows: "And he's staying with Marquis & Aurbach because they've been working on this case

7   for over two years.  I know for a fact that Mr. Rosenberg has been meeting with Mr. Aurbach

8   himself several times to try to come up to speed on this case because there were no documents

9   provided and missing a lot of important information, so he's just now got in touch with Mr.

10   Lisowski there to try to communicate about this case your Honor."  Jan23 Transcript at 13:23 to

11   14:12.  In response to the court's inquiry into whether Rosenberg was thinking about replacing

12   MAC as special counsel, Kim stated as follows: "Your Honor, without going out on a limb, I

13   don't think so, your Honor, because Marquis & Aurbach was hired on a contingency basis.  My

14   understanding is that they have expended over $900,000 in fees and costs so far, and it would be

15   very burdensome for someone else to come up to speed on this case, although, you know, the

16   parties have discussed their potential conflict arising from representing both sides of the fence, so

17   to speak.  But I can represent to the Court that Mr. Rosenberg is inclined to stay with Marquis &

18   Aurbach for now, your Honor."  Id. at 14:15 to 15:4.  At most, these statements reflect that

19   Rosenberg had not yet decided whether to retain MAC as special counsel, but do not constitute a

20   waiver of any conflict or binding consent to continued representation.

21         Rosenberg's delay in seeking disqualification of MAC and Larson is not unreasonable

22   under the circumstances.  All parties to the instant motion concede that the Debtor's case is

23   complex, involving multiple actions in State Court and in the bankruptcy court, as well as

24   multiple cases and contested matters.  Complete details of MAC's financial connections with the

25   Debtor were not fully disclosed to the court, if at all, until after the Disqualification Motion was

26   filed.  Having created the predicament by violating the disclosure requirements of FRBP 2014(a),

47

1    MAC is in no position to argue that Rosenberg has been unreasonable in seeking disqualification

2    after attempting to sort through the complexities of the case.[49]  Although unreasonable delay may

3    warrant denial of an otherwise meritorious disqualification motion, see Ipatt Grp., Inc. v. Scotts

4    Miracle-Gro Co., 2013 WL 3043677 at *6 n.6 (D.Nev. Jun17, 2013), the delay in the instant

5    matter was not unreasonable.

6        With respect to Lisowski's initial employment of MAC as special counsel, there is no

7    indication that Lisowski was aware of Aurbach's existing financial connections to the Debtor or

8    of Hayes' prior financial connection.  Only Aurbach's name appears on the MAC Employment

9    Application and the accompanying Aurbach Verified Statement did not disclose the financial

10   connections.[50]  As previously reflected with respect to the purported sharing of confidential

11   information, the parties to this Disqualification Motion refer to Lisowski's involvement when it

12   serves their purposes, but none of the parties have offered testimony from Lisowski to support

13

14       [49]  MAC argues that after the February Meeting, it has been paid $325,629.40 in legal fees

15   and costs by its clients, the majority of which is attributable to preparation for the trial in the 929
     State Action.  See MAC Opposition at 38:17-20 and Wakayama Declaration at ¶ 5.  The true

16   significance of this amount is that it illustrates the enormity of the risk that MAC visited upon the
     O'Brien group of clients when it took Lisowski on as an additional client while violating the

17   disclosure requirements of FRBP 2014(a).  The risk is magnified given that since 2008, the
     creditor clients apparently paid MAC over $1,400,000 in attorneys fees and costs for their

18   services in connection with the Debtor.  See MAC Opposition at 41:4-8.  The record does not
     reflect whether the O'Brien group of clients was informed that MAC would seek to be employed

19   by Lisowski and, more important, the possible consequences if MAC did not properly obtain
     court approval.

20

21       [50]  The Aurbach Verified Statement bears a signature date of April 11, 2011, but was not

22   electronically filed, along with the MAC Employment Application, until April 14, 2011.  The
     Aurbach RAS Declaration in which Aurbach disclosed his interest in Sunset V bears a signature

23   date of April 13, 2011, corresponding to the date the 65% Owners RAS Motion was filed.  If
     Lisowski signed the MAC Employment Application on the same date the Aurbach Verified

24   Statement was executed, it would have been before the Aurbach RAS Declaration was signed
     and filed.  Thus, the court cannot infer that Lisowski was aware or put on notice of Aurbach's

25   financial connection to the Debtor based on the sequence in which the Aurbach RAS Declaration

26   and MAC Employment Application were filed.

48

1   their factual assumptions.  On this record, the court cannot conclude that Lisowski knowingly

2   waived any objections to MAC's initial or continued employment as special counsel.  Lisowski's

3   purported waiver or consent therefore cannot be extended to Rosenberg.

4         As to the MAC's filing of the first partial summary judgment motion in the Golden

5   Sunray Action, Larson appears to be referring to a footnote buried on the last page of the motion.

6   That footnote states in part that "The Trustee recognizes that certain creditors have sought relief

7   from the automatic stay to proceed with an arbitration to determine whether or not Gayler, pre-

8   bankruptcy, sold his interests in Ch. Angelus and Ch. Angelus II."  GS MSJ-1 at 28 n.131.

9   Nothing in that language or the balance of that footnote, however, sets forth Rosenberg's express

10   or even implied consent to Larson's or MAC's clients proceeding forward in the 777 State

11   Action.

12         Even more overreaching than the waiver or consent arguments are counsel's contention

13   that Rosenberg gave a written waiver or consent because the January 23 Hearing was recorded.

14   Although MAC's counsel represented at the hearing that he had caselaw to support this

15   argument, counsel could only refer to NRPC 1.0(b) or 1.0(n) rather than any relevant judicial

16   decision.  The language of NRPC 1.0, however, simply does not support the conclusion asserted

17   by MAC and Larson.

18         NRPC 1.0(b) defines "confirmed in writing" to mean "informed consent" given in

19   writing.  NRPC 1.0(n) defines "writing" or "written" to include a record of a communication or

20   representation by print or recording, and a "signed" writing to be an expression of the parties'

21   intent to sign the writing.  As previously discussed, Kim's statements at the January 23 Hearing

22   were not a conflict waiver nor a binding consent to continued representation by Rosenberg.

23   Nothing in NRPC 1.0 transforms those statements into a written waiver or consent.

24         Notwithstanding Rosenberg's failure to meet his burden of proof under NRPC 1.9(a),

25   neither he nor Lisowski waived their ability to object.

26         **3.**      <u>**Prejudice to Creditors.**</u>

1    If Rosenberg had demonstrated that MAC is privy to confidential information or

2    strategies of its former clients under NRPC 1.9(a), MAC's remaining argument is that

3    disqualification would unduly prejudice its current clients.  See MAC Opposition at 40:21 to

4    41:3, citing, Brown v. Eighth Judicial District Court ex rel. Cnty. of Clark, 116 Nev. 1200, 1205,

5    14 P.3d 1266, 1269-70 (Nev. 2000); In re Jet 1 Center, Inc., 310 B.R. 649, 654 (Bankr.M.D.Fla.

6    2004); and Millen v. Eighth Judicial District Court ex rel. Cnty. of Clark, 122 Nev. 1245, 1256,

7    148 P.3d 694, 701-02 (Nev. 2006).  Outside of the bankruptcy context, courts considering

8    disqualification of opposing attorneys are asked to balance certain "...competing interests: the

9    individual right to be represented by counsel of one's choice, each party's right to be free from

10   the risk of even inadvertent disclosure of confidential information, and the public's interest in the

11   scrupulous administration of justice."  Brown v. Eighth Judicial District Court, 116 Nev. at 1205,

12   14 P.3d at 1270.  Included in this balance are "the prejudices that will inure to the parties as a

13   result of [the court's] decision."  Id.

14   None of the cases cited by MAC, however, involved counsel appointed as a bankruptcy

15   professional under Section 327 required to make the disclosures set forth in FRBP 2014(a).

16   Unlike other professionals whose loyalties are limited to their specific clients, attorneys

17   employed by a bankruptcy trustee have fiduciary responsibilities to all creditors of the bankruptcy

18   estate.  See In re Taxman Clothing Co., 49 F.3d at 314.  To determine whether a proposed

19   attorney has any conflicts that jeopardize counsel's ability to act as a fiduciary to all creditors,

20   FRBP 2014(a) requires counsel to disclose all present and past connections with the debtor,

21   creditors, and other parties in interest, as well as their respective attorneys and accountants.  See

22   Park-Helena Corp., 63 F.3d at 882.  All financial connections must be disclosed.  See Maximus

23   Computers, Inc., 278 B.R. at 195-96.  It is the bankruptcy court, not proposed counsel, that

24   determines whether counsel's connections disqualify the professional from the proposed

25

26

50

1  employment.  See Sundance Self Storage-El Dorado LP, 482 B.R. at 630-31.[51] Attorneys who fail

2  to make the disclosures required by FRBP 2014(a) are subject to disqualification, see Plaza Hotel

3  Corp., 111 B.R. at 891, and denial of compensation.  See Park-Helena Corp., 63 F.3d at 882.

4        In a bankruptcy context, the parties who may be prejudiced by potentially faithless

5  conduct of a trustee's former counsel are far greater in number than typical litigation between a

6  discrete set of adversaries.  In a bankruptcy context, a party's choice of counsel may be impacted

7  by the specific requirement that the same counsel fully disclose connections with other parties

8  and interests.  In a bankruptcy context, the public interest in the scrupulous administration of

9  justice is safeguarded through the fiduciary responsibility committed to the trustee and chosen

10  counsel.

11        Balancing all of the foregoing considerations, the court is not persuaded that the prejudice

12  to MAC's current clients necessarily outweighs the severity of MAC's failure to comply with

13  FRBP 2014(a).  If it was necessary to make this determination, the court would require MAC's

14  current clients to submit additional evidence of the impact of disqualification through separate

15  legal counsel.  Because Rosenberg failed to demonstrate that MAC received confidential

16  information warranting disqualification under NRPC 1.9(a), however, such evidence will not be

17  required.

18                                    **CONCLUSION**

19        Based on the foregoing, the Disqualification Motion will be denied.  A separate order has

20

21        [51] FRBP 2014(a) directs proposed counsel to submit a verified statement setting forth

22  counsel's connections with specified parties.  It does not invite, much less require, counsel to
   state whether counsel is a "disinterested person" within the meaning of Section 101(14) for

23  purposes of Section 327(a) or whether counsel represents or holds "any interest adverse" to the
   debtor or the estate under Section 327(e).  Those determinations are made by the court and not by

24  counsel.  It is for this reason that the typical methods used by a law firm in checking for client
   conflicts may be insufficient for attorneys who seek to be employed under Section 327.

25  Unfortunately, whatever method was used by MAC in this case was insufficient to meet the

26  requirements of FRBP 2014(a).

1   been entered concurrently herewith.

2

3   Notice and Copies sent through:

4          CM/ECF ELECTRONIC NOTICING AND/OR BNC MAILING MATRIX

5   and sent via FIRST CLASS MAIL BY THE COURT AND/OR BNC to:

6          WILLIAM A GAYLER
           9960 WEST CHEYENNE AVENUE, SUITE 160
7          LAS VEGAS, NV 89129

8
           John O'Brien
9          Marquis Aurbach Coffing
           Attn: David A. Colvin, Esq.
10         10001 Park Run Drive
           Las Vegas, NV 89145
11
           April Bonifatto, Esq.
12         Marquis Aurbach Coffing
           10001 Park Run Drive
13         Las Vegas, NV 89145

14
           Albert Marquis, Esq.
15         Marquis Aurbach Coffing
           10001 Park Run Drive
16         Las Vegas, NV 89145

17
           James Patrick Shea, Esq.
18         Erika M. Wright, Esq.
           Shea & Carlyon, Ltd.
19         701 Bridger Ave., Suite 850
           Las Vegas, NV 89101
20
           John R. McMillan, Esq.
21         Jessica K. Marsh, Esq.
22         FLANGAS MCMILLAN LAW GROUP
           3275 S. Jones Blvd., Suite 105
23         Las Vegas, NV 89146

24

25

26

Jacqueline A. Gilbert, Esq.
Katherine C.S. Carstensen, Esq.
Howard Kim & Associates
400 N. Stephanie St., Suite 160
Henderson, NV 89014

# # #